**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GLOBAL DIRECT SALES, LLC, PENOBSCOT INDIAN NATION, CHRISTOPHER RUSSELL, and RYAN HILL,<br><br>Plaintiffs,<br><br>-v-<br><br>AARON KROWNE, individually, and d/b/a THE MORTAGE LENDER IMPLODE-O-METER and ML-IMPLODE.COM, KROWNE CONCEPTS, INC., IMPLODE-EXPLODE HEAVY INDUSTRIES, INC. JUSTIN OWINGS, KRISTA RAILEY, STREAMLINE MARKETING, INC. and LORENA LEGGETT,<br><br>Defendants. | )<br>)<br>) Case No.: 8:08-cv-02468<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Assigned:<br>) Hon. Deborah K. Chasanow<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**SPECIAL MOTION TO DISMISS PURSUANT TO**
**MARYLAND COURTS AND JUDICIAL PROCEEDINGS § 5-807**

> Saul Ewing, LLP
> Lockwood Place
> 5000 East Pratt Street, Suite 900
> Baltimore, MD 21202-3171
> (410) 332-8756
>
> Julie S. Turner, Esq. (*pro hac vice*)
> TURNER BOYD LLP
> 2625 Middlefield Road, No. 675
> Palo Alto, CA 94306
> (650) 494-1530
>
> *Attorneys for Defendants Implode-Explode*
> *Heavy Industries, Inc. and Krowne*
> *Concepts, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. I

I. INTRODUCTION ............................................................................... 1

II. BACKGROUND ................................................................................. 1

    A. Factual Background ............................................................... 1

    B. Procedural History .................................................................. 4

III. ARGUMENT ....................................................................................... 5

    A. The Maryland Anti-SLAPP Statute is Applicable Because it Does Not Directly Conflict with Any Federal Rule and the Balance of Interests Weighs in Favor of Its Application ............. 5

        1. There is no direct conflict created by applying section 5-807 in the present action.......................................... 5

        2. This court must apply Maryland's anti-SLAPP provision because the state interests in its application vastly outweigh any Federal interests implicated............................................................................. 6

    B. Plaintiffs' Case is a Strategic Lawsuit Against Public Participation, and Is Barred by Maryland's Anti-SLAPP Statute ...................................................................................... 8

        1. Plaintiffs' suit is a SLAPP suit as defined by section 5-807, as it targets speech materially related to protected communication with the public at large and is intended to inhibit that speech..................................... 8

        2. Defendants are immune from civil liability because their communications address a matter within the authority of a government body and lacked constitutional malice. ............................................................ 12

IV. CONCLUSION .................................................................................. 14

I.     **INTRODUCTION**

Plaintiffs Global Direct Sales, LLC, the Penobscot Indian Nation, Christopher Russell, and Ryan Hill (collectively and hereinafter referred to as "the Plaintiffs") filed this lawsuit alleging defamation based on an article posted on a website owned and operated by defendant Implode-Explode Heavy Industries, Inc. (IEHI).

Defendants Krowne Concepts, Inc. and Implode-Explode Heavy Industries, Inc. (collectively and hereinafter referred to as "the Defendants") bring this motion to dismiss Plaintiffs' action under Maryland's anti-SLAPP law, codified as Section 5-807 of the Maryland Code Annotated, Courts and Judicial Proceedings.

Plaintiffs' suit is directed at protected expression materially related to Defendants' communication with the public at large regarding an issue of public concern, and is intended to inhibit such expression. Plaintiffs' case is therefore a Strategic Lawsuit Against Public Participation ("SLAPP suit") as defined in Maryland law, and should be dismissed. See Md. Code Ann., Cts. & Jud. Proc. § 5-807.

II.    **BACKGROUND**

A.    **Factual Background**

The article at the center of this lawsuit concerns the use of seller-financed down payment assistance programs, which allow prospective home buyers with insufficient money for a down payment to qualify for Federal Housing Administration (FHA)-insured loans. FHA-insured loans normally require that the buyer make a down payment of at least three percent of the total purchase price. In seller-financed down payment assistance programs (DAPs), the seller provides the necessary funds to the buyer, either directly or indirectly through a third-party organization. The Government Accountability Office ("GAO") and the Department of Housing and Urban Development ("HUD")

reported in 2005 that such programs result in both inflated sale prices and higher default rates. (Declaration of Julie Turner ("Turner Decl.") Ex. A). These programs have been described as "scams" by the IRS, and have been subjected to regulation by the FHA and Congress. (Turner Decl., Ex. B). Two weeks after this lawsuit was filed, new FHA regulations directly prohibited the direct seller grants provided by Plaintiffs' Grant America Program and described in the article at issue in this suit ("the Article"). The Grant America Program ceased operations on December 31, 2008. (Turner Decl., Ex. C).

In 2006, Defendant Aaron Krowne created the Mortgage Lender Implode-O-Meter website (the "Website"), with the purpose of educating the public about the stability of the housing finance sector. The Website's early warnings about instability in the housing sector and its prognostications about an impending collapse proved accurate less than a year later when the sub-prime mortgage market imploded. The effects of this collapse spread through this country's financial sector, resulting in the loss of billions of dollars in investment capital and the collapse of numerous banks and financial firms. (See Turner Decl., Ex. L).

Beginning in June of 2008, Krista Railey began research on the topic of a down payment programs—including the Plaintiffs' Grant America Program. (Turner Decl., Ex. D at ¶ 24). On September 9, 2008, Ms. Railey wrote an Article, which represented the culmination of her research regarding these programs. A pre-final draft of the Article was posted inadvertently on the publicly available portion of the Website. (Turner Decl., Ex. D at ¶¶ 27-28). Ms. Railey thoroughly researched the article in the course of its preparation. Her source material included, among other things, transcripts from Congressional hearings about the Plaintiffs, articles in reputable papers such as the New

2

York Times and Forbes Magazine, registrations of websites connected with Plaintiffs, and reports about down-payment assistance programs (DAPs), FHA insurance, tax treatment of DAPs, and related topics. (Turner Decl., Ex. D at ¶ 32).

On September 10, 2008, Christopher Russell submitted a comment regarding the posted draft of the Article, making a blanket and unfounded accusation of defamation by libel. (Turner Decl., Ex. F). The comment explicitly declined to identify any alleged factual inaccuracy or errors. However, it did threaten to sue if the article in its entirety was not removed. (Turner Decl., Ex. F). Mr. Russell warned that the Defendants should "Spend the money for a good lawyer because I use the best and I am coming after you hard." He also warned that his company had presumably collected over $250,000 of judgment against another person by "allow[ing] him to make monthly payments. I won't be so generous with your 'scam' blog." (Turner Decl., Ex. F.)

A revised version of the article was posted on September 15. (Turner Decl., Ex. D at ¶ 30). Both the original draft and the revised draft included hyperlinks to over 20 documents and sources used in writing the article, so that readers could verify the accuracy of the facts reported therein. (Turner Decl., Ex. D at ¶ 33). At the time of authorship, Ms. Railey believed that every statement made in the Article was true and was supported by her research. (Turner Decl., Ex. D at ¶¶ 35-36 (listing factual bases for all alleged defamatory claims contained in the Article)).

Ms. Railey's article was not the first one on the Website critical of seller-funded downpayment assistance programs. Two such articles were published in January and June respectively. Both criticized down payment programs that were similar to the one

3

being operated by the Plaintiffs.  (Declaration of Aaron Krowne ("Krowne Decl."), ¶ 6 and Exs. A & B; Declaration of Robin Medecke ("Medecke Decl."), ¶ 3 and Ex. A.)

Independent of Ms. Railey's research into the Plaintiffs' activities, in June 2008 Defendant Lorena Leggett contacted the Plaintiffs to solicit advertising for the Website. (Turner Decl. Exs. D, G at ¶ 3).  In August 2008, the Plaintiffs informed the Defendants that it would not purchase advertising on the Website.  (Turner Decl., Ex. G at ¶ 3).  At around the same time, Ms. Leggett had told IEHI employee Robin Medecke about Ms. Leggett's solicitation of advertising by Grant America Program,  It is the policy of IEHI to screen potential advertisers to make sure they do not engage in lending practices that IEHI finds suspicious or opposes.  Ms. Medecke was aware of IEHI's screening policy and that the Website had taken a stance against seller-funded downpayment assistance programs.  On August 6, 2008, Ms. Medecke told Ms. Leggett not to sell any advertising to the Plaintiffs. (Medecke Decl., ¶¶ 4-6 and Ex. B.)

Ms. Railey had no knowledge of any of these communications or subsequent refusal to purchase advertising during the authorship of the article, and such communications had no influence over the content or publication of the article.  (Turner Decl., Ex. D at ¶ 37).

**B.**     **Procedural History**

Plaintiffs filed suit in the United States Court for the District of Maryland on September 19, 2008, alleging defamation, libel, and unfair business practices.  (Turner Decl., Ex. G).  At no time before filing the complaint and moving for a TRO and preliminary injunction did the Plaintiffs tell the Defendants what specific statements in the Article were allegedly untrue and defamatory.  (Turner Decl. at ¶ 10).

4

On September 26, 2008, the Court heard Plaintiffs' motion for a preliminary injunction. The Court denied that motion because Plaintiffs failed to prove likelihood of success on the merits and failed to establish irreparable harm. (Turner Decl. at ¶ 11).

### III.   ARGUMENT

**A.   The Maryland Anti-SLAPP Statute is Applicable Because it Does Not Directly Conflict with Any Federal Rule and the Balance of Interests Weighs in Favor of Its Application**

While the Maryland anti-SLAPP provision is procedural in nature, it positively affects the substantive rights of defendants in bad faith actions by providing a mechanism to protect their constitutional right to free expression. Federal courts have no independent anti-SLAPP provisions. To determine whether the provisions of Maryland's anti-SLAPP law may be properly applied in this action, this Court must determine whether the statute directly conflicts with the Federal Rules and, finding no conflict, whether Maryland's interests in applying the law outweigh Federal interests implicated by the rule.

   *1.   There is no direct conflict created by applying section 5-807 in the present action.*

To apply Maryland's anti-SLAPP provision, this Court must begin by considering whether it would result in a "direct collision" with the Federal Rules. See *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980); see also *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (1999) (performing an *Erie* analysis before applying California's anti-SLAPP statute). In *Walker*, the court found no conflict between the Federal Rules and the Oklahoma statute at issue because both statutes could "exist side by side, therefore, each controlling its own intended sphere of coverage without conflict." *Walker*, 446 U.S. at 752. Here, section 5-807 merely

5

provides an additional procedural mechanism for "weeding out meritless claims before trial." *Lockheed Missiles*, 190 F.3d at 973. Importantly, the anti-SLAPP statute is intended to protect a constitutional right—Defendants' right to freedom of expression—not directly addressed by the Federal Rules. No direct conflict with the Federal Rules exists.

> **2.   *This court must apply Maryland's anti-SLAPP provision because the state interests in its application vastly outweigh any Federal interests implicated.***

Since there is no direct conflict between the Federal Rules and section 5-807, the Court must do an unguided *Erie* analysis and balance the state and federal interests implicated in invoking the anti-SLAPP statute. See *Hanna v. Plumer*, 380 U.S. 460, 471 (1965). There are no federal interests implicated in the application of anti-SLAPP statutes. See *Lockheed Martin*, 190 F.3d at 973 (finding no federal interests against applying California's anti-SLAPP provision); see also *Byrd v. Blue Ridge Rural Elec. Coop., Inc.* 356 U.S. 525, 537-40 (1958) (balancing state and federal interests in considering whether to apply a state law requiring that judge, rather than jury, decide questions of immunity). On May 11, 2004, the Maryland General Assembly enacted the "Qualified Immunity from Civil Liability - SLAPP Suits" Act. In so doing, it recognized that the "goal [of SLAPP Suit Plaintiffs] is often not to win the case, but rather to cause the defendants to devote such significant resources to defending it that they are unable to continue the challenged activities." (Turner Decl., Ex. K). Anti-SLAPP motions such as the one before this Court provide relief by requiring dismissal before the cost of litigation drives SLAPP defendants into bankruptcy or settlement. Maryland's legislature has articulated important substantive state interests in providing relief to SLAPP plaintiffs, and the anti-SLAPP statute thereby represents an important policy choice. (See Turner

6

Decl., Ex. K); cf. *Gasperini v. Center for Humanities, Inc.*, 116 S.Ct. 2211, 2220 (1996) (finding that while the state law at issue was plainly procedural, its objective was manifestly substantive and applying the state law).

Additionally, the *Erie* rule serves the "discouragement of forum-shopping and inequitable administration of the law." *Hanna*, 380 US at 468. Failure to apply state anti-SLAPP provisions would encourage forum shopping, and give litigants in meritless SLAPP suits an incentive to bring suit in a federal forum to the considerable disadvantage of defendants. There are no federal interests implicated in the application of the anti-SLAPP statute, and there are strong state policy interests in the application of the provision.

Since there is no conflict created by applying section 5-807, and state interests weigh strongly in favor of application, this court should therefore apply Maryland's anti-SLAPP statute in this case. Federal courts in other states with anti-SLAPP legislation have found such provisions do not conflict with the Federal Rules and are substantive in nature. See, e.g., *Lockheed Martin*, 190 F.3d at 973 (California court applying anti-SLAPP statute); see also *Containment Techs. Group, Inc. v. Am. Soc'y of Health Sys. Pharmacists*, 2009 U.S. Dist. LEXIS 25421 (S.D. Ind. 2009) (Indiana court, finding anti-SLAPP provision to be substantive in nature and applying its substantive provisions); *Buckley v. DirecTV*, 276 F. Supp. 2d 1271, 1276 (N.D. Ga. 2003) (applying Georgia's anti-SLAPP provision and dismissing the action); *Airtran Airlines, Inc. v. Plain Dealer Pub. Co.*, 66 F. Supp. 2d 1355, 1369 (N.D. Ga. 1999) (assuming without deciding that Georgia anti-SLAPP statute applies in federal diversity actions); *Bible & Gospel Trust v.*

7

*Twinam*, 2008 U.S. Dist. LEXIS 103674 (D. Vt. 2008) (holding the Vermont anti-SLAPP statute applied in diversity actions, as it did not directly conflict with the Federal Rules).

**B.     Plaintiffs' Case is a Strategic Lawsuit Against Public Participation, and Is Barred by Maryland's Anti-SLAPP Statute**

As considered by the Maryland legislature, the anti-SLAPP statute was intended to "protect individuals and groups, many with few assets, from defending costly legal challenges to their lawful exercise of such constitutionally protected rights [including] free speech." (Turner Decl., Ex. K).  To grant this motion to dismiss, the Court must find (1) that Plaintiffs' action is a SLAPP suit as defined by section 5-807, and (2) that Defendants lacked constitutional malice in posting the Article.  See Md. Code Ann., Cts. & Jud. Proc. § 5-807(b)-(c) (defining the nature of SLAPP suits and the scope of immunity provided to defendants in SLAPP suits).

> *1.     Plaintiffs' suit is a SLAPP suit as defined by section 5-807, as it targets speech materially related to protected communication with the public at large and is intended to inhibit that speech.*

Under 5-807, a SLAPP suit is characterized as a bad faith lawsuit, defined as a lawsuit based on protected communication with the public at large, regarding speech materially related to that communication, and intended to inhibit the exercise of that speech.  Md. Code Ann., Cts. & Jud. Proc. § 5-807.

**(i)     This suit targets protected speech.**

Plaintiffs' suit is based upon protected communication with the public at large. Involvement in political affairs is a fundamental focus of the First Amendment right to free expression granted by the Constitution, and "information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 150 (1966).  In considering whether speech is

8

directed to a matter of public concern, courts look to "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 148 (1983).

The Article relates to a matter of grave public concern. The implosion of the sub-prime mortgage market, which instigated the collapse of numerous financial and insurance firms, has cost the United States trillions of dollars and led to the highest levels of unemployment in 26 years. (See Turner Decl., Exs. L, M). Seller-financed down payment assistance programs, such as the Plaintiffs' Grant America Program, have higher default rates, and serve to exacerbate an already tenuous financial market. (See Turner Decl., Ex. A). Furthermore, at the time the Article was written and posted, the United States Congress and the FHA were considering further laws and regulations designed to ban the practice of seller-financed down payment assistance. Informing the public of the risk posed by such programs is a legitimate topic of public discourse, and deserving of protection. Defendants' speech involved a matter of public concern, and is afforded a high level of protection under the First Amendment.

### (ii) The speech at issue is materially related to Defendants' communication.

Secondly, the alleged defamatory speech is materially related to Defendants' communication. A fact is material if it has "some logical connection with the consequential facts. . . . [or is o]f such a nature that knowledge of the item would affect a person's decision-making." BLACK'S LAW DICTIONARY, 8th ed. 2004. Plaintiffs' complaint enumerates thirteen allegedly defamatory statements contained in the Article. (Turner Decl., Ex. G at ¶ 37). In each case, the statements were directed to concerns and observations regarding the manner in which the Plaintiffs operated and benefited from

9

their Grant America seller-financed down payment program. (See Turner Decl., Ex. G at ¶ 37). The statements were not directed to the personal character or affairs of the Plaintiffs beyond the extent to which such affairs affected the stability and purpose of the Grant America Program. In each case, the statements were intended to inform the public at large about concerns regarding the Grant America Program, such that readers could make an informed decision regarding the program. The allegedly defamatory statements contained in the Article were materially related to Defendants' communication of constitutionally protected speech.

      **(iii)**     **Plaintiffs' lawsuit is intended to inhibit the exercise of Defendants' freedom of expression.**

Finally, the Plaintiffs' action is intended to inhibit the Defendants' exercise of Free Speech rights. Plaintiffs' "state of . . . mind or scienter is a question of fact. And being subjective in nature, proof of wrongful intent is seldom direct, but is usually inferred from proven circumstances. . . . The inference must as always be reasonable." *Caldwell v. State*, 26 Md. App. 94, 108 (Md. Ct. Spec. App. 1975) (citations omitted).

The record before the court is replete with the Plaintiffs' threats, attempts at intimidation, and lack of good faith. (See generally Turner Decl. Exs. F, N, O). Plaintiff Russell's original response to the article did not ask for correction or retraction of factual errors or inadequacies. In fact, Mr. Russell explicitly refused to name factual inaccuracies, stating he did not "have the time or patience to go line by line through every factual error and lie in your article." (Turner Decl., Ex. F). The only specific facts that Mr. Russell did discuss in his comment were from sworn testimony before a Senate hearing. (Turner Decl., Ex. F). Mr. Russell took issue only with the veracity of that sworn testimony, admitting that the statements had been made. (Turner Decl., Ex. F).

10

Importantly, Mr. Russell's posted response demanded the complete removal and retraction of the Article, not the correction of the thirteen allegedly libelous statements contained therein.  (Turner Decl., Ex. F; cf. Turner Decl., Ex. G at ¶ 37).  Plaintiffs do not contest the overall veracity of the Article absent the thirteen statements at issue, but attempted to intimidate Defendants into retracting the Article.

Additionally, Mr. Russell threatened Defendants with financial ruin.  He pointed to a large judgment he had received in another case, indicating that he had allowed the defendant there to pay monthly but that he "won't be so generous with your 'scam' blog." (Turner Decl., Ex. F.)  Mr. Russell further threatened Defendants with the *expense* of a lawsuit:  "Spend the money for a good lawyer because I use the best and I am coming after you hard."  (Id.)   The monies that Defendant IEHI has had to spend already on defending this case has already driven it to the edge of bankruptcy.  (Krowne Decl., ¶¶ 7-8).

 On September 19, 2008, the Plaintiffs filed this lawsuit.  Rather than serve the Defendants with a copy of the complaint as required by the Federal Rules, the Plaintiffs forwarded a "courtesy copy of the electronic receipt" of filing via electronic mail to the Defendants on September 22.  (Turner Decl., Ex. H).  While the Defendants and Plaintiffs reached an agreement regarding service, the initial communications served as an attempt to inhibit Defendants' freedom of expression by intimidating them into removing the entirety of the Article, rather than to correct inaccuracies or vindicate a legal right.

Plaintiffs continue litigation in this action despite a finding by this court that they had been unable to show a  likelihood of success on the merits or that the Article's

11

statements were actually false. (Turner Decl., Ex. J). This continued litigation, despite the absence of actual false statements or malice, is intended to drive Defendants to bankruptcy. (See Krowne Decl., ¶¶ 7-8). The Plaintiffs' conduct in the prosecution of this lawsuit has been for the obfuscation of the issues, the intimidation of Defendants, and has been litigated in bad faith. The Plaintiffs' conduct gives rise to an inference of intent to inhibit the Defendants' freedom of expression. The current action is a SLAPP suit, as defined in Maryland law.

### 2. *Defendants are immune from civil liability because their communications address a matter within the authority of a government body and lacked constitutional malice.*

The Maryland anti-SLAPP statute provides that a "defendant in a SLAPP suit is not civilly liable for communicating with . . . the public at large, if the defendant, without constitutional malice, reports on, comments on, rules on, challenges, opposes, or in any other way exercises rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding any matter within the authority of a government body." § 8-507(c).

The FHA requires that homebuyers make at least a three-percent down payment on a home purchase in order to be eligible for an FHA-insured loan. (Turner Decl. Ex. A). Here, the Article was directed at Plaintiffs' operation of the Grant America Program, a seller-financed down-payment assistance program that provided the down-payment necessary to obtain an FHA-insured loan. It is within the scope of the federal government's authority, through Congress and the FHA, to establish the eligibility criteria for an FHA loan. The Article addressed a matter within the authority of a government body.

Defendants in a SLAPP suit are immune from civil liability if they acted without constitutional malice. § 5-807(c). A defendant "acts with constitutional malice if the person makes a statement that the person knows is false, or acts with reckless disregard as to whether the statement is false or not." Fiscal Policy Analysis § 5-807 (defining constitutional malice as actual malice, as established in *New York Times v. Sullivan*, 376 U.S. 254 (1964)). (See Turner Decl., Ex. K.) Here, Defendants acted without any malice. Plaintiffs selected thirteen statements out of a seven-page article and alleged defamation. Former defendant Railey provided factual support for nine of the thirteen allegedly defamatory contentions. The remaining four statements are not statements of facts, but conclusions and analyses well supported by the Article's contents. The Article was thoroughly researched and carefully written by Ms. Railey. (See Turner Decl., Ex. D at ¶¶ 31-33).

Additionally, Defendants did not act with actual malice because there was no retributive intent behind the authorship of the Article. Well before Ms. Railey authored her article, IEHI had published two other articles critical of seller-funded downpayment assistance programs. (Krowne Decl., ¶ 6 and Exs. A & B.) Aware of this fact, Ms. Medecke had already directed sales agent Lorena Leggett to not solicit the Grant America Program as an advertiser, because it was such a program. (Medecke Decl., ¶¶ 3-6.) Furthermore, at no time during her authorship of the Article was Ms. Railey aware of Plaintiffs' refusal to advertise with Defendants, and Plaintiffs' discussions regarding advertising had no effect on the decision to write and publish the article. (Turner Decl., Ex. D at ¶ 37). Nor did IEHI direct Ms. Railey to write about the Plaintiffs or provide substantive direction to Ms. Railey on the Article. (Krowne Decl., ¶ 5.)

Given Ms. Railey's thorough research for the Article, the alleged defamatory comments cannot be said to be knowingly false or made with reckless disregard to their veracity, and Defendants cannot be said to have acted with actual malice because any advertising discussions had no effect on her decision to write the Article or on its contents. Defendants in no way acted with malice or reckless disregard for the veracity of the statements contained in the Article.

Furthermore, Ms. Railey had a regular blog column on the Website, and she was entitled to post any of her articles concerning matters related to the mortgage and home financing industries. Defendant IEHI did not solicit or suggest the Article in response to any advertising discussions between their outside sales representative (Lorena Leggett) and any of the Plaintiffs. In other words, the Article was not published in response to advertising discussions but rather was published by Ms. Railey in the normal course of her blog. IEHI cannot be said to have acted with actual malice. (Krowne Decl., ¶¶ 4–5.)

## IV.   CONCLUSION

Plaintiffs' lawsuit is a SLAPP suit as defined by Maryland law, as it alleges defamation based on Defendants' constitutionally protected expression, regarding communication materially related to that expression, and is intended to inhibit Defendants' freedom of expression. Defendants are immune from civil prosecution for their communications under section 5-807, as they spoke on a matter of public concern

being debated in Congress and acted without constitutional malice.  Dismissal is therefore proper under section 5-807(d)(1).


Dated: November 11, 2009              Respectfully submitted,

                                      SAUL EWING, LLP

                                      By:   /s/ Henry R. Abrams /s/
                                            Henry R. Abrams

                                      Lockwood Place
                                      500 East Pratt Street, Suite 900
                                      Baltimore, MD 21202-3171
                                      (410) 332-8756


                                      TURNER BOYD LLP

                                      By:   /s/ Julie S. Turner /s/
                                            Julie S. Turner
                                      2625 Middlefield Road
                                      Palo Alto, CA 94306
                                      (650) 494-1530

                                      *Attorneys for Defendants*
                                      *Implode-Explode Heavy Industries, Inc.*
                                      *and Krowne Concepts, Inc.*