# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| GLOBAL DIRECT SALES, LLC, PENOBSCOT INDIAN NATION, CHRISTOPHER RUSSELL, and RYAN HILL, | ) ) ) ) | Case No.: 8:08-cv-02468 |
| Plaintiffs, | ) ) ) | |
| -v- | ) ) ) | |
| AARON KROWNE, individually, and d/b/a THE MORTAGE LENDER IMPLODE-O-METER and ML-IMPLODE.COM, KROWNE CONCEPTS, INC., IMPLODE-EXPLODE HEAVY INDUSTRIES, INC. JUSTIN OWINGS, STREAMLINE MARKETING, INC. and LORENA LEGGETT, | ) ) ) ) ) ) ) ) ) ) | Assigned: Hon. Deborah K. Chasanow |
| Defendants. | ) ) ) | |

## DEFENDANTS' REPLY IN SUPPORT OF SPECIAL MOTION TO DISMISS, PURSUANT TO MARYLAND COURTS AND JUDICIAL PROCEEDINGS § 5-807

Julie S. Turner
TURNER BOYD LLP
2625 Middlefield Road
Palo Alto, CA 94306
(650) 494-1530 (phone)

Henry Abrams
SAUL EWING LLP
Lockwood Place
500 East Pratt Street, Suite 900
Baltimore, MD 21202-3171
(410) 332-8756 (phone)

*Attorneys for Defendant*
IMPLODE-EXPLODE HEAVY
INDUSTRIES, INC. and KROWNE
CONCEPTS, INC.

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ............................................................................................   1

II.  ARGUMENT..................................................................................................   1

A.   Maryland's Anti-SLAPP Statute is Applicable ..................................   1

B.   This is a SLAPP Suit and Dismissal is Proper Under
Section 5-807 ......................................................................................   4

1.   Defendants' communication addresses an issue
within the authority of a government body............................   5

2.   Plaintiffs can make no showing of constitutional
malice ......................................................................................   6

3.   Plaintiffs can make no showing of any false or
defamatory statement. .............................................................   7

4.   Plaintiffs continue to prosecute this suit in bad faith
despite no demonstrable right that can be vindicated
at law. .....................................................................................   9

III. CONCLUSION...............................................................................................   10

APPENDIX OF UNREPORTED CASES................................................................   A-1

## I.     INTRODUCTION

On November 11, 2009, Defendants filed a special motion to dismiss under Maryland's Anti-SLAPP statute, codified at Md. Code Ann., Cts. & Jud. Proc. art. § 5-807.[1]  Plaintiffs filed a responsive brief on December 7, 2009, asserting that the motion should be denied because: (1) the case at bar does not meet the requirements of the Anti-SLAPP provision; and (2) the Anti-SLAPP provision is in conflict with the Federal Rules of Civil Procedure and therefore inapplicable.  However, Defendants have shown, that this is a bad faith lawsuit brought against a party exercising rights guaranteed under the First Amendment in order to inhibit such exercise, and that the Anti-SLAPP provision may be applied without conflict or collision with the Federal Rules of Civil Procedure. Plaintiffs have failed to show the existence of any evidence suggesting otherwise. Therefore, this court should properly grant Defendants' motion and dismiss the case pursuant to § 5-807.

## II.     ARGUMENT

### A.     Maryland's Anti-SLAPP Statute is Applicable

The intent of the *Erie* Doctrine "was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945).  A state law serving a substantive interest may be applied even where it has a procedural effect so long as its

---

[1] Subsequent statutory references contained herein are to this Code, unless otherwise indicated.

application would not result in a "direct collision" with the Federal Rules.  See *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980).  Direct conflict is absent where both the state and federal provisions "can exist side by side . . . each controlling its own intended sphere of coverage without conflict."  *See id.* at 752.

Plaintiffs have argued that the Maryland Anti-SLAPP statute should not be applied in federal court, on the ground that the Ninth Circuit is the only one that applies the Anti-SLAPP statutes of the states in its jurisdiction, and is an outlier compared with other federal courts.   For support, Plaintiffs point to decisions in two other district courts (Massachusetts and Maine), both of which are in the First Circuit.

Plaintiffs' assertion is patently erroneous.  A wide range of district courts, sitting in a number of states both within and outside the Ninth Circuit, have applied the Anti-SLAPP provisions of their states, finding they do not conflict with the Federal Rules. These states include Vermont (see *Bible & Gospel Trust v. Twinam*, 2008 WL 5245644 (D.Vt. 2008) (adopting Magistrate Judge's recommendation that the Vermont Anti-SLAPP provision does not directly conflict with the Federal Rules of Civil Procedure and thereby applies in diversity actions)), Utah (see *Usana Health Services, Inc. v. Minkow*, 2008 WL 619287, *3 (D. Utah 2008) (applying California law after choice of law analysis and concluding that defendants could bring motion to strike under California Anti-SLAPP statute)), Louisiana (see *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 183 (5th Cir. 2009) (reversing district court's denial of an Anti-SLAPP motion and remanding for determination of fees and costs) and *Alexanian v. Brown*, No. 07-00806, 2009 WL 2356443, *10 (W.D.La. July 29, 2009) (granting motion to strike under Anti-SLAPP statute)), Washington (see *Eklund v. City of Seattle*, 2009 U.S. Dist. LEXIS

60896, *10 (W.D. Wash. 2009) (awarding fees to defendants under Anti-SLAPP

provision)), Oregon (see *Mt. Hood Polaris, Inc. v. Martino*, 563 F.3d 981, 991 (9th Cir.

2009) (holding that the Oregon statute does not directly conflict with the Federal Rules)),

Hawaii (see *Villeza v. United States of America*, 2006 WL 278618, *5-6 (D.Hawai'i

2006) (analyzing under Anti-SLAPP statute but denying for failure to make prima facie

case under the statute)), Georgia (see *International Brominated Solvents Assoc. v.

American Conference of Governmental Indust. Hygienists, Inc.*, 2005 WL 1220850, *2

(M.D.Ga. 2005) (finding that Georgia's Anti-SLAPP and the Federal Rules "can exist

side by side ... each controlling its own intended sphere of coverage," but applying Rule

15 in place of special pleadings provision after *Hanna* analysis) and *Buckley v. DirecTV,

Inc.*, 276 F.Supp.2d 1271, 1275 (N.D.Ga. 2003) (applying 9th Circuit precedent and

finding no *Erie* conflict between Federal Rules and the Georgia Anti-SLAPP statute)),

District of Columbia (see *Blumenthal v. Drudge*, 2001 WL 587860, *1-4 (D.D.C. 2001)

(performing analysis using California's Anti-SLAPP statute)), and Indiana (see

*Containment Technologies Group, Inc. v. American Society of Health System

Pharmacists*, No. 1:07-cv-0997-DFH-TAB, 2009 WL 2750093, *4 (S.D.Ind. Aug. 26,

2009) (holding that the Anti-SLAPP statute's complete defense to defamation claims and

the award of attorney fees were substantive provisions, and applicable in a diversity

action) and *Kentner v. Timothy R. Downey Insurance, Inc.*, 430 F.Supp. 844, 844 (S.D.

Ind. 2006) (applying Indiana's Anti-SLAPP statute)).  Even the District of Maryland has

applied an Anti-SLAPP provision in a diversity case, albeit the one from California,

without any qualms concerning whether such a statute conflicts with the federal rules.

See *NeuralStem, Inc. v. Stemcells, Inc.*, No. AW-08-CV-1173, 2009 WL 2412126 (D.Md.

3

Aug. 27, 2009) (holding that California law applied, and granting in part and denying in part defendant's motion to strike under the California Anti-SLAPP statute).

Maryland's Anti-SLAPP statute is not inconsistent with federal rules governing dismissal of an action (Rules 8, 12, or 56). Indeed, Rule 56, like many Anti-SLAPP statutes, requires, at a minimum, that the party bearing the burden of proof make a *prima facie* showing of facts sufficient to sustain a favorable judgment. This is the standard often applied by courts in assessing Anti-SLAPP motions to dismiss. See, *e.g., Alexanian*, 2009 WL 2356443, at *4.

As is clear, the greater trend among federal courts is to apply the anti-SLAPP statutes of the states in which they sit. If any courts are outliers in this regard, it is those of the First Circuit.

**B.      This is a SLAPP Suit and Dismissal is Proper Under Section 5-807**

As Defendants have shown in their opening brief, this suit falls within the provisions of Section 5-807 as a SLAPP suit because Defendants' communication addressed an issue within the authority of a government body, because Plaintiffs cannot satisfy their burden for their defamation claim, and because this suit was brought in bad faith to drive Defendants out of business and thereby silence them.

In opposition, Plaintiffs contend that this suit is not a SLAPP suit because, they argue, it was brought in good faith to address Defendants' allegedly "untrue and defamatory" article. However, Plaintiffs are unable to direct this Court to a single statement not amply supported by the research cited by former co-defendant Krista

Railey in her authorship of the Article.[2]  Furthermore, Plaintiffs are unable to provide any showing of constitutional malice on the part of any of the Defendants (the author included).  Failing these showings, Plaintiffs have not established a right vindicated by this suit.  Therefore, dismissal by this court is proper.

      *1.*      *Defendants' communication addresses an issue within the authority of a government body.*

Plaintiffs argue that Defendants' motion fails because two statements—one a supportable characterization of the arbitration decision disposing of Ameridream's complaint against Russell, the second a fair characterization of sworn testimony before Congress regarding Plaintiff Russell's management of Ameridream—are not issues under the authority of a government body.

Plaintiffs' argument fails because the Maryland Anti-SLAPP provision does not require that each and every individual statement be directed toward issues under the authority of a government body.  Rather, the provision applies to a "communication."  There is no question but that Railey's Article in its entirety is the "communication" at issue here.  That Article was directed to the legality, propriety, and financial implications and risks of Plaintiffs' seller-financed down-payment program.  Following the implosion of this nation's financial sector in the wake of the subprime mortgage crisis, discussion and understanding of other potential risks to this country's financial stability was of the

---

[2] Despite the notable absence in Krista Railey's declaration of the identification of any specific statements from the Article that she now contends are "false," Plaintiffs' brief relies greatly on her generalized allegations and allusions.  Plaintiffs' reliance is misplaced, as Railey's declarations create no genuine issue of material fact for this court.  See *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Circ. N.C. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct").  Railey's declaration in support of Plaintiffs' opposition is conclusory and does not set forth any fact necessary to sustain Plaintiffs' argument.  See id. (noting that "[t]he entire content of the affidavit is conclusory, it does not set forth facts of which the plaintiff has personal knowledge and it does not give specific facts, but only generalities" before discounting the value of declarant's contradictory affidavits).

utmost importance.  These very issues were being discussed and debated by Congress at the time the Article was published.  As the Court found at the hearing on Plaintiffs' preliminary injunction motion, "The few sections that the plaintiffs complain of do not detract from the overall public interest of the nature of the article."  (Turner Decl., Ex. A, at 41).

The presence of two statements—both of which happen to be true—in a six page Article does not alter the nature of the Article itself and it does not overcome the applicability of Maryland's Anti-SLAPP provision.

      2.    *Plaintiffs can make no showing of constitutional malice* .

For Plaintiffs to prevail in this case, they must prove that Defendants acted with constitutional malice, a proposition that Plaintiffs do not dispute.  Under *New York Times Co. v. Sullivan*, constitutional malice requires "knowledge that [a statement] was false or with reckless disregard of whether it was false or not."  376 U.S. 254, 280 (1965).  Despite having procured the support of former co-defendant Railey—the person solely responsible for the inspiration, research, and authorship of the Article—Plaintiffs have still failed to make any showing of constitutional malice.

In her much earlier declaration of October 7, 2008, submitted to this court in support of Defendants' Opposition to Plaintiffs' Motions for a Temporary Restraining Order and Preliminary Injunction, Railey swore under oath: "I stand behind all of the statements I have made in my article about the Plaintiffs and believe each and every one of them to be based in truth and supported by my research."  (Turner Decl., Ex. B at ¶ 35).  She further noted that she "fully researched everything that appeared in" both versions of the Article.  (Id. at ¶ 31-32).

Even though Railey is now cooperating with Plaintiffs in exchange for a settlement, Plaintiffs remain unable to present this Court with any statement that she or any Defendant made with knowledge of falsity or reckless disregard for the truth. Railey's declaration for Plaintiffs merely asserts that she presently "believes there are significant problems with the final published article[, and that it] contains and implies false statements."  However, nowhere in the declaration she prepared for Plaintiffs does Railey identify a single statement she wrote with knowledge of its falsity or with reckless disregard for its truth— knowledge of which she, as author of the piece, is in sole possession.  Nor does Railey claim that IEHI had any knowledge of the falsity of any statements before this lawsuit was filed, or that IEHI acted with malice toward the Plaintiffs.[3]

Without establishing such malice on the part of the Article's author, Plaintiffs cannot establish any malice on the part of the remaining Defendants.

3.      *Plaintiffs can make no showing of any false or defamatory statement.*

Despite the fact that the Article was thoroughly researched and even contained numerous citations and hyperlinks to other sources supporting its claims, Plaintiffs' argue that the Article is "wholly unsupportable."  In their brief, Plaintiffs rehash their preliminary injunction arguments about four allegedly false statements, concerning whether their business "launders" money from seller to buyer, whether Russell made a "copycat" Ameridream site to get money, the meaning of an IRS ruling regarding

---

[3] The issue of Defendant IEHI's solicitation of GAP for advertising remains a red herring.  Railey swore in her October 7, 2008, declaration that she was unaware of any attempt by Defendants to solicit Plaintiffs to advertise on the website.  (Turner Decl., Ex. B at ¶ 37).  Since Ms. Railey was solely responsible for the research, authorship, and content of  the Article, and she was not aware of any solicitation, the entire advertising issue is a red herring.

"concessions" (seller give-backs to buyers), and the meaning and import of a HUD

settlement as a form of "approval" of Plaintiffs' business.

Each and every one of these issues was raised and thoroughly discussed in

connection with Plaintiffs' unsuccessful preliminary injunction motion.  In ruling on that

motion, the Court directly addressed these claims:

> At bottom, I conclude that the plaintiffs have not established the
> grounds for the issuance of a preliminary injunction, even of the lesser
> nature of requiring the elimination of the word "laundering," "extortion,"
> "sales concession," or, frankly, any of the other "not HUD approved", or
> any of the other dozen or so purported falsehoods in the article.
>
> The article itself is, I don't know, I didn't count the number of words,
> but it's one, two, three, four, five, six pages in one of the exhibits, another
> one with smaller type that may not be quiet [sic] as long, but it's lengthy.
> It covers a lot of material and plaintiffs have chosen to focus on some
> phrases, sometimes taken out of context, but more significantly, from my
> perspective, at a place where what's being discussed provides a link to
> other information as well.
>
> I mean, this is a comprehensive article and it is simply not, I don't
> think, susceptible at this stage to the conclusion that plaintiff wants me to
> draw, that they can have proven that any of these terms or words are
> false.…
>
> The term "laundering" may have a certain in the Criminal Code. It
> may not necessarily have that same definition when used in this article.
>
> In any event, I think the allegations of plaintiff are simply not precise,
> focused enough to make a determination that they can prove that any one
> or more of them necessarily are false on the current record, never mind
> whether they can make the, or have made sufficient showings of the other
> elements of a defamation claim to show likelihood of success on the
> merits.

(Turner Decl., Ex. A at 39-40).

Railey's declaration submitted on behalf of Plaintiffs' opposition does not cure

this gross defect.  Railey makes the naked assertion that the article "contains and implies

false statements," but mysteriously does not identify a single instance.  Railey's recent

declaration merely begs the question of whether any of these "false statements" is material or defamatory.  See *Rosenberg v. Helinski*, 328 Md. 664, 675 (Md. 1992) (in addition to falsity of the statement, defamation requires publication, legal fault in making the statement, and harm to the plaintiff); see also *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) ("[i]f the gist or 'sting' of a statement is substantially true, 'minor inaccuracies will not give rise to a defamation claim'").

It is clear that Plaintiffs' claims of defamation are predicated on misquotes and on statements that are not only true, but provably true.  It is also clear that Plaintiffs can adduce no evidence from Railey as to precisely what statements she believes to be false (despite her sworn testimony earlier that all statements were true), or whether such "false" statements and "implications" are even defamatory.  Plaintiffs' claims that the Article is defamatory are not and cannot be supported by fact.

> 4.      *Plaintiffs continue to prosecute this suit in bad faith despite no*
>         *demonstrable right that can be vindicated at law.*

Defamation requires a showing that the speaker knew or should have known that the statement was false.  See *New York Times Co. v. Sullivan*, 376 U.S. 254 (1965) (establishing the standard for constitutional malice).  Plaintiffs' own declaration in support of their opposition to this motion, submitted by the sole researcher and author of the article, fails to establish any malice on her part and cannot impute such malice to the remaining Defendants.  Plaintiffs' continued prosecution despite the absence of any malice or actual falsity gives this Court sufficient basis to find Plaintiffs' conduct is in bad faith and to grant this motion.

Further, Plaintiffs' brief asserts that Railey "advised IEHI and Krowne that Russell should be afforded a fair opportunity to rebut the article and IEHI and Krowne refused."  It is the established and posted policy of the site to allow for principal managers to respond to negative coverage of their companies by contacting the site and "address[ing] the alleged inaccuracies," as set forth in the terms of the Website's complaint policy.  (Turner Decl., Ex. C).  Importantly the policy goes on to state that "We cannot do anything without further (publishable) information; and a legal threat or naked assertion does not constitute sufficient information we can use."  (Id.).  Plaintiff Russell's comment posted in response to Railey's original draft did not include any substantive corrections to the facts central to Railey's article, and instead threatened immediate legal action.  (Turner Decl., Ex. D).  Plaintiffs were afforded a full and fair opportunity to rebut the criticisms raised, and declined to do so in favor of intimidation and litigation.

Plaintiffs have exercised demonstrable bad faith through their use of intimidation in the commencement of this lawsuit and continued prosecution of a case with no demonstrable right to vindicate at law.

## III.   <u>CONCLUSION</u>

Defendants have demonstrated that the case at bar properly falls under the auspices of Maryland's Anti-SLAPP statute, and that the statute may be properly applied by a Federal court sitting in diversity without violence to or collision with the Federal Rules of Civil Procedure.  Plaintiffs have failed to make a prima facie showing of their claims, despite having access to and a declaration from the key witness, co-defendant and

10

co-movant, Krista Railey.  This court should therefore grant Defendants' special motion

to dismiss this case pursuant to § 5-807.


Dated: January 11, 2010                Respectfully submitted,

                                           /s/ Julie S. Turner /s/
                                       _____
                                       Julie S. Turner
                                       Admitted *Pro Hac Vice*
                                       TURNER BOYD LLP
                                       2625 Middlefield Road
                                       Palo Alto, CA 94306
                                       (650) 494-1530 (phone)
                                       (650) 472-8028 (facsimile)
                                       turner@turnerboyd.com

                                       Henry Abrams
                                       Trial Bar No.: 03563
                                       SAUL EWING LLP
                                       Lockwood Place
                                       500 East Pratt Street, Suite 900
                                       Baltimore, MD  21202-3171
                                       (410) 332-8756 (phone)
                                       (410) 332-8757 (facsimile)
                                       habrams@saul.com

                                       *Attorneys for Defendant*
                                       IMPLODE-EXPLODE HEAVY
                                       INDUSTRIES, INC. and KROWNE
                                       CONCEPTS, INC.

## APPENDIX OF UNREPORTED CASES

*Alexanian v. Brown,*
　　　No. 07-00806, 2009 WL 2356443 (W.D.La. July 29, 2009)......................   A-2

*Bible & Gospel Trust v. Twinam,*
　　　2008 WL 5245644 (D.Vt. 2008)..................................................................   A-12

*Blumenthal v. Drudge,*
　　　2001 WL 587860 (D.D.C. 2001) ..................................................................   A-14

*Containment Technologies Group, Inc. v. American Society of Health System*
　　　*Pharmacists*, No. 1:07-cv-0997-DFH-TAB, 2009 WL 2750093
　　　(S.D.Ind. Aug. 26, 2009) ............................................................................   A-18

*Eklund v. City of Seattle,*
　　　2009 U.S. Dist. LEXIS 60896 (W.D. Wash. 2009) ...................................   A-43

*International Brominated Solvents Association v. American Conference*
　　　*of Governmental Industrial Hygienists, Inc.,*
　　　2005 WL 1220850 (M.D.Ga. 2005) ............................................................   A-47

*NeuralStem, Inc. v. Stemcells, Inc.,*
　　　No. AW-08-CV-1173, 2009 WL 2412126 (D.Md. Aug. 27, 2009) ............   A-54

*Usana Health Services, Inc. v. Minkow,*
　　　2008 WL 619287 (D. Utah 2008).................................................................   A-62

*Villeza v. United States of America,*
　　　2006 WL 278618 (D.Hawai'i 2006) ...........................................................   A-72

Slip Copy, 2009 WL 2356443 (W.D.La.)
**(Cite as: 2009 WL 2356443 (W.D.La.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, W.D. Louisiana, La-
fayette and Opelousas Division.
Garo ALEXANIAN, Individually and in his capa-
city as executive director of the Companion Animal
Network, an unincorporated association
v.
Jason BROWN, Individually and in his official ca-
pacity as a reporter of the Daily Advertiser, Edward
"Ted" Tower, individually and in his capacity as
publisher of the daily advertiser, The Daily Advert-
iser, Gannett Co., Inc.
**Civil Action No. 07-00806.**

July 29, 2009.

Garo Alexanian, Bayside, NY, pro se.

Edward C. Abell, Jr., Graham N. Smith, Onebane
Law Firm, Lafayette, LA, for Jason Brown, Indi-
vidually and in his official capacity as a reporter of
the Daily Advertiser, Edward "Ted" Tower, indi-
vidually and in his capacity as publisher of the
daily advertiser, The Daily Advertiser, Gannett Co.,
Inc.

## JUDGMENT

REBECCA F. DOHERTY, District Judge.

**\*1** This matter was referred to United States Magis-
trate Judge Mildred E. Methvin for her Report and
Recommendation. After an independent review of
the record, the applicable jurisprudence, and the ob-
jection filed by plaintiff, this Court concludes that
the findings and recommendation of the magistrate
judge are correct and this Court adopts the conclu-
sions set forth therein. Therefore,

**IT IS ORDERED** that Defendant's Special Motion
to Strike Pursuant to Louisiana C.C.P. art. 971

(rec.doc.46) is **GRANTED.** Plaintiff's claims are
**DISMISSED WITH PREJUDICE,** and defend-
ants shall be awarded reasonable attorney fees and
costs. Defendants shall submit an affidavit of attor-
neys' fees and costs to be filed into the record no
later than 10 days after entry of this judgment, and
plaintiff shall submit any opposition within 10 days
thereafter.

### REPORT AND RECOMMENDATION
### (Rec.Doc.46)

MILDRED E. METHVIN, United States Magistrate
Judge.

Before the undersigned is Defendants' Special Mo-
tion to Strike Pursuant to Louisiana C.C.P. Art. 971
. The motion is opposed.

### Background and Argument of Parties

Pro se plaintiff filed this action for, *inter alia,* de-
famation and libel against defendants, alleging he
was defamed by defendants in two separate but re-
lated publications. The first publication alleged to
be defamatory was an article (hereinafter the
"Story"), published on September 1, 2006, written
by defendant Jason Brown; the second was a cor-
rection to the Story (the "Correction"), published
on September 2, 2006. Both were published in The
Advertiser, a newspaper based in Lafayette, Louisi-
ana.FN1

> FN1. A copy of the *News Release* of Au-
> gust 28, 2006, by plaintiff, is attached
> hereto, as well as a copy of the *Story* and
> the *Correction*.

The Story written by Brown addressed allegations
made by plaintiff Garo Alexanian in a News Re-
lease about euthanasia and other practices by the
Lafayette Parish Division of Animal Control at the
Roicy Duhon Animal Shelter in Lafayette, Louisi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2356443 (W.D.La.)

**(Cite as: 2009 WL 2356443 (W.D.La.))**

ana ("Roicy"). Among the criticisms in the News Release were allegations that then acting Lafayette Police Chief James Craft's refused to accept a grant obtained by plaintiff for a year's supply of sodium pentobarbital (an euthanasia agent), to be used in place of carbon monoxide gas at the shelter. The Story also addressed statements made in the News Release concerning plaintiff's past accomplishments in obtaining grants for Lafayette and other parishes in the wake of Hurricane Katrina, and a statement in the News Release describing plaintiff's organization, Companion Animal Network ("CAN") as "one of the lead agencies in procuring recovery funding for over one dozen Louisiana Parish animal control agencies....". FN2

> FN2. *News Release*.

The copies of the challenged publications submitted with the briefs are blurry and difficult to read. Since the challenged publications are brief, their content and headlines will be reproduced herein for easy reference, as well as attached to this report:

**Group slings mud at Animal Control**

**Allegations against agency prove untrue.**

**\*2** A New York-based animal rescue organization is making unwarranted accusations against the Lafayette Parish Animal Control Division regarding its practices and management, according to local and national officials.

In a news release from the Companion Animal Network, Executive Director Garo Alexanian claimed Lafayette officials turned down "a major grant" for a years supply of sodium pentobarbital, a chemical used in injections to euthanize animals, which would have helped it replace its practice of using a carbon monoxide chamber to euthanize animals.

This, he said, followed the announcement that his organization was instrumental in procuring funding for an animal pick up truck work nearly $40,000 for the parish, one of more than a dozen

across the state.

Alexanian also claims his organization is working under the Maddie's Fund, which provides grant monies to organizations involved in animal rescue.

However, no one at Maddie's Fund was aware of Alexanian or expressed any affiliation with his organization.

As for the donated trucks, Laura Lanza, a southern regional manager for the American Society for the Prevention of Cruelty to Animals, claims Alexanian simply brought the idea of getting new trucks for several Louisiana parishes to the A. S.P.C.A. and the Humane Society of the United States and that those two agencies took it from there. She said she would not describe his work as "instrumental."

And in Lafayette, Jim Craft, acting Lafayette police chief, said he only has spoken with Alexanian through an e-mail in which he asked Alexanian why he was making allegations against the department and citing the office as a source.

As for the unit's policies, Craft said it does not have the staff, resources or space to perform any other type of euthanizing than what already is in place.

The following day, The Advertiser issued the second complained of publication, the Correction, as follows:

**Correction: Headline did not reflect article**

A headline on a story on Page 1C Friday about Lafayette Parish Animal Control's method of euthanizing animals did not reflect the context or content of the story. Garo Alexanian, an animal-rights activist from New York, has criticized the parish for its method of euthanizing animals and has taken steps to change the process. Alexanian's group has sought a grant from Maddie's Fund, a pro-animal organization.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2356443 (W.D.La.)
**(Cite as: 2009 WL 2356443 (W.D.La.))**

Plaintiff alleges the Story and Correction are defamatory and libelous, and that "virtually every sentence in the front page article had conclusory allegations of falsity attributed to Plaintiff without any reference to any information warranting such conclusions." [FN3]

> FN3. See *First Amended Complaint* (rec.doc.4), p. 5, ¶ 17.

Plaintiff's complaint focuses on four groups of statements that he alleges are false and defamatory. The first group concerns the statement in the Story that "[a] New York-based animal rescue organization is making unwarranted accusations against Lafayette Parish Animal Control Division regarding its practices and management, according to local and national officials" and "Alexanian claimed Lafayette officials turned down "a major grant" for a years supply of sodium pentobarbital....." Plaintiff alleges these statements are defamatory and false because plaintiff's accusations were warranted, as Lafayette officials did in fact turn down the grant of sodium pentobarbital.

**\*3** The second group surrounds plaintiff's role in procuring funding for the animal control pick-up trucks. Plaintiff contends defendants defamed him by denigrating and falsely minimizing his role in same. Plaintiff complains of the following statements: "he said ... that his organization was instrumental in procuring funding for an animal pickup truck worth nearly $40,000 for the parish ...." [but that] "[a]s for the donated trucks, Laura Lanza ... claims Alexanian simply brought the idea of getting new trucks for several Louisiana parishes to the A.S.P.C.A. and the Humane Society of the United States and that those two agencies took it from there" [and that] "she would not describe his work as 'instrumental'." Plaintiff alleges these statements were misquotes of Laura Lanza, a southern regional manager for the American Society for the Prevention of Cruelty to Animals (ASPCA), who did not say any such thing. [FN4] Plaintiff has attached an email from Laura Lanza in support of his allegation that she was misquoted. [FN5]

> FN4. *Ibid.*, pp. 6, 7 ¶ 19.

> FN5. *Ibid.*, Exhibit C.

The third group of statements were in reference to plaintiff's grant accomplishments and efforts, specifically his involvement with Maddie's Fund, and the statement that "no one at Maddie's Fund was aware of Alexanian or expressed any affiliation with his organization." [FN6] Plaintiff alleges this is inaccurate, as he was in fact pursuing a grant from Maddie's Fund, and he has attached an email from a Maddie's Fund representative to that effect. [FN7]

> FN6. See *Story*.

> FN7. *First Amended Complaint* (rec.doc.4), p. 8, ¶ 21.

The fourth statement alleged to be defamatory was made in the Correction, where plaintiff complains that he was mischaracterized as an "animal-rights activist," [FN8] thereby painting him as an extremist. Plaintiff alleges that "[c]haracterizing primarily an advisor and leader in the field of animal control as an 'animal rights' organization is similar to characterizing a Muslim Imam as an 'extremist,' and thus infer that he is a terrorist." [FN9]

> FN8. *Ibid.*, p. 9, ¶ 23.

> FN9. *Ibid*.

Plaintiff alleges that as a result of the defamatory Story and defendants' refusal to issue a meaningful correction, he has suffered damages in the form of, *inter alia,* lost contributions, lost volunteers, lost reputation, and had been forced to expend funds and labor "to explain the falsehoods to the readers of both the on-line edition of Defendants' newspaper, THE ADVERTISER, which reaches a global market, and the paper edition, which reaches precisely the readership which Plaintiff was campaigning to educate and enroll in his efforts in the furtherance of his goal and mission ." [FN10]

> FN10. *Ibid.*, pgs. 11, 12, ¶ 30.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2356443 (W.D.La.)

**(Cite as: 2009 WL 2356443 (W.D.La.))**

### Applicable Law

The Fifth Circuit has recently ruled that "Louisiana law, including the nominally-procedural Article 971," is to be applied by the federal court in a diversity case, as is this one. *Henry v. Lake Charles American Press LLC,* 566 F.3d 164, *2, 2009 WL 989190 (5th Cir.2009).* La. C.C.P. art. 971 is "a procedural device to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press." *Henry,* at *3, quoting *Lee v. Pennington,* 830 So.2d 1037, 1041 (La.App.4th Cir.2002). As explained by the Fifth Circuit, La. C.C.P. art. 971 was passed in reaction to a concern over the use or abuse of lawsuits that chill the exercise of First Amendment rights-"strategic lawsuits against public participation," or " **SLAPPs.**" La. C.C.P. art. 971 reads in pertinent part as follows:

**\*4** A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.

B. In any action subject to Paragraph A of this Article, a prevailing party in a special motion to strike shall be awarded attorney fees and costs.

\* \* \*

As explained in *Henry,* La. C.C.P. art. 971 sets up a burden-shifting analysis, where the defendant must first " 'establish [ ] that a cause of action against him arises from an act by him in furtherance of the exercise of his right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue." *Henry,* at *4, citing *Starr v. Boudreaux,* 978 So.2d 384, 388-89 (La.App. 1st Cir.2007). If such a showing is made, then "the burden shifts to the plaintiff to demonstrate a probability of success on his claim." *Id.* If the plaintiff cannot demonstrate a probability of success on his claim, the court dismisses the claim-if he can, the matter continues. *Id* .

In order to demonstrate a probability of success on his claim, a plaintiff opposing an Article 971 motion, as outlined in *Henry,* must do the following:

A plaintiff contesting an Article 971 motion must show a probability that she will be able to establish all of the elements of her tort claim. *Baxter,* 847 So.2d at 233.[FN11]

> FN11. *Baxter v. Scott,* 847 So.2d 225, 231 (La.App.2d Cir.), *vacated as moot,* 860 So.2d 535 (La.2003).

> \* \* \*

"To establish a probability of prevailing on his claim, a plaintiff must state and substantiate a legally sufficient claim. This is done through a prima facie showing of facts sufficient to sustain a favorable judgment." *Baxter,* 847 So.2d at 231-32. This requires more than that which is necessary to survive a normal motion to dismiss, as "a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial." *Estiverne v. Times-Picayune, L.L.C.,* 950 So.2d 858, 860 (La.App.4th Cir.2006)(quotation marks omitted). As one Louisiana court has noted, establishing a probability of success is a "difficult burden." *Baxter,* 847 So.2d at 235. The burden is justified, however, as "the neces-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2356443 (W.D.La.)
**(Cite as: 2009 WL 2356443 (W.D.La.))**

sity of protecting our constitutional rights of free speech and petition, particularly when exercised in relation to public issues or matters of public interest, requires the imposition of this burden on a plaintiff who brings a defamation action impacting these rights." *Id.*

**\*5** In *Kennedy v. Sheriff of East Baton Rouge,* 935 So.2d 669, 674-75 (La.2006), the Louisiana Supreme Court outlined the tort of defamation as follows:

We most recently addressed the tort of defamation in *Costello v. Hardy,* 03-1146 (La.1/21/04), 864 So.2d 129. Therein, we noted that defamation is a tort involving the invasion of a person's interest in his or her reputation and good name.

*Costello,* 03-1146 at 12, 864 So.2d at 139. Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Id., quoting Trentecosta v. Beck,* 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; Restatement (Second) of Torts § 558 (1977). The fault requirement is generally referred to in the jurisprudence as malice, actual or implied. *Costello,* 03-1146 at 12, 864 So.2d at 139.

By definition, a statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule. *Costello,* 03-1146 at 13, 864 So.2d at 140; *Trentecosta,* 96-2388 at 10, 703 So.2d at 559 (citing Restatement (Second) of Torts § 559 cmt. e (1977)). In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. *Costello,* 03-1146 at 13, 864 So.2d at 140; *Madison v.. Bolton,* 234 La. 997, 102 So.2d 433, 438 (La.1958). Words which expressly or

implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. *Costello,* 03-1146 at 13-14, 864 So.2d at 140; *Cangelosi v. Schwegmann Brothers Giant Super Markets,* 390 So.2d 196, 198 (La.1980). When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. *Costello,* 03-1146 at 14, 864 So.2d at 140. Injury may also be presumed. *Id.* When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault) and injury. *Id.*

When the plaintiff in a defamation action is a public figure, he must prove by clear and convincing evidence that the defamatory statement was made with actual malice, "i.e., that the defendant either knew the statement was false or acted with reckless disregard for the truth." *Starr v. Boudreaux,* 978 So.2d 384, 390, citing *Costello,* 864 So.2d at 140-141. To establish reckless disregard, "the plaintiff must show that the false publication was made with a high degree of awareness of probable falsity, or that the defendant entertained serious doubt as to the truth of his publication." *Starr,* at 390, citing *Tarpley v. Colfax Chronicle,* 650 So.2d 738, 740 (La.1995). Such conduct would be "typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have put it in circulation. *Starr,* at 390, citing *Kennedy,* 935 So.2d at 688-689.

**\*6** A person becomes a public figure for a limited purpose when he voluntarily injects himself into a particular public controversy with the intent to influence the resolution of the issues. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997 (1974). "An individual who voluntarily injects himself or is drawn into a particular controversy becomes a public figure for this limited range of issues .... such

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Slip Copy, 9 L .D.La.*
**(Cite as: 2009 WL 2356443 (W.D.La.))**

*Starr, 97 So.d at 91,* citing *Gertz, 1 .S. at  and 1, 9 S.Ct. at 9 and 1* .

### Argument and Discussion

*Defendant's prima facie burden*

Defendants argue they have met their prima facie burden that plaintiff's cause of action against them arises from acts in furtherance of their exercise of their constitutional right to free speech in connection ith a public issue. Defendants cite several Louisiana cases finding the publication of nespaper articles and broadcast of television nes reports are acts related to free speech rights.[1]   Defendants contend the Story and Correction ere made in connection ith a public issue, as the es elease, the Story and the Correction all revolved around the conduct of a public official Police Chief Craft, the practices of a government agency the Division of Animal Control, the criticism of both by a nonprofit animal rights organization and its executive director CA and Alexanian, and claims of previous grants allegedly obtained by Plaintiff.[1]   Defendants argue these issues affect the public at large and are commonly reported by the nes media.

> 1.   *Memorandum in Support of Defendants' Special Motion to Strike Pursuant to Louisiana C.C.P. Art. 971 rec.doc., p. 9, citing Starr v. Boudreaux, 97 So.d  1st Cir.7    Johnson v. KTBS, Inc., 9 So.d 9,  La.App.  Cir.* .

> 1.   *Ibid., p. 11.*

In opposition, plaintiff argues the statements made ere not in connection ith a public issue because The Advertiser is a privately-oned nespaper and is not a public forum, as he argues is reuired by definition in La. C.C.P. art. 9711c. urthermore, plaintiff contends that very little of

the Story dealt ith affairs of public interest, and most of the Story overhelmingly dealt ith Plaintiff's credentials and accomplishments, providing rebuttal to LCG, not the matter contained in his es elease.[1]    Plaintiff concedes that the matter of public interest may be the operation of the animal shelter in Lafayette, ho as criticized in Plaintiff's es elease but argues that Plaintiff's previous and future grant efforts[1] ere not matters of public interest, and ere defamed.

> 1.   *Plaintiff's Memorandum in Opposition to Motion to Strike rec.doc.7, p. 1.*

> 1.   *Ibid.*

Considering the facts and the applicable la, the undersigned concludes that defendants have met their prima facie burden, and have established that plaintiff's claims arise from acts in furtherance of defendants' free speech rights, and ere made in connection ith a public issue. The acts complained of ere statements made in nespaper articles. hether The Advertiser is privately-oned or publicly-oned is irrelevant there is nothing in Louisiana la hich affords free speech rights only to publicly-oned nespapers. The urisprudence analyzing *La. C.C.P. art. 971* is extensively comprised of cases alleging defamation based on publications made as stories in privately-oned nespapers.[1]    urthermore, La. C.C.P. art. 9711c contains no reference to nespaper onership status. It provides only that first amendment protection is afforded to, any ritten or oral statement or riting made in ... a public forum in connection ith an issue of public interest, among other things.

> 1.   *See Starr v. Boudreaux, 97 So.d  La.App. 1 Cir.7    Henry v. Lake Charles American Press LLC,  .d 1, , 9 L 9919 th Cir.9  Estiverne v. Times-Picayune, L .LC., 9 So.d ,  La.App.th Cir.    Lee v. Pennington,  So.d 17 La.App.*

Cir.2002).

**\*7** Plaintiff's argument that his prior grant accomplishments and credentials are not matters of public interest are not persuasive. Standing alone they well may not be, but they became so when plaintiff issued his News Release criticizing the practices and policies of the animal control shelter and Parish officials, while touting himself and his agency as being "one of the lead agencies in procuring recovery funding for over one dozen Louisiana Parish animal control agencies" and as "instrumental in procuring a previous major grant for Lafayette Parish Animal Control...." FN17 Plaintiff made his grant accomplishments, by his own self-lauding, a matter of public interest.

> FN17. See *News Release,* "Lafayette Government Rejects Major Donation," attached hereto.

The undersigned finds defendants have met their burden of showing plaintiff's cause of action arises from acts by defendants in furtherance of the exercise of their right to free speech under the United States or Louisiana Constitution in connection with a public issue. Therefore, the burden now shifts to plaintiff to demonstrate a probability of success on his claim.

*Plaintiff's burden to demonstrate a probability of success on his claim.*

### I. Limited purpose public figure

Defendants argue plaintiff is a public figure, and thus must prove actual malice as an element of his defamation claim. Defendants argue plaintiff injected himself into a public controversy when he sent his News Release to The Advertiser, criticizing the policies and operations of, and the governmental officials responsible for, the animal control shelter, and thereby became a public figure for the limited purpose of the controversy surrounding the subjects of the News Release. As such, defendants argue, the plaintiff must show, in addition to all of the oth-

er elements of a defamation claim, that defendants acted with actual malice when they published the articles; i.e., plaintiff must show that defendants either knew the statements were false or acted with reckless disregard for the truth when the statements were made.

In opposition, plaintiff argues he is not a limited purpose public figure, as he did not inject himself into a pre-existing public controversy. FN18 Plaintiff argues defendants created the controversy with their articles, which defamed, *inter alia,* his grant accomplishments. Plaintiff argues the News Release only tangentially mentioned the grants plaintiff had previously obtained, yet the defaming articles focused on those grants, which plaintiff argues were not a matter of public concern or controversy. Plaintiff argues "the issues raised by the News Release and the defamatory report were issues of private disputes between Plaintiff, Roicy Duhon animal shelter and Lafayette government." FN19

> FN18. *Plaintiff's Memorandum in Opposition to Motion to Strike* (rec.doc.76), p. 18, citing *Hutchinson v. Proxmire,* 443 U.S. 111, 130, 136, 99 S.Ct. 2675, 2688 (1979).

> FN19. *Ibid.,* p. 23.

The undersigned disagrees. The animal shelter and its practices, including its methods of euthanasia as well as the policies of Parish officials in accepting or rejecting grants for the benefit of the animals contained therein, are matters of public concern and controversy. Plaintiff's argument that his News Release only tangentially mentioned his grant accomplishments is not persuasive-the title of the News Release is "Lafayette Government Rejects Major Donation," and the first sentence touts plaintiff's Companion Animal Network (CAN) as being "one of the lead agencies in procuring recovery funding" and describes the rejected grant as "a follow-up major grant." FN20 Plaintiff's News Release labeled Police Chief Craft's behavior in declining the grant as "aberrant," and stated CAN had begun a "formal

Slip Copy, 2009 WL 2356443 (W.D.La.)

**(Cite as: 2009 WL 2356443 (W.D.La.))**

legal investigation" into, *inter alia*, "grant revenue practices...."[FN21]

> FN20. See *News Release,* attached hereto.

> FN21. *Ibid.*

**\*8** The undersigned finds plaintiff injected himself into a public issue, the operations of the animal shelter, then proceeded to create or exacerbate a public controversy surrounding its operations and policies, including its refusal to accept the grant of sodium pentobarbital, while lauding his other grant accomplishments. Thus, plaintiff is a limited purpose public figure for all subjects addressed in his News Release.

*II. Actual Malice*

In order for plaintiff's action to survive the motion to strike, he must show facts sufficient to sustain a favorable judgment, and as a limited public figure, he must show actual malice. That is, he must show that defendants either knew the statement was false or acted with reckless disregard for the truth. *Starr,* 978 So.2d at 390, citing *Costello,* 864 So.2d at 140-141. To establish reckless disregard, "the plaintiff must show that the false publication was made with a high degree of awareness of probable falsity, or that the defendant entertained serious doubt as to the truth of his publication." *Starr,* 978 So.2d at 390, citing *Tarpley v. Colfax Chronicle,* 640 So.2d 738, 740 (La.1995).

Plaintiff points to the headline of the article reading "allegations prove untrue" and the text of the Story, wherein it was acknowledged the grant was not accepted, as proof defendants must have known their publication was false, and thus acted with actual malice. However, the headline did not refer solely to plaintiff's allegations regarding denial of the sodium pentobarbital grant, which the text of the article acknowledges was denied, but the entirety of plaintiff's News Release.

The accusations made by plaintiff in the News Re-

lease were much broader than the refusal of the sodium pentobarbital grant, and included the following: Craft's refusal to respond to plaintiff's emails and conversations about the sodium pentobarbital grant; a description of Craft's behavior in not accepting the grant as "inexplicable," "questionable," and "abberant;" an anonymous quote from a sodium pentobarbital manufacturer describing Craft and other officials as "those \* & #" and stating that he "would not want my product in their hands as they may jeopardize my DEA license to sell the drug as they would probably not be competent enough to store it safely and securely;" and, a statement that CAN, plaintiff's organization, had "begun a formal legal investigation into the practices of Lafayette Parish...."[FN22]

> FN22. See *News Release.*

The undersigned finds the conflict between the general headline and the limited text of the Story regarding non-acceptance of the sodium pentobarbital grant does not constitute proof of actual malice.

In addition to arguing that the headline and content of the story itself show actual malice, plaintiff cites several actions by defendant Brown he contends are evidence of actual malice, including the following: Brown's failure to keep the recording of his interview with Laura Lanza regarding plaintiff's role in obtaining funding for the animal pick up trucks; his failure to pursue a Maddie's Fund representative familiar with plaintiff before reporting no one with Maddie's Fund was familiar with plaintiff or his organization; his failure to seek out corroborating sources for plaintiff's claims regarding his obtaining grants for the animal trucks and sodium pentobarbital; and, Brown's failure to confirm the improper practices regarding intermingling of puppies and euthanasia.

**\*9** In support of the motion to strike, defendants introduced the Affidavit of Jason M. Brown.[FN23] In his affidavit, Brown detailed the contacts and conversations he had with plaintiff, Police Chief Craft, Laura Lanza, and the national office of Maddie's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2356443 (W.D.La.)
**(Cite as: 2009 WL 2356443 (W.D.La.))**

Fund. In his affidavit, Brown stated "the facts, quotations, and statements contained in the Story are not fabrications, misquotations, or the product of Affiant's imagination" and that "[p]rior to the News Release, Affiant had never heard of Alexanian or CAN, and did not harbor any hidden bias or animosity toward Alexanian or CAN." [FN24]

> [FN23.] "Exhibit A," to *Memorandum in Support of Defendant's Special Motion to Strike Pursuant to Louisiana C.C. art. 971* (rec.doc.46).

> [FN24.] *Ibid.*

The undersigned finds that even if all of plaintiff's allegations regarding Brown's contacts and communications, or lack thereof, are true, these actions merely show negligence and lack of thoroughness on Brown's part, not actual malice. The Supreme Court has stated, "failure to investigate will not alone support a finding of actual malice ... [but] the purposeful avoidance of the truth is in a different category." [FN25] Plaintiff does not necessarily complain Brown did not investigate; rather, that Brown did not thoroughly or adequately investigate. Furthermore, plaintiff has introduced no evidence that defendants, Brown in particular, purposefully avoided the truth when it investigated and published the Story about plaintiff's News Release and the allegations and assertions made therein.

> [FN25.] *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678 (1989)(internal citations omitted).

Neither has plaintiff introduced any evidence supporting actual malice in the Correction. Plaintiff complains that defendants' defamed him therein by describing him as an "animal rights activist ." While plaintiff apparently sees a meaningful difference between his self-described role as an "animal control policy expert" and defendants' characterization of him as an "animal rights activist," [FN26] the undersigned does not. In support of their motion to strike, relevant to the Correction, defendants submitted the "Affidavit of Edward "Ted" Power," [FN27] wherein Power attests as follows:

> [FN26.] *First Amended Complaint* (rec.doc.4), p. 9.

> [FN27.] "Exhibit B," to *Memorandum in Support of Defendant's Special Motion to Strike Pursuant to Louisiana C.C. art. 971* (rec.doc. 46).

13) At the time of the publication of the Correction, Affiant believed Alexanian to be an "animal-rights activist" as that phrase is commonly used in casual conversation;

14) In the Correction, Affiant did not use the phrase "animal-rights activist" to implicitly call Alexanian a terrorist or otherwise insult him; Correction, Affiant did not use the phrase "animal-rights activist" to implicitly call Alexanian a terrorist or otherwise insult him;

15) In the Correction, Affiant used the phrase "animal-rights" activist" only to describe Alexanian as a person who publicly advocates the rights of animals;

16) Prior to the August 28, 2006, "News Release," Affiant had never heard of Alexanian or CAN, and did not harbor any hidden bias or animosity toward Alexanian or CAN.

Plaintiff has submitted no evidence that describing an individual as an "animal rights activist" is necessarily defamatory. Moreover, even if such a description could be defamatory, plaintiff has introduced no evidence that defendants uttered it with actual malice.

**\*10** For the reasons given above, the undersigned finds plaintiff has not met his burden of proving all the elements of his defamation claim based on defendants' publication of the Story or the Correction; particularly, plaintiff has not produced any evidence of actual malice on defendants' part.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### *Conclusion and Recommendation*

The undersigned finds defendants have met their initial burden under La. C.C.P. art. 971, and have established plaintiff's cause of action against them arose from an act by them in furtherance of their rights to free speech under the United States or Louisiana Constitution in connection with a public issue. The undersigned also finds plaintiff is a public figure for the limited purpose of the controversy surrounding the News Release and the subject Story and Correction, and plaintiff has not satisfied his burden of proving all the elements of his defamation claim; particularly, plaintiff has not introduced evidence of actual malice on defendants' part.

Plaintiff has not satisfied his burden of proving all the elements of his defamation claim. and plaintiff has not opposed defendants' motion to dismiss his other claims.[FN28] For the reasons given above,

> FN28. Pro se plaintiff also brought causes of action for common law misappropriation, common law unfair competition, negligent hiring, training and supervision, fraudulent and negligent misrepresentation, and civil conspiracy. Defendants moved to dismiss these claims either as not cognizable under Louisiana law, or dependent on plaintiff's defamation claim. Plaintiff has not opposed the motion to dismiss as to these claims, and the defendants' reasons for dismissal are meritorious.

**IT IS RECOMMENDED** that Defendant's Special Motion to Strike Pursuant to Louisiana C.C.P. art. 971 (rec.doc.46) be **GRANTED** as follows:

1) Plaintiff's claims be **DISMISSED WITH PREJUDICE;**

2) Defendants be awarded reasonable attorney fees and costs.

**IT IS FURTHER RECOMMENDED** that defendants be ordered to submit an affidavit of attorneys' fees and costs to be filed into the record no later than 10 days after final judgment is entered in this matter, if the court adopts this Report and Recommendation, and the defendants' motion is granted.

**IT IS FURTHER RECOMMENDED** that plaintiff be given 10 days to file an opposition to any affidavit of attorneys' fees and costs submitted by defendants.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir.1996).

W.D.La.,2009.
Alexanian v. Brown
Slip Copy, 2009 WL 2356443 (W.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5245644 (D.Vt.)
**(Cite as: 2008 WL 5245644 (D.Vt.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Vermont.
BIBLE & GOSPEL TRUST, Plaintiff,
v.
Timothy J. TWINAM, www.peebs.net, Sallie Twinam, Defendants.
**No. 1:07-cv-17.**

Dec. 12, 2008.

West KeySummary
**Federal Civil Procedure 170A ⬥2553**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2553 k. Time for Consideration of Motion. Most Cited Cases

**Federal Courts 170B ⬥433**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk433 k. Other Particular Matters. Most Cited Cases
Vermont's anti-**SLAPP** statute did not directly conflict with the Federal Rules of Civil Procedure and, therefore, was applicable in diversity suit alleging that defendant posted copyrighted material on website. The anti-**SLAPP** statute required the court to consider the pleadings and supporting and opposing affidavits, making the procedure analogous to a motion for summary judgment. Accordingly, the parties were permitted to engage in limited discovery for 30 days. 12 V.S.A. § 1041; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

George A. Gasper, Matthew H. Kirtland, Fulbright

& Jaworski L.L.P ., Washington, DC, Kathleen Walls, Glinka & Walls, Middlebury, VT, for Plaintiff.

Rebecca E. Boucher, Ronald A. Shems, Esq., Shems Dunkiel Kassel & Saunders, PLLC, Thomas E. McCormick, McCormick, Fitzpatrick, Kasper & Burchard, P.C., Burlington, VT, Eve R. Jacobs-Carnahan, Vermont Office of the Attorney General, Montpelier, VT, for Defendants.

Sallie Twinam, Richmond, VT, pro se.

*RULING ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION* (Paper 92)

J. GARVAN MURTHA, District Judge.

Plaintiff, Bible & Gospel Trust ("BGT"), brought suit against Defendants Timothy J. Twinam and Sallie Twinam for conversion, tortious interference with a contractual relationship and violations of the Copyright Act stemming from Timothy J. Twinam's ("Twinam") posting of allegedly copyrighted material to his website. The case is currently before the Court on Twinam's special motion to strike Plaintiff's complaint under Vermont's anti-**SLAPP** statute, 12 V.S.A. § 1041.

Judge Niedermeier's Report and Recommendation ("R & R") filed July 18, 2008 recommends this Court deny Twinam's motion. (Paper 92 .) The Court has reviewed the R & R and the parties' objections (Papers 94, 96, 99 and 101) and considered *de novo* those portions of the R & R to which objections pertain. *See* Fed.R.Civ.P. 72(b).

BGT objects to the R & R on procedural grounds. BGT argues Judge Niedermeier's R & R should be the ruling of the Court because the case was directly assigned to him under 28 U.S.C. 636(c). The Court disagrees. Judge Niedermeier correctly issued a § 636(b) Report and Recommendation in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5245644 (D.Vt.)
**(Cite as: 2008 WL 5245644 (D.Vt.))**

stead of a § 636(c) Order on July 18, 2008 because not all parties consented to full § 636(c) authority under 28 U.S.C. § 636, Federal Rules of Civil Procedure 72(b) & 73(a), and Local Rule 73.1. Whether parties subsequently consented is irrelevant. The Report and Recommendation was properly issued and is subject to timely objection and review by the Judge of this Court. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); Local Rule 73.1(e).

The Court agrees with the Magistrate Judge that Vermont's anti-**SLAPP** statute, 12 V.S.A. § 1041, does not directly conflict with the Federal Rules of Civil Procedure. 12 V.S.A. § 1041 therefore applies in this diversity action. The Court disagrees, however, that it should treat Defendant's Special Motion to Strike as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Section 1041 (c)(2) allows the Court to order limited discovery and § 1041(d) requires a hearing on the issues set out in subsections (e)(1)(A) and (B). Section 1041 also requires the Court to consider the pleadings and supporting and opposing affidavits. § 1041 (e)(2). This procedure is more analogous to a motion for summary judgment. Therefore, the Court will apply Vermont's anti-**SLAPP** statute under Federal Rule of Civil Procedure 56.

Accordingly, the parties may engage in limited discovery for thirty (30) days from the date of this ruling, on the issues set forth in 12 V.S.A. § 1041(a) and (e)(1)(A) and (B). Any additional memoranda or affidavits shall be filed on or before January 26, 2009. A hearing limited to the consideration of the pleadings and any supporting or opposing affidavits will take place Thursday, February 12, 2009, at 10:00 a.m. at the U.S. District Court in Brattleboro, Vermont.

The Court therefore AFFIRMS, APPROVES and ADOPTS the Magistrate Judge's Report and Recommendation with respect to the applicability of 12 V.S.A. § 1041 in this case, but REJECTS and MODIFIES the Report with respect to the applicable standard, *see* 28 U.S.C. 636(b)(1). The Court will use the summary judgment standard in consid-

ering questions arising under 12 V.S.A. § 1041.

SO ORDERED.

D.Vt.,2008.
Bible & Gospel Trust v. Twinam
Not Reported in F.Supp.2d, 2008 WL 5245644 (D.Vt.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 587860 (D.D.C.), 29 Media L. Rep. 1347
**(Cite as: 2001 WL 587860 (D.D.C.))**

**H**

United States District Court, District of Columbia.
Sidney BLUMENTHAL
and
Jacqueline Jordan BLUMENTHAL, Plaintiffs,
v.
Matt DRUDGE, Defendant.
**No. Civ.A. 97-1968(PLF.**

Feb. 13, 2001.

*MEMORANDUM OPINION AND ORDER*

FRIEDMAN, J.

**\*1** This matter is before the Court on defendant Drudge's special motion to strike plaintiffs' complaint. Defendant contends that plaintiffs' suit is meritless and that he therefore is entitled to dismissal of the action under California law. Plaintiffs respond that according to their choice of law analysis, California law is inapplicable in this action. Even if California law did apply, plaintiffs believe that dismissal is inappropriate because they are entitled to discovery under the Federal Rules of Civil Procedure before the Court considers any summary resolution of this case. Upon consideration of the arguments presented by the parties and the Court's own analysis of California law, the Court will deny the special motion to strike plaintiffs' complaint.

**I. BACKGROUND**

Plaintiffs Sidney and Jacqueline Jordan Blumenthal have brought this suit against defendant Matt Drudge for allegedly defamatory statements published on defendant's Internet website on August 10, 1997. The facts of this case have been summarized by the Court in two previous opinions and do not need to be repeated here. *See Blumenthal v. Drudge,* 186 F.R.D. 236, 238-40 (D.D.C.1999), *Blumenthal v. Drudge,* 992 F.Supp. 44, 46-48

(D.D.C.1998).

On October 31, 2000, the Court heard argument on defendant's motion for judgment on the pleadings. Defendant argued that the case should be dismissed as a matter of law because plaintiffs could not prove defamation. The Court denied the motion. The Court also ordered that before plaintiffs could depose Mr. Drudge to learn the sources for his story, they first must depose those individuals identified as possible alternative sources of such information. *See* November 17, 2000 Order at 1-2. The Court referred all discovery disputes to Magistrate Judge John M. Facciola and ordered the parties to contact Judge Facciola's Chambers before scheduling depositions so that he could be available either by telephone or in person to deal with any disputes that may arise during the depositions. *See id.* at 2-3. After consulting with Judge Facciola's Chambers, plaintiffs scheduled depositions for February 14 and 15, 2001 in Washington. D.C. On January 31, 2001, defendant filed his special motion to strike plaintiffs' complaint.[FN1] Defendant contends that the lawsuit filed by the Blumethals is a **SLAPP** ("Strategic Lawsuit Against Public Participation") action and therefore should be dismissed pursuant to California's Anti-**SLAPP** statute. *See* Cal.Civ.Proc.Code § 425.16 (West 2001).

> FN1. Along with the special motion to strike, defendant filed a motion for a protective order and to quash the depositions scheduled for February 14 and 15, 2001, and a motion to shorten the time in which to consider the motion for a protective order and to quash the depositions. The motion to shorten time was granted, but because plaintiffs rescheduled the depositions in question, defendant's motion for a protective order and to quash the depositions was rendered moot.

**II. DISCUSSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 587860 (D.D.C.), 29 Media L. Rep. 1347

**(Cite as: 2001 WL 587860 (D.D.C.))**

California's Anti-**SLAPP** statute is a procedural rule designed "to provide for the early dismissal of meritless suits aimed at chilling the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Globe-trotter Software, Inc*. *v*. *Elan Computer Group, Inc*., 63 F.Supp.2d 1127, 1128 (N.D.Cal.1999). *See also United States* ex rel. *Newsham v. Lockheed Missiles & Space Co*., 190 F .3d 963, 970-71 (9th Cir.1999); *Wilcox v. Superior Court*, 33 Cal.Rptr.2d 446, 449-50 (Cal.Ct.App.1994). The California legislature explicitly enacted the statute to respond to what it saw as a

**\*2** disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.

Cal.Civ.Proc.Code § 425.16(a). Under the Anti-**SLAPP** statute, a defendant may file a special motion, but to succeed on the motion he first must meet his *prima facie* burden of showing that the suit arises out of the exercise of his right of petition or free speech. *See* Cal.Civ.Proc.Code § 425.16(b)(1). If the defendant carries this burden, the plaintiff must demonstrate through the pleadings and affidavits that there is a probability he will prevail on the claim. *See id*. § 425.16(b)(1), (b)(2) Failure to do so results in the dismissal of the lawsuit and the awarding of attorneys' fees and costs to the defendant. *See id*. § 425.16(b)(1). (c). Through the invocation of this statute, the defendant can obtain early dismissal of a lawsuit before substantial time and expense is incurred defending against meritless First Amendment-chilling litigation.

Defendant Drudge argues that the Anti-**SLAPP** statute should be applied in this case. He contends that plaintiffs will be unable to prevail in this matter because they "are both public figures ... and must show by clear and convincing evidence at trial

that the material published by Drudge was defamatory, and was published with 'actual malice." ' December 28, 2000 Order Granting Defendant Matt Drudge's Motion to Amend the Court's November 17, 2000 Order. He also contends that plaintiffs have no evidence to support their claim of defamation against defendant. Plaintiffs oppose the special motion, arguing that the statute should not apply under their choice of law analysis and that even if it did apply, they should be allowed the opportunity to conduct discovery to assist them in establishing the probability that they will prevail at trial *See Metabolife International, Inc. v. Wornick*, 72 F.Supp.2d 1160, 1166 (S.D.Cal.1999)

The Court will assume for the purposes of deciding the special motion that the California Anti-**SLAPP** statute does apply in this case. The statute states that the special motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." Cal.Civ.Proc.Code § 425.16(f). Although the statute states that the special motion "may" be filed within 60 days and not that it "must" be filed within that time, Section 425.16(f) has been interpreted by both federal and state courts in California to require filing within 60 days of the complaint or amended complaint unless otherwise permitted by the court in its discretion. *See Globe-trotter Software, Inc v. Flan Computer Group. Inc*. 63 F Supp 2d at 1129; *Rogers v. Home Shopping Network*, 57 F.Supp.2d 973, 975-76 (C.D.Cal.1999); *Wilcox v. Superior Court*, 33 Cal.Rptr.2d at 454; *see also* Eric E. Younger & Donald E. Bradley, YOUNGER ON CALIFORNIA MOTIONS § 14.38 (2000).[FN2] A requirement that the motion to strike be filed soon after the filing of the complaint best serves the purpose of the Anti-**SLAPP** statute-to provide for the early dismissal of meritless First Amendment-chilling lawsuits. *See Wilcox v. Superior Court*, 33 Cal. Rptr 2d at 454-55 (early filing of special motion to strike allows "fast and inexpensive unmasking and dismissal of **SLAPPs**," benefitting defendant, court and public). The 60 day period for filing the special motion has long since ex-

Not Reported in F.Supp.2d, 2001 WL 587860 (D.D.C.), 29 Media L. Rep. 1347

**(Cite as: 2001 WL 587860 (D.D.C.))**

pired in this case. Plaintiffs filed their complaint on August 27, 1997, and defendant did not file the special motion until January 31, 2001, well over three years past the expiration of the 60 day period. The question under the statute, then, is whether the Court should exercise its discretion to permit filing out of time.

> FN2. Reading Section 425.16(f) as a whole, it is logical to interpret it as requiring the filing of the special motion within 60 days. If the first clause is not read as a restriction on when the special motion may be filed, the second half of the provision giving the Court discretion to allow the motion to be filed "at any later time upon terms it deems proper" would make no sense. Providing the court with such discretion is logical only if the 60 day time period acts as a limitation on when the special motion must be filed.

*3 Defendant's own actions in this case strongly suggest that the failure to file the special motion within 60 days should not be excused by the Court in the exercise of its discretion. Putting aside relatively inconsequential motions, such as motions for enlargements of time, defendant Drudge has actively litigated this case from the beginning and has already filed two dispositive motions: (1) a motion to dismiss filed on October 27, 1997, and (2) a motion for judgment on the pleadings filed on December 15, 1999.FN3 Despite the filing of these motions and his active involvement in discovery and litigation relating to discovery, defendant inexplicably has waited until this late date to file his special motion to strike. Defendant himself has aggressively sought discovery from plaintiffs in the form of requests for production of documents, interrogatories and the depositions of both Mr. and Mrs. Blumenthal-depositions that took several days and are still not concluded and that involved extensive litigation before this Court. See *Blumenthal v. Drudge,* 186 F.R.D. at 240-42. On October 7, 1998, defendant even filed a motion to compel, seeking the pro-

duction of additional documents, interrogatory and deposition responses, and discovery sanctions against plaintiffs. See *id*. at 238, 240-42. If this suit were really the type of meritless action suitable for early dismissal under the Anti-**SLAPP** statute, then defendant should have filed this special motion long ago; defendant's actions in this litigation have pushed this suit beyond the point where the special motion should be allowed in the exercise of the Court's discretion.

> FN3. Although the motion to dismiss mentions the California Anti-**SLAPP** statute and suggests that the statute may be applicable in this case, at that time defendant did not file a special motion to strike under the Anti-**SLAPP** statute or request dismissal on that basis: he only argued that the case should be dismissed for lack of personal jurisdiction. *See* Memorandum of Points and Authorities in Support of Defendant Mart Drudge's Motion to Dismiss for Lack of Personal Jurisdiction and Alternative Motion to Transfer for Convenience and in the Interest of Justice at 2-3.

Finally, the Court concludes that this suit does not appear to be the type of action that the California legislature had in mind when it enacted the Anti-**SLAPP** law. **SLAPP** suits are often brought for "purely political purposes" in order to obtain "an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff." *Rogers v. Home Shopping Network, Inc., 57 F.Supp.2d at 974* (citation omitted). As one court has observed:

[O]ne of the common characteristics of a **SLAPP** suit is its lack of merit. But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective. As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff in the

Not Reported in F.Supp.2d, 2001 WL 587860 (D.D.C.), 29 Media L. Rep. 1347

**(Cite as: 2001 WL 587860 (D.D.C.))**

political arena is substantially diminished.... Thus, while **SLAPP** suits "masquerade as ordinary law-suits" the conceptual features which reveal them as **SLAPPs** are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal right or to punish them for doing so. Because winning is not a **SLAPP** plaintiff's primary motivation, defendants' traditional safeguards against meritless actions, (suits for malicious prosecution and abuse of process, requests for sanctions) are inadequate to counter **SLAPPs**.

**\*4** *Wilcox v. Superior Court,* 27 Cal. Rptr 2d at 449-50 (citations omitted). The suit filed by the Blumethals bears little resemblance to this description. While the law of defamation as applied to public figures will make it difficult for the plaintiffs ultimately to prevail, the Court cannot characterize the suit as meritless (an issue it considered in denying defendant's motion for judgment on the pleadings) or conclude at this stage that plaintiffs have not been injured in their reputations or that "winning is not [their] primary motivation", so far as it appears, they have brought this suit to "vindicate a legally cognizable right." *Id.* While defendant correctly points out that the Court must be sensitive to the chilling effect that a defamation suit has on the exercise of First Amendment rights, this suit does not appear to have chilled defendant's exercise of his free speech rights as he continues to publish stories on his website in much the same manner as he did before the lawsuit was filed. Accordingly, it is hereby

ORDERED that defendant's special motion to strike plaintiffs' complaint is DENIED.

SO ORDERED.

D.D.C.,2001.
Blumenthal v. Drudge
Not Reported in F.Supp.2d, 2001 WL 587860 (D.D.C.), 29 Media L. Rep. 1347

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.   Case 8:08-cv-02468-DKC   Document 78   Filed 01/26/10   Page 31 of 111

Page 1

Slip Copy, 2009 WL 2750093 (S.D.Ind.)
**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Indiana,
Indianapolis Division.
CONTAINMENT TECHNOLOGIES GROUP,
INC., Plaintiff,
v.
AMERICAN SOCIETY OF HEALTH SYSTEM
PHARMACISTS; Gregory F. Peters; Marghi R.
McKeon; and William T. Weiss, Defendants.
**No. 1:07-cv-0997-DFH-TAB.**

Aug. 26, 2009.

Daniel P. King, Joel E. Tragesser, Frost Brown
Todd LLC, Indianapolis, IN, for Plaintiff.

Jan M. Carroll, Kara M. Moorcroft, T. Joseph
Wendt, Barnes & Thornburg LLP, Indianapolis, IN,
Danford Royce Due, Geoffrey B. Davis, Due Doyle
Fanning & Metzger, Indianapolis, IN, Kellie M.
Barr, Kelly Michelle Scanlan, Steven M. Badger,
Bose McKinney & Evans, LLP, Indianapolis, IN,
for Defendants.

ENTRY ON DEFENDANTS' FEE PETITIONS

DAVID F. HAMILTON, Chief Judge.

*1 The March 15, 2007 issue of the American
Journal of Health-System Pharmacy included an
article entitled "Potential for Airborne Contamina-
tion in Turbulent and Unidirectional Air Flow
Compounding Aseptic Isolators." The article repor-
ted on comparative tests of several specialized
products called compounding aseptic isolators.
These important devices are used where medica-
tions that will be injected directly into a patient's
bloodstream are prepared. The devices keep the
medications sterile and safe for injection. The art-
icle reported results that were critical of a product

made by plaintiff Containment Technologies
Group, Inc. ("Containment Tech"). Plaintiff filed
this defamation action against the publisher of the
magazine, the American Society of Health System
Pharmacists (ASHP), and the article's three authors.

After a reasonable time for discovery pursuant to
the agreed case management plan, all defendants
filed motions to dismiss pursuant to Indiana's anti-
**SLAPP** law (" **SLAPP** " stands for "strategic law-
suits against public participation"). See Indiana
Code § 34-7-7-1 *et seq.* Treating the motions to dis-
miss as motions for summary judgment, this court
granted the motions. 2009 WL 838549 (S.D.Ind.
March 26, 2009). Indiana Code § 34-7-7-7 provides
that a prevailing defendant under the anti-**SLAPP**
law "is entitled to recover reasonable attorney's fees
and costs." All defendants have now filed petitions
for their attorney fees and costs. For the following
reasons, those petitions are granted in full.

*Discussion*

Containment Tech sued four defendants. The claim
against publisher ASHP was distinct from the
claims against the individual authors. ASHP had its
own counsel. Author Peters owns his own business
(Lab Safety Corp.) and employs author McKeon.
They shared the same counsel. Author Weiss had
his own counsel hired through his employer, the
Mayo Clinic in Rochester, Minnesota. The three au-
thors raised very similar defenses. For the most
part, Weiss' counsel took the lead on a number of
joint efforts, including discovery motions and the
more substantive summary judgment briefing. Dkt.
No. 176 at 6.

The total request for ASHP is $220,591.21, includ-
ing attorney fees, costs, and prejudgment interest.
The total request for Peters' and McKeon's counsel
is $69,006.07. The total request for Weiss' counsel
is $220,757.07, but without prejudgment interest in-
cluded. Those figures are appropriate "lodestar"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2750093 (S.D.Ind.)
**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

amounts-calculated by applying the attorneys' actual hourly rates to the hours spent on the litigation. See generally *Hensley v. Eckerhart,* 461 U.S. 424, 433-34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The fee petitions show that the amounts sought were market rates actually billed to and paid by the clients, and the defense attorneys used "billing judgment" by choosing not to charge for some of their time and efforts. See *id.* at 434.

The fee requests are substantial but reasonable. All counsel on both sides of this case are highly competent, and the case was litigated vigorously on both sides. (An appeal still proceeds on the merits.) Containment Tech has raised no issue as to the reasonableness of the hourly rates sought. The fact that they were market rates actually billed and paid is strong evidence that they were reasonable. See *People Who Care v. Rockford Bd. of Educ.,* 90 F.3d 1307, 1310 (7th Cir.1996) ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."); *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1150 (7th Cir.1993) ("the best measure of the cost of an attorney's time is what that attorney could earn from paying clients"); *In re Continental Illinois Securities Litigation,* 962 F.2d 566, 568 (7th Cir.1992) (court's role is to determine market value of attorney's services, not to determine "the equivalent of the medieval just price").

**\*2** The case presented a number of issues that raised the legal costs for the defense. There is a key choice of law issue. The relationship among the state anti-**SLAPP** statute, state procedural rules, and federal procedural rules presented several substance/procedure problems governed by the principles of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The substance of the scientific debate required all defense counsel to dig into the science and engineering involved in compounding aseptic isolators. The parties conducted substantial discovery, including numerous depositions taken by plaintiff Containment Tech, along with the usual disputes over the

confidentiality of sensitive but unprivileged information during discovery.

The stakes were high. Containment Tech said in its interrogatory answers that it sought damages of $5.8 million. (It is unclear whether that number included any of the punitive damages being sought.) Beyond money, the professional reputations of the defendants and the availability of accurate information about the safety of important medical devices were at stake. And beyond the individual parties, larger principles of free scientific debate were at risk in this lawsuit. See *Underwager v. Salter,* 22 F.3d 730, 735 (7th Cir.1994) (recognizing public interest in protecting vigor of scholarly research and publication). Those are the stakes that provide the foundation for the Indiana anti-**SLAPP** statute.

The attorney fee-shifting provision of the anti-**SLAPP** statute is a key part of the law's substantive policy. It is designed "to place the financial burden of defending against so-called **SLAPP** actions on the party abusing the judicial system by bringing a **SLAPP** lawsuit." *Poulard v. Lauth,* 793 N.E.2d 1120, 1124 (Ind.App.2003) (reversing denial of attorney fees where prevailing party's fees had been paid by a third party). In applying the statute, the Indiana courts have explained: "In general, the purpose of allowing an award of attorney's fees in a civil action is to 'make whole' and fully compensate a party who has successfully enforced his legal rights in court." *Shepard v. Schurz Communications, Inc.,* 847 N.E.2d 219, 227 (Ind.App.2006) (affirming fee award and allowing appellate attorney fees under anti-**SLAPP** statute).

Containment Tech does not challenge the accuracy of the defendants' time records or the reasonableness of the hourly fees that support the requested lodestar amounts. In an effort to reduce the fee award, Containment Tech argues: (1) that the defendants waited too long to file their motions to dismiss and that a fee award should include only time directly attributable to the motions rather than all reasonable efforts in the litigation; (2) that fees should not be awarded for some specific discovery

Slip Copy, 2009 WL 2750093 (S.D.Ind.)
**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

activities; (3) that defendants are not entitled to fees incurred in seeking fee awards under the statute; and (4) that Weiss' attorney spent too much time on the case, especially when compared to the efforts of ASHP's attorneys. None of these arguments are persuasive.

### I. *Timing of the Defense Motions*

**\*3** Containment Tech's principal argument is that the defendants waited too long to file their motion under the anti-**SLAPP** statute. The Indiana anti-**SLAPP** statute provides for a defense motion to dismiss that must be treated like a motion for summary judgment. Ind.Code § 34-7-7-9(a). The law also provides an expedited procedure for ruling on motions invoking the statute: "All discovery proceedings in the action are stayed upon the filing of a motion to dismiss made under this chapter, except for discovery relevant to the motion." Ind.Code § 34-7-7-6. The statute instructs the court that once a defendant "files a motion to dismiss under this chapter," the court should specify time limits for discovery relevant to the motion and establish "a reasonable time period, not to exceed one hundred eighty (180) days, to expedite and rule on the motion." Ind.Code § 34-7-7-9(a).

The case was removed to federal court on August 1, 2007. All defendants raised the anti-**SLAPP** statute in their answers. ASHP filed its summary judgment motion on August 21, 2008. The authors filed their motion on October 1, 2008. Containment Tech argues: "Despite having raised the Anti-**SLAPP** statute early in litigation, Defendants chose to engage in and proceed with litigation, including initial disclosures, case management negotiations, extensive discovery, discovery disputes, and several depositions. [Containment Tech] must not be penalized for the strategic decision of Defendants that lead [sic] to a delayed filing of their respective Anti-**SLAPP** motions." Dkt. No. 190 at 4.

Containment Tech's argument fails at several levels. First, even if the procedures of the Indiana

anti-**SLAPP** statute were controlling here, the statute does not set a schedule for filing the motion to dismiss or otherwise require any expedited behavior by the defendant. The expedited process and 180-day period in the statute are triggered by filing the motion to dismiss. Indiana Code § 34-7-7-9 states, with emphasis added:

(a) If a person *files* a motion to dismiss under this chapter, the court in which the motion is filed shall do the following:

\* \* \*

(2) Establish a reasonable time period, not to exceed one hundred eighty (180) days, to expedite and rule on the motion.

The statute imposes no deadline for filing the motion. Nor does the statute attempt to deny the plaintiff a fair opportunity to conduct discovery or to litigate its claim.

Second, even in state courts, the status of the statute's deadlines and specific procedures is doubtful. As a matter of separation of powers under the Indiana Constitution, Indiana courts have repeatedly held that the procedural rules adopted by the Indiana Supreme Court take precedence in the case of a conflict with a legislative effort to dictate court procedure. See *Shepard v. Schurz Communications,* 847 N.E.2d at 224; accord, *State v. Bridenhager,* 257 Ind. 699, 279 N.E.2d 794, 796 (Ind.1972); *Jackson v. City of Jeffersonville,* 771 N.E.2d 703, 705-06 (Ind.App.2002); *Humbert v. Smith,* 655 N.E.2d 602, 604 (Ind.App.1995), adopted on transfer, 664 N.E.2d 356 (Ind.1996).

**\*4** Third, after this case was removed to federal court, federal law and rules governed procedural aspects of the case. See generally *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (holding that Federal Rule of Civil Procedure 4 for personal service of summons controlled diversity action in fed-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2750093 (S.D.Ind.)
**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

eral court).[FN1] Pursuant to standard procedures in this court, the parties conferred and agreed upon a case management plan. That plan did not provide for expedited motions practice or for limited or bifurcated discovery. See Dkt. Nos. 37 & 40. Some of the deadlines were adjusted from time to time, sometimes by agreement and sometimes over one side's opposition, but the lawsuit essentially followed the course charted in the agreed case management plan. Containment Tech now describes the steps along this path as delaying tactics intended to raise defendants' fee petitions. The court views these instead as necessary steps to prepare the case for orderly disposition after Containment Tech had a fair opportunity to develop its case. The court has found no indications in the record that Containment Tech tried to expedite the case or to require compliance with the view of the state statute's procedures that it now advocates.

> [FN1.] In this case, the court held that the anti-**SLAPP** statute's complete defense to defamation claims and attorney fee provisions were substantive. The timing requirements in Ind.Code § 34-7-7-9, however, are decidedly procedural.

Fourth, to the extent that Containment Tech is arguing that a fee award should be limited to time spent actually preparing a motion to dismiss, the court views that limit as inconsistent with the anti-**SLAPP** statute and its purpose. Nothing in the statutory language imposes that limit. Indiana courts have interpreted the anti-**SLAPP** statute as intended to put the financial burden of the litigation defense on the plaintiff, *Poulard v. Lauth,* 793 N.E.2d at 1124, and to "make whole" and fully compensate a defendant who has successfully protected his rights. *Shepard v. Schurz Communications,* 847 N.E.2d at 227. As a matter of Indiana law, fee awards to prevailing defendants under the anti-**SLAPP** statute should reimburse them for all time reasonably spent on the litigation to achieve the successful result. That time will often include, as it does here, taking, responding to, and defending necessary discovery.

Those activities will be necessary preludes to a successful motion. They should be reimbursed to make the defendant whole and to make the plaintiff bear the financial burden of the defense.

Under the federal rules, the parties were required to make initial disclosures, develop a case management plan, and start discovery. Given the complexity of this case and the high stakes, the filing of summary judgment motions twelve to fourteen months after the commencement of the case did not reflect unreasonable delay by any party. This conclusion is bolstered by the way that discovery took place. While the defendants served some interrogatories and document requests, plaintiff was the prime mover for most discovery expenses. Defendants did not notice a single deposition. All of their discovery was written discovery. Depositions taken by plaintiff's counsel required all counsel to travel throughout the eastern part of the United States.

**\*5** The court is not suggesting that Containment Tech conducted too much discovery. It chose its course, and the court sees nothing unreasonable about it. But the defendants were certainly entitled to participate in that discovery. It is unclear what Containment Tech would have had defendants do. Containment Tech was entitled to take discovery to prepare its case, to respond to the defense motions, and to develop its theory of the case. To reply to the defendants' motion for summary judgment, Containment Tech needed to come forward with evidence that would allow a reasonable jury to find, by clear and convincing evidence, that the defendants had published false defamatory content without a reasonable basis in law and fact for doing so. See Ind.Code § 34-7-7-5. To prepare its response, Containment Tech was entitled to conduct discovery, including depositions. If ASHP and the authors had filed their summary judgment motions at the very outset, the court would have been required to grant Containment Tech a fair opportunity to conduct discovery to respond to the motions. There would have been no point in filing a motion for summary judgment until Containment Tech had had a reasonable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2750093 (S.D.Ind.)
**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

opportunity to conduct discovery. Containment Tech's arguments in opposition to the fee petitions seem to imply that the court should have prevented Containment Tech itself from taking discovery so as to reduce the defense costs. But the parties proceeded at a reasonable pace, and the timing of the motions for summary judgment offers no basis for reducing the requested fees.

## II. *Challenges to Specific Actions During Discovery*

Containment Tech also argues that certain specific activities should not be compensated as part of an award of attorney fees. First, it challenges the authors' discovery requests, which it says "far exceeded any information needed to support their Anti-**SLAPP** defense." Dkt. No. 190 at 5. Containment Tech refers to some of the information sought and then notes that it was not used in the authors' actual motion for summary judgment. This is not the correct standard. "Blind alleys are an ordinary part of litigation," and if the effort was reasonable at the time it was made, a reasonable fee award should cover it. *Bohen v. City of East Chicago,* 666 F.Supp. 154, 158 (N.D.Ind.1987) (Easterbrook, J., by designation). The parties agreed on a fairly compressed schedule of about four months to conduct discovery. The authors served a comprehensive document request at the outset. The parties had not provided for staged discovery in their case management plan, so it was reasonable to take that approach. It was not apparent at the time of the document request what the eventual strategy for summary judgment would be. In fact, it took a considerable amount of time to obtain from Containment Tech even something as basic as a definitive statement of the allegedly defamatory statements.

The most specific complaint by Containment Tech was about the authors' request for information on a different isolator from the one tested in the article at issue. The product is apparently similar to the device tested for the article, so it might have proved relevant at later stages in the case. The authors had no obligation to limit their discovery to the actual

motion for summary judgment. Again, the procedural requirements of the Indiana anti-**SLAPP** rule could not possibly have been triggered until the defendants filed their motions, and they do not apply in federal court in any event. The parties did not seek limited or bifurcated discovery in this case. The Indiana statute provides for limited discovery, but even if that requirement applied, the limit kicks in only "upon the filing of a motion to dismiss made under this chapter." See Ind.Code § 34-7-7-6. The record does not indicate here that Containment Tech sought to limit its own discovery to matters relevant to the defense motions. All discovery for this case was scheduled to close on July 1, 2008 regardless of the disposition of the motions for summary judgment.[FN2]

> FN2. Containment Tech also challenges fees for discovery disputes, specifically defendant Weiss' litigation over a protective order. This dispute was part of the litigation, and Weiss had to deal with plaintiff's insistence on a protective order. The parties worked out a partial agreement, and Magistrate Judge Baker resolved the remaining disputes, with mixed results. Dkt. No. 118. The court probably would not allow fees for time devoted to a prevailing party's losing discovery motion, but this dispute was an integral and unavoidable part of the lawsuit. Since the attorney fees provision is intended to "place the financial burden of defending against so-called **SLAPP** actions" on the plaintiff, it must bear the cost of this expense as well. *Poulard v. Lauth,* 793 N.E.2d at 1124.

**\*6** Containment Tech also challenges the fees and costs devoted to the issue of the confidentiality of the article's peer reviewers. Containment Tech argues that this dispute was not relevant to the anti-**SLAPP** motion itself, so that the fees should not be recoverable. This argument has no more force here. ASHP seeks fees for roughly fourteen hours of time on the issue, which seems reasonable. Containment

Slip Copy, 2009 WL 2750093 (S.D.Ind.)

**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

Tech was going to go after the peer reviewers in any event to show alleged bias-that was a key part of its litigation strategy.[FN3]

> FN3. Since Containment Tech wanted to depose the peer reviewers, this attempt to shield their identities could arguably have been a valid strategy for preparing the future motion for summary judgment and not simply an attempt to protect ASHP's confidentiality for the sake of the organization, as Containment Tech argues.

III. *Fees on Fee Petition*

Containment Tech argues that the court should not include in a fee award any attorney time spent on litigating these fee award issues, relying on *In re Estate of Inlow,* 735 N.E.2d 240 (Ind.App.2000). The court held in *Inlow* that a probate attorney seeking to bill the estate is not entitled to collect a fee for time spent preparing the bill or litigating a fee petition under Indiana Code § 29-1-10-13. *Id.* at 253-54. *Inlow* applied the standard that governs when an attorney bills her own clients: preparing a bill is a cost of doing business and the attorney does that work on her own clock. As the *Inlow* court wrote: "Requiring a client to pay an additional amount for being told what he owes in the first instance is neither good business nor good law." *Id.* at 253.

The defendants and defense attorneys in this case are not trying to bill plaintiff for the attorneys' time spent preparing bills for their own clients (including the significant effort that goes into recording time for billing purposes). The defendants seek their attorneys' time devoted to litigating the contested fee issue. Preparing a fee petition to require the opposing party to pay an attorney fee benefits the attorney's client directly. Such time is routinely allowed under fee-shifting statutes, as the Indiana courts have made clear in distinguishing *Inlow* on this issue on precisely this basis. See *Bigley v. Metropolitan School Dist. of Wayne Township,* 881 N.E.2d 77, 85-86 & n. 9 (Ind.App.2008) (ordering that prevailing party was entitled to attorney fees for time spent defending fee award on appeal); *Walton v. Claybridge Homeowners Ass'n,* 825 N.E.2d 818, 824-25 (Ind.App.2005) (affirming attorney fee award under fee-shifting contract, including time spent preparing and litigating fee petition). *Bigley* and *Walton* both noted that such fees for successful fee petitions are routinely allowed under federal fee-shifting statutes. *Bigley,* 881 N.E.2d at 85 n. 8; *Walton,* 825 N.E.2d at 825 n. 2. Such fees are necessary to make whole the party who incurred and paid those fees in the first place. *Bigley,* 881 N.E.2d at 85. As explained above, the purpose of the fee-shifting provision in the Indiana anti-**SLAPP** statute is to make the defense whole. *Shepard,* 847 N.E.2d at 227. Defendants are entitled to attorney fees incurred in obtaining this fee award.

IV. *Imbalance in Time between ASHP's and Weiss' Attorneys*

**\*7** Containment Tech points out that Weiss' counsel billed nearly twice as much for the successful motion for summary judgment as ASHP's equally successful counsel. This argument also must be rejected. While many of the alleged defamatory statements were brought against all defendants, the authors faced different issues. As the publisher, ASHP was able to defend itself by relying on the peer review process it established for the article. ASHP did not need to defend the ultimate accuracy of the article or the soundness of the authors' test methodology. It could rely on its efforts to ensure thorough review by others.

The authors, on the other hand, were required to defend the substance of their test methodology and the test results. The authors were alleged to have developed the entire study to sully the name of Containment Tech. The authors' only defense was the quality of their work. Presumably Weiss' counsel is not an expert in compounding aseptic isolators. The authors also had to deal with the complica-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2750093 (S.D.Ind.)
**(Cite as: 2009 WL 2750093 (S.D.Ind.))**

tion that some of their data files from the test had been lost. The fact that Weiss's counsel spent more time than ASHP's counsel does not mean that his time was unreasonable. Not all attorneys are able to work at the same rate of efficiency. Fee petitions are not decided based on what the most highly skilled and efficient attorney in the country could do but are decided based on what is reasonable. The time spent by Weiss' counsel preparing the motion for summary judgment was reasonable.

*Conclusion*

The court grants the defendants' fee and cost petitions in the following amounts. ASHP is entitled to $220,591.21. Weiss is entitled to $220,757.07. Peters and McKeon are entitled to $69,006.07. The court is issuing a supplemental judgment to that effect.

So ordered.

S.D.Ind.,2009.
Containment Technologies Group, Inc. v. American Society of Health System Pharmacists
Slip Copy, 2009 WL 2750093 (S.D.Ind.)

END OF DOCUMENT

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. Indiana,
Indianapolis Division.
CONTAINMENT TECHNOLOGIES GROUP,
INC., Plaintiff,
v.
AMERICAN SOCIETY OF HEALTH SYSTEM
PHARMACISTS; Gregory F. Peters; Marghi R.
McKeon; and, William T. Weiss, Defendants.
**No. 1:07-cv-0997-DFH-TAB.**

March 26, 2009.

West KeySummary
**Libel and Slander 237 ⫸51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice
Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and Comment on
Public Matters and Publication of News. Most
Cited Cases

**Pleading 302 ⫸358**

302 Pleading
    302XVI Motions
        302k351 Striking Out Pleading or Defense
            302k358 k. Frivolous Pleading. Most
Cited Cases

Authors and publishers of an article criticizing the
safety of a medical device used for sterilizing injec-
ted medications did not act with actual malice, and
therefore they could not be held liable for defama-
tion of the device manufacturer. The safety of med-
ical devices was a public concern, as required by
Indiana's anti-**SLAPP** law. In addition, the defend-
ants did not publish the article with reckless or with
knowing disregard for the truth. West's IC §§
34-7-7-2, 34-7-7-5(2).

Daniel P. King, Joel E. Tragesser, Frost Brown
Todd LLC, Indianapolis, IN, for Plaintiff.

Jan M. Carroll, Kara M. Moorcroft, T. Joseph
Wendt, Barnes & Thornburg LLP, Danford Royce
Due, Geoffrey B. Davis, Due Doyle Fanning &
Metzger, Anne L. Cowgur, Bingham McHale LLP,
Kellie M. Johnson, Kelly Michelle Scanlan, Steven
M. Badger, Bose Mckinney & Evans, LLP, Indiana-
polis, IN, for Defendants.

ENTRY ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

DAVID F. HAMILTON, Chief Judge.

**\*1** In this diversity jurisdiction action, a manufac-
turer claims it was libeled by an academic journal
and three authors who tested and criticized the
manufacturer's product, which plays a critical role
in safely packaging prescription medications for
direct injections into patients. An Indiana statute
provides protection from civil liability for people
who exercise their federal and state constitutional
rights to free speech. The statute, known as the
"Anti-**SLAPP**" law ( **SLAPP** stands for "strategic
lawsuits against public participation"), serves as a
bulwark against attempts to silence speakers
through unjustified defamation suits. The defend-
ants have moved for summary judgment under the
Anti-**SLAPP** statute, Indiana Code § 34-7-7-1 et
seq.

The defendants published an article on a public is-
sue, one of importance to the pharmacy community
dealing with the performance of devices used to
compound drugs in a sterile setting. The article,
"Potential for airborne contamination in turbulent-
and unidirectional-airflow compounding aseptic
isolators," appeared in the March 15, 2007 issue of
the American Journal of Health-System Pharmacy.
The journal is published by defendant American
Society of Health System Pharmacists (ASHP). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

authors are defendants Gregory F. Peters, Marghi R. McKeon, and William T. Weiss.

The court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff Containment Technologies Group is an Indiana corporation with its principal place of business in Indiana. Defendant ASHP is a Maryland not-for-profit corporation with its principal place of business in Maryland. Authors Peters and McKeon are citizens of Wisconsin. Weiss is a citizen of Minnesota. The amount in controversy exceeds $75,000. Containment Tech originally filed its complaint in Indiana state court. Defendants properly removed under 28 U.S.C. § 1441.

Defendants have filed motions to dismiss under Indiana's anti-**SLAPP** law. The motions are treated as motions for summary judgment under both the terms of the Indiana statute, see Ind.Code § 34-7-7-9(a)(1), and the Federal Rules of Civil Procedure, thus avoiding any *Erie Railroad* debate over whether that particular provision is substantive or procedural. ASHP has filed its own motion. The three authors have combined to file their own motion.

As explained below, the Indiana residence of the alleged victim, Containment Tech, weighs in favor of applying Indiana law. Under Indiana law, defamation actions based on speech about matters of public concern require proof of "actual malice"-either knowledge of actual falsity or reckless indifference to truth or falsity. Containment Tech cannot meet that standard. The authors' article is sharply critical of Containment Tech's product, but the undisputed facts show that Containment Tech cannot show that the authors or the publisher knowingly or recklessly published any false information. The law leaves this dispute between the authors and Containment Tech to the realm of open scientific debate. A suit for defamation merely chills attempts at open academic debate and genuine sharing of information. Containment Tech's defamation claims therefore must be dismissed. Pursuant to the anti-**SLAPP** statute, the court will also award attorney fees to all defendants.

*Undisputed Facts*

**\*2** The facts set forth in this entry are not necessarily true in an objective sense, but pursuant to federal standards for summary judgment, they reflect the evidence in the light reasonably most favorable to plaintiff Containment Tech, giving it the benefit of conflicts in the evidence and reasonable inferences from the evidence. Where defendants have established a fact as beyond reasonable dispute, the court treats the fact as true.

Compounding aseptic isolators ("CAIs") are devices used in pharmacy and nursing settings to ensure that medications will be sterile. In particular, CAIs are used for preparing medications that are administered by injection directly into the vascular or central nervous system of the patient. Weiss Decl., Ex. A. Since these injections immediately enter the blood stream, outside contaminants can cause serious problems. CAIs use airflow to help keep a facility sterile while the medications are being prepared.

The defendants' article reported test results for four CAIs that cause air to flow in one direction and one CAI (Containment Tech's product) that uses a turbulent or multi-directional airflow. The authors recommended the four unidirectional-airflow devices but not plaintiff's turbulent-airflow device. The defendant authors entered an evolving field of research as these newer CAI devices were being standardized. The United States Pharmacopeia issued a guidance document "USP 797" in January 2004 for compounded sterile preparations, but it did not create uniform industry standards other than a requirement that the devices create an environment with "at least ISO Class 5 quality of air" to prepare the compounding sterile preparations. Weiss Decl., Ex. A. The majority of isolators are unidirectional, creating a continuous flow of air moving in one direction to remove contaminants. A turbulent airflow brings air into the area to dilute contaminants in the area, thus reducing the concentration. Dkt. 114, Ex. T at 3-4.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
(Cite as: 2009 WL 838549 (S.D.Ind.))

Containment Tech developed a turbulent-airflow device called the MIC (Mobile Isolation Chamber). Containment Tech's MIC device successfully complied with USP 797. After the creation of that standard, however, some experts in the field argued that compliance should be tested not at rest but in "dynamic" conditions, as the device is supposed to work in the field. 64 Am. J. Health-Syst. Pharm. 855. In fact, the updated 2008 USP 797 requires CAI devices to be placed in a buffer area unless they can maintain the ISO Class 5 standard "during dynamic operating conditions." Weiss Decl., Ex. B at 23.

Defendant Peters is the majority owner, president, and CEO of Lab Safety Corporation, which provides "testing, design and certification of engineering controls for clean spaces and containment systems." Peters Decl. ¶ 2. He was the lead writer on the defendants' paper and designed the study. *Id.* at ¶ 7. Defendant McKeon is the quality assurance manager of Lab Safety, where she has worked since 1989. McKeon Decl. ¶ 2-3. Defendant Weiss is a pharmacist. For the past ten years, he has been the pharmacy production manager for the Mayo Clinic in Rochester, Minnesota. Weiss Decl. ¶ 3.

**\*3** The authors selected five CAI devices for testing: four unidirectional-airflow devices and Containment Tech's turbulent-airflow MIC device. Two unidirectional CAIs were from NuAire, Inc. One each came from Germfree, Inc. and Baker Company. The five devices were put through a series of three tests. The first test involved a smoke tracer to mimic dynamic conditions. The second involved a "worst case" with surrogate compounding materials placed on the critical work surface. Alcohol drying times were also taken. The third phase involved filling the device with smoke and timing how long it took to create ISO Class 5 operating conditions. See Article at 626-28.

In testing the devices, the authors tested Containment Tech's MIC device that was used by the Gonda Outpatient Procedure Center at the Mayo Clinic. The other four devices were all tested to-

gether at Lab Safety. The undisputed facts provide a simple explanation for the difference. Containment Tech refused to provide the authors with a sample MIC device with appropriate protocols, while the four unidirectional-airflow devices were all provided by the manufacturers. As a result, the test was not done with full access to Containment Tech's recommended procedures and protocols. The Containment Tech MIC device used at the Mayo Clinic included some discoloration that Weiss thought might be rust. Weiss Dep. 81-83. The unit did not have an updated certification record, which Minnesota state law requires that these devices undergo every six months. Someone at Mayo told Peters that an unidentified "qualified independent testing company" had re-certified it in February 2006. Peters Decl. ¶ 27. The MIC unit complied with the manufacturer-required baseline ISO Class 5 when in a static condition. Peters Decl. ¶ 26. After the authors' tests, Weiss had the Containment Tech device tested by CSI Testing, which found that it met certification standards. Weiss Decl. ¶¶ 24-25.

The results of the tests run by the authors were overwhelmingly poor for Containment Tech's turbulent-airflow CAI. In the first test, the four unidirectional CAIs all were successful, while "at no time during phase 1 testing did the turbulent CAI tested achieve an ISO class 5 operating condition at the critical orifice." Article at 628. These results were repeated in the second phase. The added alcohol drying test showed drying times of less than or equal to 16 seconds for the unidirectional CAIs, but six minutes for Containment Tech's CAI. In the third phase, which measured the length of time it took to clean out the system, the unidirectional CAIs ranged from 31 to 70 seconds. The test of the Containment Tech device was stopped when it did not reach ISO class 5 operating conditions after seven minutes. Based on these results, the authors concluded: "The performance of four unidirectional-flow CAIs supports their use in pharmacy and nursing CSP operations, whereas the performance of one turbulent-flow CAI does not." Article at 630.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)

**(Cite as: 2009 WL 838549 (S.D.Ind.))**

**\*4** Complicating the litigation, the authors no longer have access to the written protocols that they followed. They have lost the "raw data test folder," which includes data test strips from the particle counter as well as contemporaneous notes. The results had been recorded elsewhere (allowing the article to be written), but the protocols and design are missing with the raw data folder. Peters did recover the actual data, although not until August 2008. Peters Suppl. Decl. ¶ 4. Peters has no explanation for what happened to the raw data test folder, and he and McKeon both testified that they were surprised at its disappearance.

Peters submitted the first draft of the article to ASHP electronically in February 2006. Dr. Guy Hasegawa was assigned to evaluate the manuscript. Dr. Hasegawa has been employed by ASHP since 1988, and since 1994 he has been the Senior Editor of the American Journal of Health-System Pharmacy. Hasegawa Decl. ¶ 4. He determined that the article would be important because "pharmacists (and other health-care professionals) working in hospitals and other health systems are responsible for preparing medicines that will be injected into patients." Hasegawa Decl. ¶ 8. Dr. Hasegawa's initial review was not a substantive review of content. He established that he needed technical assistance to evaluate and edit the manuscript. Hasegawa Decl. ¶ 12. Dr. Hasegawa did not review the "conflict of interest" submission, which stated no conflicts. Peters and his company Lab Safety had previously had a relationship with NuAire, which manufactured two of the unidirectional CAIs tested. This relationship was fully disclosed in the final article. FN1

> **FN1.** The article stated: "A relationship, dissolved in February 2006, existed between Valiteq (a division of Lab Safety Corporation) and Scientific Visions (a division of NuAire, Inc., manufacturer of two of the compounding aseptic isolators [CAIs] tested in this study). The relationship involved Scientific Visions' distribution of Valiteq training literature and media-fill products only and was unrelated to the marketing, sale, or use of CAIs or laminar-airflow workstations (LAFWs). Neither Lab Safety Corporation nor the Mayo Clinic is affiliated with any CAI or LAFW manufacturer or distributor."

Dr. Hasegawa sought out peer reviewers, as was consistent with the ASHP Journal's policy. Peters submitted proposed peer reviewers through the online system. Dr. Hasegawa testified that he did not even check Peters' proposed names because of Dr. Hasegawa's own "familiarity with persons with expertise in the area of sterile compounding." Hasegawa Decl. ¶ 14. In most cases, the ASHP Journal enlisted two peer reviewers. Here, Dr. Hasegawa sent out four requests "because the manuscript addressed a highly technical topic, and I suspected that one or more of the prospective reviewers might not be able to submit comments because of their busy schedule." Hasegawa Decl. ¶ 16. Three of the selected reviewers agreed to review the article. The fourth recommended a different expert who also agreed to serve as a peer reviewer.

The four reviewers all acknowledged the significance of the manuscript. Reviewer 1 called it "a critically needed article to educate pharmacists and technicians on the performance attributes of isolators." Reviewer 2 wrote that the article "should be a very high priority paper for publication." Reviewer 3 wrote that the article "covers a very important topic and I believe is critically important work ... This needs to get out to the pharmacy community." Reviewer 4 wrote that the article "is a badly needed piece of information." Hasegawa Decl, Ex. A.

**\*5** The peer reviewers questioned the writing and other stylistic choices. Reviewer 3 expressed concern with some of the authors' sourcing. Only one reviewer, Reviewer 3, raised a concern with methods, questioning the use of the alcohol drying times and arguing that it was not "cut and dried and will only take away from the credibility of the rest of

Slip Copy, 2009 WL 838549 (S.D.Ind.)

**(Cite as: 2009 WL 838549 (S.D.Ind.))**

the work." *Id*. On March 10, 2006, Dr. Hasegawa presented the manuscript and peer review comments to ASHP Journal's Manuscript Development Group. The group agreed to publish the article, pending satisfactory revisions by the authors. Hasegawa Decl. ¶ 21.

Peters was notified of this tentative acceptance. He returned a revised manuscript in May 2006. He included a point-by-point response to the concerns raised by the peer reviewers. Dr. Hasegawa found the response satisfactory and formally accepted the article for publication. Hasegawa Decl. ¶ 24. In June 2006, the article was waiting in line for final attention at the ASHP Journal when Peters made a new proposal. He decided that he wanted the manufacturers to review and comment on the manuscript. The ASHP Journal refused to get involved. Dr. Hasegawa feared that "injured" companies "will pester us relentlessly and perhaps even threaten legal action." He chose to rely on the "good faith effort" that is the peer review process and suggested that "authors are ultimately responsible for what they say, and they must be able to take their lumps after publication." Hasegawa Decl ., Ex. D. Peters decided to seek the information himself and requested that publication be put on hold.

For the sake of this dispute, Peters' communication with Containment Tech's Technical Director Hank Rahe is all that is relevant. Rahe had initially refused a request to provide information about the MIC device and the device itself before the studies were done. Peters tried again to procure a new MIC unit to be tested at Lab Safety, where he had tested the four unidirectional-airflow CAIs. Peters also offered to provide Containment Tech with the current draft of the article if Containment Tech signed a confidentiality agreement, which the other three manufacturers had all agreed to do. Peters Decl. ¶ 36.

Peters and Rahe traded emails throughout the summer of 2006. Rahe asserted that he was particularly hostile towards Peters because of Peters' connection with NuAire. Additionally, Peters did not provide the protocols used in the testing of Containment Tech's MIC at Mayo. Peters responded that the protocols were in the article, which he was unwilling to share with Rahe because Rahe refused to ensure its confidentiality. Rahe responded that in speaking of protocols: "It is very important that specific procedures be used in transfer of non-sterile components using an airlock. Proper training to assure reduction of micro contamination is critical. Testing without this will lead to false conclusions." Peters Decl., Ex. B.

On August 13, 2006, Rahe told Peters he would ask the Containment Tech board of directors to consider whether to give him access to an MIC device. On August 28, 2006, Containment Tech president Michele Moore rejected the request. The reasons included Peters' relationship with NuAire, Peters' "continued attempt" to gain knowledge of Containment Tech technology (including an alleged incident where Peters represented himself as an "independent reporter"), his unwillingness to provide protocols, and his "attitude towards [Containment Tech] in terms of academic and professional credentials while refusing to present your or your colleagues' credential [sic]." Peters Decl., Ex. D.

**\*6** The end of the exchange was a letter in November 2006 from Containment Tech to Peters threatening a lawsuit. The letter also demanded that the article state that the testing on the MIC unit "was conducted without the benefit of [Containment Tech] approved protocols and training." Peters Decl., Ex. E. The authors made that change. Peters testified that the litigation threats made him consider not publishing the article because, "as a small business owner, the cost of defending litigation was a very strong disincentive for me to go forward with publication of the Article." Peters Decl. ¶ 39.

The article was published in the March 15, 2007 edition of the ASHP Journal. Dr. Hasegawa was aware of the dispute between Peters and Rahe but still decided to publish: "In my experience, as an editor and an author, disputes and debates about

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)

(Cite as: 2009 WL 838549 (S.D.Ind.))

study findings are frequent in the scientific literature, and the ASHP Journal routinely publishes articles which are controversial." Hasegawa Decl. ¶ 33. With the large exception of this lawsuit, ASHP has received no complaints or objections about the article's methods or conclusions. In his deposition, Richard Talley, editor of the journal, noted: "This paper has been in the public by virtue of its being published for 18 months, and we have not had one word from readers about anything about this paper." Talley Dep. 78.

*Choice of Law*

Before reaching the merits of the defendants' motions, the court must address a choice of state law. Containment Tech is an Indiana company. The article was written by the authors in Minnesota, published by ASHP's journal based in Maryland, and distributed all over the United States. The parties' dispute over choice of law is based primarily on the differences between the Indiana and Maryland anti-**SLAPP** statutes. Indiana's anti-**SLAPP** law applies to speech "in connection with a public issue or an issue of public interest" and provides attorney fees to a prevailing defendant. Ind.Code §§ 34-7-7-2, -7. Maryland's anti-**SLAPP** law deals only with communications dealing with government matters, and it makes no provision for attorney fee awards. Md.Code Cts. & Jud. Proc. § 5-807.

A federal court hearing a case under diversity jurisdiction must apply the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the laws of more than one jurisdiction might apply, *Erie* principles require a federal court to apply the forum state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Horn v. Transcon Lines, Inc.,* 7 F.3d 1305, 1307 (7th Cir.1993). In *Hubbard Manufacturing Co. v. Greeson,* 515 N.E.2d 1071 (Ind.1987), the Indiana Supreme Court adopted a modified version of the "most significant contacts" choice of law test for

tort cases. As the court noted in *Hubbard,* where the place of the tort is significant and the place with the most contacts, that is the law to be applied. *Id.* at 1073; see also *Jean v. Dugan,* 20 F.3d 255, 261 (7th Cir.1994). Here, however, the place of the tort is not significant. The article was published across the country, and the alleged tort occurred equally in every state.

*7 When the place of the tort is not significant, *Hubbard* instructs a court to consider additional factors that may be more relevant, such as where the conduct causing the injury occurred, the residences or places of business of the parties, and the place where the relationship between the parties is centered. 515 N.E.2d at 1073-74. "These factors are not an exclusive list nor are they necessarily relevant in every case." *Simon v. United States,* 805 N.E.2d 798, 805 (Ind.2004). All contacts "should be evaluated according to their relative importance to the particular issues being litigated." *Hubbard,* 515 N.E.2d at 1074.

The Seventh Circuit applied Indiana choice of law principles to a libel case in *Jean v. Dugan,* 20 F.3d 255 (7th Cir.1994). There, the plaintiff claimed that he was libeled by a letter printed in a union publication. The plaintiff lived and worked in Indiana. The defendant was based in Illinois, and the allegedly defamatory article was distributed in Illinois, Indiana, and Iowa. The Seventh Circuit applied the *Hubbard* test to apply Indiana law: "Jean lived and primarily worked in Indiana; hence, the relevant community in which the alleged injury to his reputation occurred was in Indiana. Following from this, we conclude that the 'conduct causing the injury' was not simply the publication of Dugan's articles, but, more precisely, their publication *in Indiana." Id.* at 262 (emphasis in original).

Containment Tech argues against this conclusion on two grounds. First, it argues that the tort occurred in Maryland where the article was printed and notes that it would be anomalous to allow a Maryland corporation (and Minnesota and Wisconsin residents) to benefit from an Indiana law in a case where

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

their home states' laws offer them no equivalent protection. Second, Containment Tech argues that the *Hubbard* factors counsel in favor of Maryland law. Containment Tech is wrong that defamation occurs where the material is printed and mailed. "In cases where, as here, the conduct at issue is publication, the place of injury is under most circumstances the place of publication." *Jean,* 20 F.3d at 261.

The court finds nothing odd about allowing a Maryland publisher to benefit from Indiana's anti-**SLAPP** statute for its activities in Indiana. Indiana could not choose to protect only Indiana publishers for similar conduct, and Indiana residents are the intended beneficiaries of the robust public debate that the anti-**SLAPP** law is intended to protect. In *Simon v. United States,* the Indiana Supreme Court held on a certified question from the Third Circuit Court of Appeals that Indiana choice of law rules do not include depecage (application of different states' laws to different issues), nor has Indiana adopted the policy analysis component of the Restatement (Second) of Conflict of Laws. 805 N.E.2d at 801-03. Under a different conflict of laws regime, a different result might be reached, see *Global Relief v. New York Times Co.,* 2002 WL 31045394 (N.D.Ill. Sept.11, 2002) (applying Illinois choice of law to find that defamation action proceeded under Illinois law but that defenses to defamation, namely anti-**SLAPP**, should be considered under California law), but in Indiana, the entire defamation cause of action is considered under the same state's laws. Because the defamation claim is properly heard under Indiana law, the anti-**SLAPP** defense under Indiana law also applies.

**\*8** Since the alleged injury here would have been felt most severely in Indiana, Indiana law governs the dispute. The *Hubbard* factors are merely illustrations of the type of factors to consider. Given the diverse placement of parties, the fact that the alleged injury was felt most strongly in Indiana counsels in favor of Indiana law. This conclusion applies to both ASHP and the authors. See *Jean,* 20 F.3d at 262.

Containment Tech argues in the alternative that the Indiana anti-**SLAPP** law does not apply because it conflicts with Federal Rule of Civil Procedure 56. In general, a federal court sitting in diversity will apply state substantive law but use federal procedural law. See *Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (holding that Federal Rule of Civil Procedure 4 for personal service of summons controlled diversity action in federal court). Unlike the service of process rule in *Hanna,* however, the anti-**SLAPP** statute has a distinctly substantive flavor. The anti-**SLAPP** statute provides a complete defense to defamation and also provides the remedy of attorney fees to a victorious defendant. These are substantive provisions of Indiana law that govern in this diversity jurisdiction case.FN2

> FN2. The one arguable exception to this analysis is the statutory directive that the motion to dismiss (which is to be treated as a motion for summary judgment) must be granted "if the court finds that the person filing the motion has proven, by a preponderance of the evidence, that the act upon which the claim is based is a lawful act in furtherance of the person's right of petition or free speech under the Constitution of the Unites States or the Constitution of the State of Indiana." Ind.Code § 34-7-7-9(d). The Indiana Court of Appeals has read this provision as conflicting with Indiana Trial Rule 56, which sets the standard for summary judgment. See *Shepard v. Schurz Communications, Inc.,* 847 N.E.2d 219, 224 (Ind.App.2006). Section 9(a)(1) directs the court to treat the motion as one for summary judgment. This court is not persuaded that the "preponderance of the evidence" language in section 9(d) was actually intended to conflict with the standard for summary judgment. The two subsections can easily be reconciled. The af-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
(Cite as: 2009 WL 838549 (S.D.Ind.))

firmative defense under the Anti-**SLAPP** statute puts the burden of proof on the defendant by a preponderance of the evidence, without trying to replace the familiar standard for summary judgment. As one of the Supreme Court's leading trilogy of summary judgment cases shows, when a court decides a motion for summary judgment or a motion under section 9, the court must be aware of which party must prove which matters by which standard of proof. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252-54, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)* (discussing application of "clear and convincing" standard of proof to motion for summary judgment in libel case). Under section 9, therefore, the issue may be phrased as whether the undisputed facts show no genuine issue of material fact on the constitutional defense, which requires the defendant to be able to reach only the level of preponderance of the evidence.

The court applies both Rule 56 of the Federal Rules of Civil Procedure and the substantive portions of the Indiana Anti-**SLAPP** statute, including the substance of the defense and the attorney fee remedy. As Judge McKinney has noted: "Substantively, the Act does not replace the Indiana common law of defamation but provides simply that the movant must establish that her speech was 'lawful.'" *CanaRx Services, Inc. v. LIN Television Corp., 2008 WL 2266348, at *5 (S.D.Ind. May 29, 2008)*; see also *United States v. Lockheed Missiles & Space Co., 190 F.3d 963, 971-73 (9th Cir.1999)* (acknowledging that California's anti-**SLAPP** statute and the Federal Rules "do, in some respects, serve similar purposes" but finding that it is not a "direct collision" and that the anti-**SLAPP** statute also serves an interest not addressed by the Federal Rules, namely protection of free speech); *Batzel v. Smith, 333 F.3d 1018, 1025-26 (9th Cir.2003)* ("Because California law recognizes the protection of the anti-**SLAPP** statute as a substantive im-

munity from suit, this Court, sitting in diversity, will do so as well."); *Kearney v. Foley and Lardner, 553 F.Supp.2d 1178, 1182 (S.D.Cal.2008)* (finding that "attorneys' fees are mandatory, and therefore, a substantive right under the anti-**SLAPP** statute"). For these reasons, Indiana's anti-**SLAPP** statute provides substantive rights of a total defense against defamation and the award of attorney fees to prevailing defendants.[FN3]

> FN3. The anti-**SLAPP** law also allows an award of attorney fees to plaintiff if the court finds the motion to dismiss was "frivolous" or "solely intended to cause unnecessary delay." Ind.Code § 34-7-7-8.

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could decide in favor of the non-moving party. *Id.* at 249.

**\*9** When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and must resolve all factual disputes in that party's favor. See *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)*. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson, 477 U.S. at 251-52.*

*Indiana Defamation Law and the Anti-**SLAPP** Statute*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

To prove defamation, a plaintiff must show: (1) defamatory imputation; (2) malice; (3) publication; and (4) damages. *Schrader v. Eli Lilly and Co.,* 639 N.E.2d 258, 261 (Ind.1994). "Defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Id.* Under the United States Constitution's protection of free speech, a viable claim for defamation requires "a false statement of fact." *Journal-Gazette Co. v. Bandido's, Inc.,* 712 N.E.2d 446, 457 (Ind.1999). "If a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the jury." *Id.*

The anti-**SLAPP** statute was crafted "in furtherance of a person's right of petition or free speech" and requires a statement "in connection with a public issue or an issue of public interest." Ind.Code § 34-7-7-2. To qualify for protection under the statute, the statement must have been made "in good faith and with a reasonable basis in law and fact." Ind.Code § 34-7-7-5(2).

All defendants acknowledge that the article was published, and the motions for summary judgment do not question at this stage whether Containment Tech suffered any damages. The defendants argue that many of the alleged defamatory statements are not actually defamatory and that they did not act with actual malice with respect to any defamatory statements. In this context, the phrase "actual malice" refers to whether the defendant published a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), quoted in *Bandido's,* 712 N.E.2d at 456.

Before analyzing the merits of Containment Tech's claims, this court must determine what allegedly defamatory statements Containment Tech is entitled to contest. In its briefs opposing the defense motions, Containment Tech argues that eighteen statements in the article are defamatory. It argues that both ASHP and the authors defamed Containment Tech with each statement. In responses to interrogatories served by Weiss, however, Containment Tech identified twenty-one allegedly defamatory statements. Dkt. 114, Ex. J. The response briefs include only thirteen statements that appear among the twenty-one statements in the response to interrogatories. The statements in the response briefs are shorter and include multiple statements that are part of a single allegedly defamatory statement in the interrogatory. The interrogatory at issue asked Containment Tech to identify what statements in the article were false, defamatory, or both. Containment Tech presumably knew the answer to that question before it filed the lawsuit. It responded with ten statements that were false and twenty-one that were false and defamatory. The contested material is only one article, and Containment Tech should have known what statements were defamatory upon reading the article. Furthermore, Rule 26 of the Federal Rules of Civil Procedure provides that a party must supplement or correct an answer to an interrogatory "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect" Fed.R.Civ.P. 26(e)(1).

**\*10** Containment Tech never amended its responses but raised the new allegedly defamatory statements for the first time in its response briefs. Defendants were entitled to rely on Containment Tech's answer to interrogatories. Containment Tech may not contend now that statements not noted in the responses to interrogatories are defamatory. See *Holiday Inns, Inc. v. Robertshaw Controls Co.,* 560 F.2d 856, 858 (7th Cir.1977) (rejecting plaintiff's attempts to argue a new theory of liability at trial where it had failed to supplement its interrogatory responses); *Classic Cheesecake Co. v. JPMorgan Chase Bank,* 2007 WL 2897747, at *1 (S.D.Ind. March 19, 2007) (allowing defendant to rely on plaintiffs' interrogatory answers and finding "the mention of damages in summary judgment affidavits was not sufficient to act as a de facto amendment of the Plaintiffs' interrogatory answers").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)

**(Cite as: 2009 WL 838549 (S.D.Ind.))**

Also, any claims based on statements that appeared in the interrogatory response but not the response briefs are waived. *Roe-Midgett v. CC Services, Inc.,* 512 F.3d 865, 876 (7th Cir.2008) (undeveloped argument constitutes waiver). For those reasons, Containment Tech can contest the defamatory nature of only the thirteen statements in both the interrogatory response and its brief .[FN4]

> FN4. ASHP was also entitled to rely on Containment Tech's response to the authors' interrogatories. There would be no point in requiring different defendants to ask plaintiffs the same interrogatories.

I. *Defamatory Imputation*

Containment Tech presses a defamation claim against all defendants for each of the remaining thirteen allegedly defamatory statements. The claims against the authors, as the creators of the actual words, must be analyzed slightly differently than claims against ASHP, which independently read the words and decided to publish them. Nonetheless, some of the questioned statements can be dismissed across the board because they do not meet other standards of defamation. Several of the thirteen statements at issue do not amount to defamation. Eight do not show defamatory content because they are not about Containment Tech itself:

"Because USP chapter 797 mandates that the performance of such equipment be equivalent to that of the LAFW, the CAI's operational efficiencies must be compared with those of the LAFW."

"In order to represent a worst-case, in-process compounding simulation as a process qualification (PQ) in phase 2, the smoke tracer was removed from the CAI, and surrogate compounding materials were placed onto the critical work surface via the normal antechamber interface. The unit was allowed to equilibrate for one minute with no work activity."

"The unidirectional-flow CAIs tested rapidly and

reliably entrained and removed large quantities of airborne particulate contamination from the aseptic work zone, provided first air to the working materials, and facilitated the rapid drying of alcohol surface disinfectant."

"Death of the isopropyl or ethyl alcohol-saturated bacterial cell is caused by drying of the alcohol and the resulting loss of water through osmosis."

"For the purposes of this study, unbiased validation of CAI design methodology through performance relevant to the actual aseptic compounding process was necessary."

**\*11** "The unidirectional-airflow CAIs tested met the laminar-airflow workstation equivalency requirements of chapter 797 of the United States Pharmacopeia, pharmaceutical aseptic processing standards, the industry standard definition of closed isolator, and the rigorous demands of pharmacy and nursing sterile compounding."

"These attributes constitute best practices and are necessary to support the aseptic compounding process in pharmacy and nursing CSP operations in accordance with closed isolator design and testing standards."

"The unidirectional-flow CAIs tested will support the optimum alcohol disinfection routine."

Containment Tech does not make a unidirectional-airflow CAI, so these statements all refer either to the competitors that were part of the study or to assumptions, conclusions, or opinions that supported the authors' conclusions. Each statement standing alone cannot be defamatory towards Containment Tech. To the extent that any of the underlying assumptions are untrue, they could lend credence to the possibility that the ultimate conclusion-Containment Tech's CAI is inferior-was defamatory. These statements themselves, however, are not. They may or may not be true, but they do not refer to Containment Tech. See *Schrader,* 639 N.E.2d at 261 ("Defamatory words are not actionable unless

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
(Cite as: 2009 WL 838549 (S.D.Ind.))

they refer to some ascertained or ascertainable person, and that person must be the plaintiff.").

Other statements at issue can also be dismissed because, while the statements referred to Containment Tech or its device, they have no defamatory imputation:

"Following successful installation and operational qualifications, one turbulent-flow and four unidirectional-flow CAIs were challenged to compare the two airflow methodologies in removing airborne particulate contamination generated within the aseptic work zone."

"Because the turbulent-airflow CAI cannot meet the operating or testing specifications of the unidirectional-airflow CAI, the manufacturer's less demanding operational qualifications of the turbulent-airflow CAI are deferred to in the CETA standard."

"Internal pressurization of all CAIs in accordance with the manufacturer's operating specification was verified by interconnection of a water manometer as a primary standard to each CAI. Manufacturer's data were used to determine CAI process air changes per hour and antechamber purge times."

These statements refer to Containment Tech's turbulent-flow CAI, but the statements are not in any way disparaging of that product or Containment Tech. They merely describe procedural steps in the test process. To the extent Containment Tech disagrees with them factually-questioning whether installation was "successful" in the first one, the appropriateness of using the term "CETA standard" in the second, and whether the "manufacturer's operating specification" was accurate in the third one-the statements are in no way defamatory. They do not say anything negative about Containment Tech. Had the final result of the paper been a recommendation of Containment Tech's MIC device, then these statements, while still potentially untrue, would not possibly be considered defamatory. Statements

about the process of an experiment without any value judgment are not defamatory. If those processes are corrupted in a way that leads to a conclusion that is defamatory, then the conclusion can be held defamatory.

*12 The two remaining statements at issue are the heart of the case. They are both conclusions that the authors reached that Containment Tech's turbulent-flow CAI device is inferior to the unidirectional flow devices:

"The performance of four unidirectional-flow CAIs supports their use in pharmacy and nursing CSP operations, whereas the performance of one turbulent-flow CAI does not."

"As a factor in realistic CSP process design and execution, the alcohol disinfectant drying times observed in the turbulent-flow CAI are excessive to the point of either causing undue delay of the process or encouraging premature resumption of the process before complete drying, and the maximum plasmolysis of potential viable surface contaminants can occur. Neither scenario is acceptable in terms of customary pharmacy workload or patient safety."

ASHP argues that each of these statements is merely "a statement of opinion." "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend on its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). To that extent, if ASHP honestly thought that the authors' process was appropriate and that the authors honestly interpreted those results to show that Containment Tech's MIC device is inferior, then stating those "opinions" is not defamation. At the same time, defamation cannot be cloaked merely be prefacing the statement with "I believe." *Sullivan v. Conway*, 157 F.3d at 1097 ("It is true that prefacing a defamatory statement with the qualification, 'In my opinion,' does not shield a defendant from liab-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

ility for defamation. The test is whether a reasonable listener would take him to be basing his 'opinion' on knowledge of facts of the sort that can be evaluated in a defamation suit."). Where the conclusions are reported as the result of scientific testing, a reasonable jury could find that these two conclusions had defamatory content.

## II. *Matter of Public Concern*

Finding potential defamatory content is only the first step for plaintiffs, however. The Indiana Supreme Court has been more protective of free speech than the United States Supreme Court and has held that actual malice is required in defamation cases brought by private individuals for statements made about matters of "public or general concern." *Journal-Gazette Co. v. Bandido's, Inc.,* 712 N.E.2d at 452, adopting the rule of *Aafco Heating & Air Conditioning v. Northwest Publications,* 162 Ind.App. 671, 321 N.E.2d 580 (Ind.App.1974); see *Jean v. Dugan,* 20 F.3d at 262 ("it is perfectly appropriate for the states to give speakers greater protection than the United States Constitution requires"); *Filippo v. Lee Publications, Inc.,* 485 F.Supp.2d 969, 973 (N.D.Ind.2007) (summarizing Indiana's additional protection). Actual malice must be shown by "clear and convincing evidence." *Bandido's,* 712 N.E.2d at 456.

**\*13** The next question is whether the article addressed a matter "of public and general concern," and whether the Indiana anti-**SLAPP** statute applies. The article here appeared in a national journal and dealt with a serious health issue, the efficacy of devices designed to sterilize injectable pharmaceuticals. The safety of medical devices is undoubtedly one of both general and public concern. See, *e.g.,* *St. Margaret Mercy Healthcare Centers, Inc. v. Ho,* 663 N.E.2d 1220, 1224 (Ind.App.1996) ("The public interest includes a wide range of considerations including health and the availability of health care."); *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* 162 Ind.App. 671, 321 N.E.2d 580 (Ind.App.1974) (circumstances sur-

rounding a residential fire were matter of public concern); *Filippo* 485 F.Supp.2d at 974 (collecting Indiana cases where matters were deemed of public concern); see also *Moore v. University of Notre Dame,* 968 F.Supp. 1330, 1338 (N.D.Ind.1997) (Sharp, J.) ("it is this court's opinion that football, and specifically Notre Dame football is a matter of public interest").

To avoid this conclusion, Containment Tech argues that the article was merely "an effort to fail the MIC, and only the MIC, in an eminent industry journal." Pl. Br., Dkt. 121 at 18. This argument confuses the subject matter inquiry, which asks objectively whether the article addressed a matter of general or public concern, with an inquiry into the defendants' subjective intentions. To the extent that Containment Tech cites case law, it distinguishes cases where defamation was not found, *Dilworth v. Dudley,* 75 F.3d 307 (7th Cir.1996), or that did not actually confront the issue of public concern. *Sullivan v. Conway,* 157 F.3d 1092, 1097 (7th Cir.1998) (noting that couching a potentially defamatory comment as an opinion does not shield it from defamation laws but not mentioning the issue of public concern and not finding defamation). Containment Tech's argument about the defendants' motives does not undermine the fact that the article addressed an issue of public concern.

Since the actual malice standard applies, Containment Tech must show that a false statement in the article was published "with knowledge of its falsity or with reckless disregard of whether it was false." *Aafco,* 321 N.E.2d at 586. Whether there is sufficient evidence to support a finding of actual malice is a question of law. *Bandido*'s, 712 N.E.2d at 456. Reckless disregard can be found where there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.,* quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). As a result, the issue is not whether the defendants had some inkling a statement was not true. Plaintiff Containment Tech

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)

**(Cite as: 2009 WL 838549 (S.D.Ind.))**

must come forward with evidence that the defendants either knew that a statement was false or "entertained serious doubts" about the truth of the statement.

### III. *ASHP's Lack of Malice*

**\*14** For the claims against ASHP, the key question becomes whether Containment Tech has come forward with evidence that would allow a reasonable jury to find, by clear and convincing evidence, that ASHP published defamatory conclusions with actual malice, that is, with reckless or knowing disregard for the truth. The undisputed facts show that Containment Tech cannot make such a showing against ASHP in this case.

ASHP is a journal of all pharmacists, not just experts in the world of CAI devices. When the journal receives potential articles, those articles are sent to peer reviewers. Dr. Hasegawa was assigned to evaluate the manuscript. Not an expert in this particular field, he decided to send the article to peer reviewers. He chose peer reviewers who he knew had expertise in sterile compounding. Hasegawa Decl. ¶ 14. Four peer reviewers agreed to review the authors' manuscripts.

The responses from the peer reviewers were powerful and positive. Language such as "critically important work," a "high priority for publication," "critically needed" and "a badly needed piece of information" certainly indicated that the article had value and not that its underlying work had been doctored so as to defame Containment Tech. With four peer reviewers speaking to the value of the article, the Manuscript Development Group approved the article for publication. Talley Decl. ¶ 17. Among four peer reviewers, only one raised a substantive issue about the process behind the article, suggesting that alcohol drying times were a controversial measure of effectiveness.

Containment Tech attempts to undermine ASHP's reliance on the peer reviewers because the published paper was not peer reviewed in that final form. Containment Tech points out changes from the original manuscript that was peer reviewed to the final published version. These arguments are not persuasive. First, ASHP was not required to use peer reviewers at every stage of the process. The stated policy for publication of hundreds of articles is to use peer reviewers to review initial manuscripts. The lack of peer review of the final version is not a sign of recklessness. Even if the statements that Containment Tech highlights were false, that falsity would not show actual malice on the part of ASHP. ASHP followed its usual pattern and practice of peer review. The peer reviewers were overwhelmingly positive about the initial manuscript. In no way was ASHP showing a knowing or reckless disregard for the truth by publishing the edited article that contained the allegedly false statements. [FN5]

> [FN5.] Containment Tech complains, for instance, about the authors' use of the phrase "CETA standard." In fact, Containment Tech argues, the CETA qualification process should be identified as a "referenced guidance." While technically correct, the article remains "substantially true." See *Heeb v. Smith,* 613 N.E.2d 416, 421 (Ind.App.1993) ("The test for determining whether a statement is substantially true is whether any inaccuracies caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken.") Maybe "standard" has a particular meaning, but in CETA's disclaimer, it does not specifically state that it does not intend to set a "standard" but says instead that "it is not the intention to set the *specific acceptance criteria.*" Madsen Decl. ¶ 15 (emphasis added).

Containment Tech's efforts to undermine the peer review process are necessary because otherwise it is left arguing that despite four different expert opin-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
(Cite as: 2009 WL 838549 (S.D.Ind.))

ions validating the methodology of the study, Containment Tech believes that ASHP defamed it because Containment Tech "warned ASHP that the Authors did not have [Containment Tech's] protocols for validating its MIC and that any tests performed on the MIC without those protocols would lead to false results." Pl. Br., Dkt. 121 at 19. This argument simply cannot stand as the basis for a defamation claim. In effect, Containment Tech argues that any testing done without its permission is invalid and cannot be published without the risk of litigation. And Containment Tech refused to provide those protocols to the authors! It could not first refuse to provide the protocols and then sue because the researchers did not use them. Containment Tech's stated reason for refusing to provide the protocols was fear that Peters, who once had a relationship with NuAire, would share the information. The parties could have dealt with that risk through a confidentiality agreement, which if breached would have entitled Containment Tech to damages. If Containment Tech thought that was insufficient protection, it could not effectively prohibit Peters (or any other researcher) from studying and testing its product and then publishing the findings. Containment Tech must live with the consequences of this study. To hold otherwise would give parties with a financial interest a stranglehold on scientific study.

**\*15** While Containment Tech may have had legitimate concerns about Peters, this rationale for defamation-the authors did not have the proper protocols-would apply equally to any situation where the manufacturer refused to cooperate with a test. If Containment Tech were in fact making an inferior product, it could simply refuse to participate with any researchers and then sue for defamation based on the results of the study. The fact that the authors did not have the protocols that Containment Tech claims were proper is not grounds for finding defamation against the publisher of the article, ASHP. FN6

FN6. In fact, the final article included Con-

tainment Tech's demanded disclaimer: "Testing was performed without Containment Tech-approved protocols or training for operation of the MIC." Article at 625. The article also noted that Containment Tech did not provide "(1) an MIC unit for testing, (2) proprietary MIC operating and sterilization protocols, or (3) proprietary studies supporting the MIC unit's design and operational qualifications." *Id*. at 630, n. a.

For the sake of summary judgment, the court assumes that Containment Tech believes that Peters was not an independent scientific investigator. Whether or not Peters did legitimate work, ASHP is protected under an actual malice standard by the peer review process and its results, and by the absence of evidence of actual malice. The experts in the field all recommended publication. In the eyes of Dr. Hasegawa and Talley, this paper was not, as Rahe wrote to Dr. Hasegawa, an "attempt to create a marketing piece with rigged data." Dkt. 122, Ex. Z. The only negative feedback came from Containment Tech itself. Crucially, Containment Tech refused even to review the article or to highlight the alleged deficiencies it now sets out before the court. Containment Tech merely complained that the authors did not have the proper protocols (which Containment Tech had refused to supply) and then accused Peters of a conflict of interest. ASHP knew about the conflict, but given four supporting peer reviewers who had *actually read* the manuscript, ASHP did not act with actual malice in going forward despite the concerns raised by Containment Tech.

One final issue concerning ASHP is the argument about alcohol-drying times. Reviewer 3 raised concerns about the use of those tests as a measure of effectiveness, so ASHP was aware of an issue there. Dr. Hasegawa asked the authors for a response. The authors responded with a justification that Dr. Hasegawa found reasonable. Dkt. 114, Ex. O. Containment Tech has offered no reason to treat

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
(Cite as: 2009 WL 838549 (S.D.Ind.))

Dr. Hasegawa's response as reckless. Additionally, the other three peer reviewers raised no such concerns with the alcohol drying time, and even the reviewer who raised the issue stated that it was not "cut and dried." That reviewer complained about the references in that section of the article, and the authors improved their references. This sort of academic dispute is simply not evidence of reckless or knowing disregard of the truth required for a finding of defamation against the publisher. The authors appear to be making a reasonable argument with regards to the alcohol drying time. Containment Tech disagrees, but the argument does not seem absurd to this court, or to the other three peer reviewers. If the authors' assumptions are incorrect, then the best place to prove that is in the academic world itself. See *Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir.1996) (noting that "judges are not well equipped to resolve academic controversies ... and scholars have their own remedies for unfair criticisms of their work-the publication of a rebuttal."). For these reasons, ASHP is entitled to summary judgment on all defamation claims.

IV. *The Authors' Lack of Malice*

**\*16** The next question is whether Containment Tech has offered evidence that would allow a reasonable jury to find by clear and convincing evidence that the authors wrote defamatory conclusions that they knew were false or acted with reckless disregard for the truth.

At this point, the two allegedly defamatory statements remaining in Containment Tech's case against the authors are the article's core conclusion and the statement about alcohol drying times. If the authors are fully believed, their overall conclusions cannot be defamatory because they merely undertook a scientific study and reported their results. Containment Tech's apparent contention is that the authors were specifically trying to create a research piece that unfairly tarnished Containment Tech. Otherwise Containment Tech has no claim for defamation. The scientific problems it alleges with the

experiment's design, if benign, might allow for effective rebuttal, but they do not show actual malice. Bad but honest science is not actionable as defamation.[FN7]

> [FN7]. The court is not suggesting the science was actually bad or that the conclusions were false. For purposes of summary judgment, however, the court must assume that the methods and conclusions were flawed, as plaintiff's expert witness Madsen testified.

To bolster its case about the inadequacies of the authors' methods, Containment Tech has submitted an affidavit from Russell Madsen, President of The Williamsburg Group, a pharmaceutical consulting group. Madsen believes that: "The study described in the Article is not scientifically valid ...." Madsen Decl. ¶ 9. He highlights what he considers to be the incorrect steps and assumptions taken by the authors. In total, Madsen questions twenty assertions by the authors. Seventeen of these were used as the defamatory statements that Containment Tech raised in its response briefs. Only one allegedly defamatory statement raised by Containment Tech in its response briefs was not identified by Madsen.

While Madsen's affidavit obviously fills an important role in showing that the authors' conclusions are not unanimous, it does not provide sufficient evidence that would allow a jury to find by clear and convincing evidence that the authors acted with actual malice. Containment Tech's unwillingness to cooperate with the authors, while perhaps understandable, makes it impossible to hold the authors liable merely for not following the manufacturer's preferred protocols. Even more damaging to Containment Tech's claim is the authors' attempt to receive feedback after the initial draft was accepted for publication. At that point, all plaintiff's Rahe had to do was guarantee confidentiality. Containment Tech then would have been free to comment on the study as it deemed necessary. If Containment Tech had agreed to confidentiality, paid Madsen to review the article, and provided Madsen's affidavit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

to the defendants before publication, the defendants' response to such criticism before publication might have made this a different case. But Rahe's opposition was based purely on his insistence that Peters was "biased" and that the authors did not have the proper protocols.[FN8]

> [FN8]. Containment Tech's bias argument is misplaced. While Peters' previous affiliation with Nu-Aire is a potential conflict of interest, Containment Tech seems to believe that everyone who thinks the MIC is an inferior product is "biased." If a person studies a product and comes to believe that it is not a good product, this is not evidence of bias. Weiss, for instance, did not have even an arguable financial incentive to disparage Containment Tech, but he clearly believed, even before the study, that the MIC was flawed. Weiss Decl. ¶ 14. His skepticism about the product does not make him "biased" against Containment Tech.

The only cognizable way that Containment Tech could show actual malice would if the entire study was rigged specifically to fail the MIC device with the intention of publishing an article that the authors knew would be false when they designed the study. It is true that "[s]cientific controversies must be settled by the methods of science rather than litigation." *Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir.1994). If the authors had rigged the study, however, it would not have been science, and deliberately or recklessly false conclusions could be actionable.

**\*17** But the theory requires evidence, not speculation. In the end, Containment Tech just does not have sufficient evidence to argue that this is anything more than a scientific dispute. The authors undoubtedly think that the MIC is a flawed device. Perhaps they held that belief before they designed the study. That is not evidence of defamation:

A person who concludes that a public figure is a knave may shout that conclusion from the mountain tops. Both [defendants] came to believe that [plaintiff] is a hired gun who makes a living by deceiving judges about the state of medical knowledge and thus assisting child molesters to evade punishment. Persons who hold such opinions cannot be expected to look kindly on their subjects, and the law certainly does not insist that they shut up as soon as they are challenged.

*Underwager,* 22 F.3d at 736.

In an attempt to show intentional wrongdoing, Containment Tech emphasizes the fact that Peters and McKeon lost the protocols they used for testing. Containment Tech urges a spoliation finding based on these lost protocols. The authors cannot explain where this data has gone, but the problem for Containment Tech is the data just is not particularly revealing. Crucially, the actual raw data has been presented. Peters Suppl. Decl., Ex. A. The testing protocols have not been found, but Peters had run similar tests before, described the methodology in the paper, and testified under oath as to what the procedures were. Containment Tech has no contrary evidence. The record here does not show that Containment Tech has repeated the defendants' tests and shown them to be false.

With regard to the alcohol drying time, Containment Tech argues that the lengthened drying time for the MIC is "more efficacious" than the shorter times for the unidirectional-airflow CAIs. Pl. Br., Dkt. 135 at 28. The theory is that the longer drying times mean longer contact with alcohol will kill more bacteria. This proposition seems reasonable, and Madsen supports it. The authors' response is that the longer drying times are less efficient, and technicians are likely not to wait sufficiently before starting the process. The evidence shows beyond reasonable dispute that this is an honest disagreement that does not rise to the level of reckless disregard for the truth.

This court is not competent to make a final judgment on the relative merits of the different CAI

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

devices, but it can certainly judge in this case that, at least, an honest academic dispute exists in the pharmacy world as to whether Containment Tech's turbulent-flow MIC device is as effective as the unidirectional-airflow devices. Four separate peer reviewers found the authors' methods appropriate and their conclusions valid. Additionally, Weiss consulted three co-workers at the Mayo Clinic who supported publication. Weiss Decl. ¶ 30. Three peer reviewers found their alcohol drying time study appropriate.[FN9] The article has been published in a widely read journal and had received (as of the time of depositions) no negative feedback. Madsen's affidavit shows at most that others in the field can disagree with the conclusions, but Containment Tech would be better served to turn those findings into a rebuttal piece and let the scientific community make its own determinations on the merits. See *Lott v. Levitt*, 556 F.3d 564, 570 (7th Cir.2009) ("To the extent that [plaintiff] is complaining about an attack on his ideas, and not his character, he is barking up the wrong tree. The remedy for this kind of academic dispute is the publication of a rebuttal, not an award of damages."); *Dilworth*, 75 F.3d at 310 ("scholars have their own remedies for unfair criticisms of their work-the publication of a rebuttal. Unlike the ordinary citizen, a scholar generally has ready access to the same media by which he is allegedly defamed.").

> FN9. The fact that peer reviewer 3 raised questions about the alcohol drying time actually hurts Containment Tech's case. The disagreement shows that the reviewer took the review seriously and was not looking to flunk Containment Tech's MIC device.

**\*18** The court is fully aware that the case is before the court on motions for summary judgment. The negative analysis by Madsen does show that the authors' position is not universal. The unexplained disappearance of the test folder could be suspicious, but the underlying data are still available. An academic dispute and data retention problems that create no prejudice, however, are not evidence of de-

famation in Indiana. In a defamation case involving a matter of public concern, Indiana law requires actual malice. Under this standard, the First Amendment interests are too important for a normal summary judgment analysis:

> The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Bose Corp. v. Consumers Union of United States., Inc.*, 466 U.S. 485, 510-11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In this case, a reasonable jury could find at most only an honest academic dispute, not reckless disregard for the truth. Defendants have shown that their speech was "lawful." Under Indiana's anti-**SLAPP** law, they are entitled to a dismissal of the suit and attorney fees. Quite simply, this battle should take place in the pages of the ASHP journal and similar publications, not in a court.

*Conclusion*

For the foregoing reason, all defendants' motions to dismiss under Indiana's Anti-**SLAPP** statute (Dkts. 98 and 112) are granted. Attorney fees and costs under Ind.Code § 34-7-7-7 for prevailing defendants are appropriate. Defendants have four weeks from the date of this entry to submit a fee petition. At that point, plaintiffs have four weeks to object. This court can decide the fee petitions on the papers but will hold a hearing if requested by any party.

S.D.Ind.,2009.
Containment Technologies Group, Inc. v. American Soc. of Health System Pharmacists
Slip Copy, 2009 WL 838549 (S.D.Ind.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 838549 (S.D.Ind.)
**(Cite as: 2009 WL 838549 (S.D.Ind.))**

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



LEXSEE 2009 U.S. DIST. LEXIS 60896

**BRUCE EKLUND, an individual, Plaintiff, v. THE CITY OF SEATTLE, et al., Defendants.**

**C06-1815Z**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*2009 U.S. Dist. LEXIS 60896*

**June 30, 2009, Decided**
**June 30, 2009, Filed**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by, in part, Motion denied by, in part *Eklund v. City of Seattle, 2009 U.S. Dist. LEXIS 64088 (W.D. Wash., July 2, 2009)*

**PRIOR HISTORY:** *Eklund v. City of Seattle, 2008 U.S. Dist. LEXIS 69145 (W.D. Wash., Sept. 12, 2008)*

**COUNSEL:** [*1] For Bruce Eklund, an individual, Plaintiff: Cleveland Stockmeyer, LEAD ATTORNEY, CLEVELAND STOCKMEYER (SEATTLE), SEATTLE, WA; Mark K Davis, LEAD ATTORNEY, Duncan Calvert Turner, BADGLEY MULLINS LAW GROUP, SEATTLE, WA; Philip A Talmadge, TALMADGE FITZPATRICK, TUKWILA, WA.

For City of Seattle Municipal Court, a municipal corporation, Fred Bonner, Jane Doe Bonner, and their marital community, Gayle Tajima, John Doe Tajima, and their marital community, Yolande Williams, John Doe Williams, and their marital community, Mark Parcher, Jane Doe Parcher, and their marital community, Defendants: Erin L. Overbey, LEAD ATTORNEY, Katrina Robertson Kelly, SEATTLE CITY ATTORNEY'S OFFICE, SEATTLE, WA.

For City of Seattle Municipal Court, a municipal corporation, Counter Claimant: Erin L. Overbey, LEAD ATTORNEY, Katrina Robertson Kelly, SEATTLE CITY ATTORNEY'S OFFICE, SEATTLE, WA.

For Bruce Eklund, an individual, Counter Defendant: Cleveland Stockmeyer, LEAD ATTORNEY, CLEVELAND STOCKMEYER (SEATTLE), SEATTLE, WA; Mark K Davis, LEAD ATTORNEY, Duncan Calvert Turner, BADGLEY MULLINS LAW GROUP, SEATTLE, WA; Philip A Talmadge, TALMADGE FITZPATRICK, TUKWILA, WA.

**JUDGES:** Thomas S. Zilly, United States District Judge.

**OPINION BY:** Thomas S. Zilly [*2]

**OPINION**

ORDER

THIS MATTER comes before the Court on Defendants Mark Parcher, Gayle Tajima, and Yolande Williams' Motion for Statutory Penalties and Attorney Fees under Washington's Anti-SLAPP Statute, *RCW 4.24.510*, docket no. 315. Having considered the pleadings and declarations filed in support of and in opposition to the motion, the Court GRANTS Defendants' Motion, docket no. 315, for the reasons outlined in this Order.

Washington's Anti-SLAPP statute provides, in

pertinent part:

> A person who communicates a complaint or information to any branch or agency of federal, state, or local government . . . is immune from civil liability based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization. A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages of ten thousand dollars. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith.

*RCW 4.24.510.*

Defendants Parcher, Tajima and Williams moved prior to trial for [*3] dismissal of Eklund's wrongful termination claim and for statutory penalties and attorneys' fees based on Washington's Anti-SLAPP statute. Defs.' Mot. Sum. J., docket no. 137, at 7-10. They argued that Eklund's wrongful termination claim against them was based on their involvement in the investigation and reporting of the ticket-fixing scheme that ultimately led to Eklund's termination. Specifically, Parcher prepared a written summary of the findings of the ticket-fixing investigation and recommended discipline for five Seattle Municipal Court ("SMC") employees, including Eklund; Parcher, Tajima and Williams, as members of the Executive Leadership Team ("ELT"), reviewed and discussed the findings, and then concluded that Eklund be terminated; and Williams then forwarded the joint recommendation to Judge Bonner. On September 12, 2008, the Court entered an Order concluding that:

> . . . Defendants are not precluded from seeking relief under the Anti-SLAPP Law, *RCW 4.24.510*, in the event they prevail at trial. This statute applies to governmental entities. See *Gontmakher v. City of Bellevue, 120 Wn. App. 365, 85 P.3d 926 (2004).* Governmental individuals and the City of Seattle may seek relief under this

[*4] statute. Plaintiff's contention that *RCW 4.24.510* is inapplicable because it protects communication to governmental agencies, rather than within governmental agencies, is without merit.

Order, docket no. 179, at 2. Eklund has thus been on notice since September 2008 that he would be at risk for attorneys' fees and statutory damages under Washington's Anti-SLAPP statute in the event Parcher, Tajima and Williams prevailed at trial on Eklund's wrongful termination claim.

On March 19, 2006, at the close of the trial, the Court dismissed Defendants Parcher, Tajima and Williams on Eklund's first claim for wrongful termination in violation of public policy as a matter of law. Minutes, docket no. 296. [1] As a result of their prevailing party status with regard to Eklund's wrongful termination claim, Parcher, Tajima and Williams now move for attorneys' fees and statutory damages under Washington's Anti-SLAPP statute.

> 1  On March 23, 2009, the jury returned a verdict in favor of Defendants Parcher, Tajima and Williams as to Eklund's *42 U.S.C. § 1983* claim for violation of Eklund's procedural due process rights. Jury Verdict, docket no. 301. Defendants Parcher, Tajima and Williams did not argue in [*5] their summary judgment motion, and they do not now argue in their fees motion, that the Anti-SLAPP statute immunizes them from liability for Eklund's *42 U.S.C. § 1983* claim. Defs.' Mot. Sum. J., at 8 n.5.

Eklund argues that Washington's Anti-SLAPP statute should not apply to intra-agency communications. The Court already ruled that governmental individuals and entities may seek relief under the statute and that the statute applies to protect communications within as well as to governmental agencies. Washington courts have expressly rejected a limited definition of the word "person" under *RCW 4.24.510* that would have only applied the Anti-SLAPP statute to protect "citizens" or "non-governmental entities." See *Gontmakher, 120 Wn. App. at 371, 374* (declining to follow dicta to the contrary in *Skimming v. Boxer, 119 Wn. App. 748, 82 P.3d 707 (2004)*). In Gontmakher, a Bellevue city employee reported clear-cutting on private land to the State Department of Natural Resources ("DNR"), and the

2009 U.S. Dist. LEXIS 60896, *5

private landowners sued the City of Bellevue based on the employee's communication with the DNR. The Gontmakher court stated that "there is a strong public policy rationale for including governmental entities in the [*6] definition of 'person,'" concluding that "reports by governmental agencies are common and important to proper agency functioning." *Id. at 372*; see also *RCW 4.24.500* (statutory purpose to encourage information gathering that will lead to "the efficient operation of government").

This information-gathering rationale applies with equal force to situations where a government actor is reporting to his or her own agency, especially because public employees are often in the best position to report on matters of reasonable concern to their own agencies. Eklund argues that applying the statute to intra-agency communications discourages public participation. As pointed out by Defendants, Eklund was free to sue the City for wrongful termination, and Judge Bonner as the actual decision-maker; however, when Eklund targeted the people who reported the ticket-fixing, he strayed into territory protected by the Anti-SLAPP statute. Defendants Parcher, Tajima and Williams have submitted declarations in connection with their reply brief explaining how it was discouraging to them as public employees to be sued for reporting misconduct. Parcher Decl., docket no. 359, PP 2-3; Tajima Decl., docket no. 360, [*7] P 2; Williams Decl., docket no. 361, P 2. Applying the Anti-SLAPP statute to these public sector employees upholds the purpose of the statute to encourage communications within public agencies on matters of reasonable concern to them, and will not discourage wrongful termination claims against employers.

Eklund argues that his wrongful termination claim was not based on the intra-agency communications of Parcher, Tajima and Williams regarding Eklund's ticket-fixing. The Court disagrees. The involvement of these defendants in Eklund's termination was the supplying of information and communicating about Eklund's involvement in ticket-fixing to various persons within the SMC. See, e.g., Trial Ex. A-71 (Parcher's June 10, 2004 memo to Williams); Trial Ex. A-100 (Parcher's draft of ELT's disciplinary recommendation as to Eklund); Trial Exs. A-102 and A-119 (Williams' memos of June 16, 2004 and June 22, 2004); see also Tajima Decl., docket no. 139, P 15 (discussing her involvement on ELT).

Eklund argues that the statute should not apply to Defendants Parcher, Tajima and Williams because they have not personally incurred any attorneys' fees. This is another rendition of Eklund's argument that [*8] the Anti-SLAPP statute should not apply to government officials and intra-agency communications, which the Court rejects. The City of Seattle has had to unnecessarily expend legal resources as a result of Eklund's wrongful termination claim against Parcher, Tajima and Williams. Clearly, the City of Seattle will be reimbursed for any attorneys' fees awarded under the Anti-SLAPP statute to Parcher, Williams and Tajima, and these individual defendants will not receive a personal windfall.

Defendants Parcher, Tajima and Williams move for $ 55,323.75 in attorneys' fees, representing $ 28,525.00 charged by Assistant City Attorney Erin Overbey (81.5 hours multiplied by the hourly rate of $ 350 per hour) and $ 26,798.75 charged by Assistant City Attorney Amy Lowen (97.45 hours multiplied by the hourly rate of $ 275 per hour). Overbey Decl., docket no. 316, P 3; Lowen Decl., docket no. 317, P 3. The rates are based on prevailing local rates for attorneys with similar experience. Overbey Decl. P 2; Lowen Decl. P 2. These are reasonable and legitimate rates. *United States v. Big D Enters., Inc., 184 F.3d 924, 936 (8th Cir. 1999)* (rates in local legal community serve as benchmark for rates for [*9] government's attorney); *United States v. City of Jackson, 359 F.3d 727, 733 (5th Cir. 2004)* (upholding payment for public sector attorneys at market rates). The attorneys' fee requests represent just over ten percent of the fees incurred by the defense in this case. Defendants have not claimed fees for time spent in defending Judge Bonner or the City of Seattle, for time spent on discovery and research relating to all Defendants, or for time spent by Assistant City Attorney Katrina Kelly. Overbey Decl. P 3; Lowen Decl. P 3. The request for $ 55,323.75 in attorneys' fees is reasonable.

In addition to attorneys' fees, Defendants Parcher, Tajima and Williams move for $ 10,000 each in statutory damages, which are mandatory under the Anti-SLAPP statute (". . . A person prevailing upon the defense . . . *shall* receive statutory damages of ten thousand dollars. . . .") unless "the complaint or information was communicated in bad faith." *RCW 4.24.510*. Eklund fails to address Defendants' request for statutory damages and makes no argument that the communications were made in bad faith. The Court finds that the communications were made in good faith. Accordingly, the Court awards

$ 10,000 each [*10] in statutory damages to Parcher, Tajima and Williams.

In conclusion, Defendants Parcher, Tajima and Williams are entitled to attorneys' fees and statutory damages under the Anti-SLAPP statute for having to defend against the wrongful termination claim, which Eklund alleged against them as a result of their communications to the SMC regarding Eklund's ticket-fixing. The Court GRANTS Defendants Mark Parcher, Gayle Tajima, and Yolande Williams' Motion for Statutory Penalties and Attorney Fees under Washington's Anti-SLAPP Statute, *RCW 4.24.510*, docket no. 315, and awards Defendants Parcher, Tajima

and Williams attorneys' fees in the amount of $ 55,323.75 and statutory damages in the amount of $ 10,000 per person, for a total award of $ 85,323.75.

IT IS SO ORDERED.

DATED this 30th day of June, 2009.

/s/ Thomas S. Zilly

Thomas S. Zilly

United States District Judge

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)
**(Cite as: 2005 WL 1220850 (M.D.Ga.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
M.D. Georgia, Macon Division.
INTERNATIONAL BROMINATED SOLVENTS
ASSOCIATION; National Mining Association;
Aerosafe Products, Inc.; and Anchor Glass Contain-
er Corp., Plaintiffs,
v.
AMERICAN CONFERENCE OF GOVERN-
MENTAL INDUSTRIAL HYGIENISTS, INC.;
Elaine Chao, Secretary, United States Department
of Labor, Defendants.
**No. 5:04 CV 394(DF).**

May 20, 2005.

William Camp Harris, Macon, GA, Henry Z. Chajet
, Washington, DC, for Plaintiffs.

David K. Monroe, Washington, DC, Matthew T.
Strickland, William David Gifford, U.S. Attorney
Office, Macon, GA, Daniel Bensing, Elizabeth J.
Shapiro, U.S. Department of Justice, Washington,
DC, for Defendants.

*ORDER*

FITZPATRICK, J.

**\*1** The parties have raised a number of discovery-re-
lated issues that must be resolved before the Court
can enter a Rule 16(b) scheduling order permitting
this case to move forward. This order will address
the following issues: (1) American Conference of
Governmental Industrial Hygienists's ("ACGIH")
Motion to Strike (tab 92) Plaintiffs' Uniform De-
ceptive Trade Practices Act ("UDTPA") claim for
failure to comply with Georgia's anti-**SLAPP** stat-
ute. O.C.G.A. § 9-11-11.1 (Lexis Supp.2004); (2)
Department of Labor's ("DOL") argument that
Plaintiffs' APA claim must be reviewed solely on

the administrative record, without the aid of newly
developed discovery; (3) Plaintiffs' motion to in-
crease the limits of written interrogatories, requests
for admission, and requests for production pre-
scribed by this Court's Local Rules and the Federal
Rules of Civil Procedure (tab 90); and (4) The dis-
covery format (whether the discovery process will
be unified or bifurcated). Each issue will be ad-
dressed in turn.

I. *ACGIH's Motion to Strike*

ACGIH moves to strike Plaintiffs' UDTPA claim
pursuant to Georgia's anti-**SLAPP** (Strategic Litiga-
tion Against Public Participation) statute, O.C.G.A.
§ 9-11-11.1 (Lexis Supp.2004). ACGIH argues that
this claim must be stricken because Plaintiffs have
failed to verify their allegation as required by the
statute. In opposing ACGIH's motion to strike,
Plaintiffs advance several arguments, one of which
the Court must address as a threshold matter:
Whether Georgia's anti-**SLAPP** statute applies in
federal court.

O.C.G.A. § 9-11-11.1(b) provides that:

For any claim asserted against any person or entity
arising from an act by that person or entity which
could reasonably be construed as an act in fur-
therance of the right of free speech ... in connec-
tion with an issue of public interest or concern,
both the party asserting the claim and the party's
attorney of record ... shall be required to file ... a
written verification under oath as set forth in
Code Section 9-10-113.... *If the claim is not veri-
fied as required by this subsection, it shall be
stricken* unless it is verified within ten days after
the omission is called to the attention of the party
asserting the claim.

Subsection (d) of the statute further provides that:

All discovery ... in the action shall be stayed upon
the filing of a motion to dismiss or a motion to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)
**(Cite as: 2005 WL 1220850 (M.D.Ga.))**

strike made pursuant to subsection (b) of this Code section.

Designed to prevent abusive litigation from chilling significant First Amendment rights, Georgia's anti-**SLAPP** statute contains "several procedural safeguards." *Providence Const. Co. v. Bauer,* 229 Ga.App. 679, 494 S.E.2d 527, 528 (Ga.Ct.App.1997). Claims impinging on an act that may "reasonably be construed as an act in furtherance of the right of free speech" must be verified under oath. Both the party bringing the claim and the party's attorney must certify that (1) they have read the claim; (2) the claim, to the best of their knowledge, information, and belief formed after a reasonable inquiry, is well grounded in fact and warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; (3) the act forming the basis of the claim is not a privileged communication [under O.C.G.A. § 51-5-7]; and the claim is not interposed for any improper purpose. *See* O.C.G.A. § 9-11-11.1(b).

***2** Plaintiffs argue that the anti-**SLAPP** statute is not applicable in federal court because its requirements are in conflict with, and therefore must yield to, the Federal Rules of Civil Procedure.[FN1] *See Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *see also Cohen v. Office Depot, Inc.,* 184 F.3d 1292 (11th Cir.1999), *vacated in part on other grounds,* 204 F.3d 1069. This issue has never been addressed by the Eleventh Circuit.[FN2]

> FN1. The need to choose between applying a state law or a Federal Rule of Civil Procedure may arise in either a diversity-of-citizenship case or a federal-question case involving a supplemental state-law claim. The instant case is of the latter variety.

> FN2. Two district courts in the Northern District of Georgia have, without analysis, addressed the applicability of the anti-**SLAPP** statute in federal court. *See Buckley v. DirecTV, Inc.,* 276 F.Supp.2d

1271 (N.D.Ga.2003) (relying on an interpretation of California's anti-**SLAPP** statute in concluding that the Georgia statute is applicable); *AirTran Airlines, Inc. v. Plain Dealer Pub. Co.,* 66 F.Supp.2d 1355 (N.D.Ga.1999) (assuming arguendo that the statute applies). The Court finds these cases to be unhelpful.

The Supreme Court in *Hanna* developed a test for determining whether a Federal Rule of Civil Procedure will prevail over, and displace, a state law. As explained by the Eleventh Circuit:

> [T]he court must ask whether the state law provision conflicts with a federal procedural rule. If it does, the federal procedural rule applies and the state provision does not.... The only exception is where the advisory committee, the Supreme Court, and Congress have collectively erred and adopted a federal procedural rule that is either unconstitutional or should not have been adopted under the Rules Enabling Act because it is a matter of substantive law.

*Cohen,* 184 F.3d at 1296-97.

According to the Supreme Court, the key inquiry in determining if a state law conflicts with a Federal Rule of Procedure is "whether the scope of the Federal Rule in fact is sufficiently broad to control the issue before the Court." *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749-750, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). "Typically, courts deem a federal rule sufficiently broad to control the issue when the court *cannot give effect to both the federal and state rules.*" (emphasis added) 17A *Moore's Federal Practice,* § 124.03[1] (Matthew Bender 3d ed.2004).

Plaintiffs argue that the anti-**SLAPP** statute conflicts with Rule 8 of the Federal Rules of Civil Procedure because it imposes "additional constraints and requirements on pleadings," above and beyond Rule 8's requirement that a claim and the grounds for relief be contained in a "short and plain state-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)
**(Cite as: 2005 WL 1220850 (M.D.Ga.))**

ment." Essentially, Plaintiffs make the same heightened-pleading argument that has been specifically rejected by the Eleventh Circuit. *See Cohen,* 184 F.3d at 1297 (rejecting the notion that a request for damages is a "claim" within the meaning of Rule 8(a)(2)). Just as a request for punitive damages in *Cohen* could not be considered a "claim" under Rule 8(a)(2), the verification procedure required by the anti-**SLAPP** statute cannot be considered an additional component of the UDTPA claim, which itself need only be pleaded in a short and plain statement. Verification is a procedural obligation separate and apart from the UDTPA claim itself. Therefore, a party asserting a claim subject to the anti-**SLAPP** statute can simultaneously comply with both the "short and plain statement" requirement of Rule 8 and the verification provision of O.C.G.A. § 9-11-11.1(b). Because the state law and the Federal Rule "can exist side by side ... each controlling its own intended sphere of coverage" there is no conflict and the *Hanna* analysis is not implicated. *See Walker,* 740 U.S. at 752.FN3

> FN3. Plaintiffs make a similarly unavailing "conflict" argument with respect to Rule 11 of the Federal Rules. They argue that, because Rule 11 and the verification provision in the anti-**SLAPP** statute both require that a claim be pursued in good faith, after reasonable inquiry, and not for any improper purpose, Rule 11 occupies the same field of coverage as the verification provision. For this reason, Plaintiffs suggest that the anti-**SLAPP** statute should not be applied in federal court. However, they fail to explain how the similarities between Rule 11 and O.C.G.A. § 9-11-11.1(b) create a conflict under *Hanna* since compliance with each can be simultaneously achieved.

**\*3** Plaintiffs also maintain that the provision in the anti-**SLAPP** statute requiring an unverified claim to be automatically stricken directly conflicts with the policy favoring liberal amendment of pleadings contained in Rule 15(a). Under Rule 15(a), "leave

[to amend] shall be freely given when justice so requires." Whether a party is granted leave to amend his pleadings under Rule 15(a) is a matter left to the discretion of the trial court. By contrast, the anti-**SLAPP** statute contains a mandatory provision stating that "[i]f the claim is not verified as required by [subsection b], it *shall be stricken* unless it is verified within ten days after the omission is called to the attention of the party asserting the claim." O.C.G.A. § 9-11-11.1(b) (emphasis added).

In this case, ACGIH brought the omission to Plaintiffs' attention by pleading Plaintiffs' non-compliance with the anti-**SLAPP** statute as an affirmative defense in its answer, which was filed on 6 April 2005. The ten-day grace period contemplated by the statute has long since passed. Therefore, under the plain terms of the statute the failure to verify the UDTPA claim requires that it be stricken. This outcome, however, creates a direct conflict with Rule 15(a). *See Verizon Delaware, Inc. v. Covad Comm. Co.,* 377 F.3d 1081, 1091 (9th Cir.2004) ("granting a defendant's anti-**SLAPP** motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed.R.Civ.P. 15(a)'s policy favoring liberal amendment."). Rule 15(a) is sufficiently broad to control this issue because the Court is unable to give effect to both the Federal Rule and the state rule. The conflict is unavoidable because leave to amend under Rule 15(a) is discretionary while the automatic-strike provision of O.C.G.A. § 9-11-11.1(b) is mandatory. *See* 17A *Moore's Federal Practice,* § 124.03[1] (Matthew Bender 3d ed.2004) (commenting that "federal courts have held that discretionary federal rules are sufficiently broad to conflict with similar mandatory state rules."); *see, e.g ., Burlington N. R.R. v. Woods,* 480 U.S. 1, 7, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) (reasoning that the federal rule's "discretionary mode of operation unmistakably conflicts with the mandatory provision of Alabama's [state law]."); *see also Harvey's Wagon Wheel, Inc. v. Van Blitter,* 959 F.2d 153, 155 (9th Cir.1992) (same reasoning, different rules). If the anti-**SLAPP** statute's madat-

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)

**(Cite as: 2005 WL 1220850 (M.D.Ga.))**

ory strike provision were applied in federal court, it would undoubtably "impair the operation and effect of" Rule 15(a). *See Cohen*, 184 F.3d at 1298.

Because a conflict exists between Rule 15(a) and the mandatory strike provision contained in the anti-**SLAPP** statute, the Supreme Court's *Hanna* analysis is triggered, and the Court must apply the federal rule unless it is unconstitutional or invalid under the Rules Enabling Act. *See Hanna,* 380 U.S. at 471. Federal Rules of Procedure are presumed to be both constitutionally and statutorily valid. *See Burlington,* 480 U.S. at 5. The Court finds nothing that would undermine these presumptions.

**\*4** Applying Rule 15(a), the Court finds that it is in the interest of justice to permit Plaintiffs to amend their First Amended Complaint, with respect to the UDTPA claim, to bring it into compliance with the verification requirements set forth in O.C.G.A. § 9-11-11.1(b). Plaintiffs are directed to verify their UDTPA claim forthwith. ACGIH's Motion to Strike (tab 92) is hereby DENIED.[FN4]

> FN4. The Court notes that Plaintiffs have also challenged ACGIH's Motion to Strike on the grounds that the anti-**SLAPP** statute, by its own terms, does not apply to ACGIH's act of disseminating TLVs. The Court disagrees. ACGIH's promulgation and publication of TLVs can "reasonably be construed as an act in furtherance of the right of free speech ... in connection with an issue of public interest or concern." O.C.G.A. § 9-11-11.1(b). The statute is to be broadly construed, and while subsection (c) of the statute lists among the examples of "act[s] in furtherance of the right of free speech" any "written or oral statement ... made before or to a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," that list is not exclusive. *See Chatham Orthopaedic Surgery Ctr., LLC v. Ga. Alliance of Comm. Hosp., Inc.,* 262 Ga.App. 353, 585 S.E.2d 700, 702 (Ga.Ct.App.2003).

## II. *Discovery Format and Scope*

There is much disagreement about the way in which discovery in this case should proceed. The parties have submitted to the Court three separate proposed scheduling orders, each of which varies widely in terms of the suggested format and scope of discovery. A brief summary of the parties' proposals is as follows:

### A. Plaintiffs

Plaintiffs are in favor of a traditional, six-month discovery period, with expiration set for 2 September 2005. They want to depose approximately fifteen individuals, including: ACGIH Board Members; ACGIH TLV committee members; and various DOL officials. They propose that all motions to amend be filed by 15 June 2005, and that all dispositive motions be filed no later than 15 October 2005[FN5] (45 days after the close of discovery).

> FN5. Plaintiffs have stated the dispositive motion deadline as 15 September in their proposed scheduling order; apparently, this is an unintentional oversight, as discovery under the terms of their proposal would have only been closed for roughly a week. The Court assumes that Plaintiffs meant to state a dispositive-motion filing deadline of 15 October.

### B. ACGIH

ACGIH proposes a bifurcated discovery process, with each phase lasting three months. The only claim remaining against ACGIH is claim brought by Plaintiffs under Georgia's Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. § 10-1-372 (Lexis 2000). ACGIH suggests that the initial phase of discovery be limited solely to the following issues: (1) whether ACGIH's conduct in publishing and disseminating the TLVs is privileged; and (2) whether ACGIH acted with actual malice toward Plaintiffs in publishing and dissem-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)
(Cite as: 2005 WL 1220850 (M.D.Ga.))

inating its TLVs. ACGIH proposes that this phase be completed by 8 July 2005. At the end of the first phase, ACGIH expects that it would file a motion for summary judgment on these issues (no later than 1 August 2005), which, if granted, would terminate them as a party in the case. If summary judgment were denied, the parties would then proceed to phase two of discovery, a second three-month period devoted to the rest of the issues pertinent to Plaintiffs' UDTPA claim. ACGIH anticipates that, 45 days after the completion of phase two, it would file a second motion for summary judgment with respect to any remaining issues.

The legal basis for ACGIH's contention is one sentence from the decision of the Georgia Court of Appeals in *Dominy v. Shumpert*, 235 Ga.App. 500, 510 S.E.2d 81, 86 (1998), which states that: "The presence of privilege combined with the absence of malice also eliminates any claim plaintiff alleged under O.C.G.A. 10-1-372(8)." The court in *Dominy*, however, dealt primarily with Georgia's libel statute, and reliance on this sentence as a basis for substantially modifying the traditional discovery model appears to this Court to be unwarranted. Further, the *Dominy* decision referred only to section (8) of O.C.G.A. § 10-1-372, but Plaintiffs have alleged violations of sections (7) and (12) as well.

C. DOL

**\*5** DOL makes two arguments regarding discovery on Plaintiffs' APA claim. First, it argues that Plaintiffs are entitled to *no* discovery because APA claims must be resolved on the administrative record alone, not by trial *de novo*. Second, DOL proposes that, if discovery is permitted, it be limited solely to the issue of whether ACGIH is "utlized by" DOL for FACA purposes. Because the Court has already determined that the allegations in Plaintiffs' amended complaint do not state a claim under the "created by" prong of FACA, it follows that if ACGIH is not "utilized by" DOL then ACGIH is not covered by FACA and the APA claim against the DOL must fail.

As the Supreme Court has noted, " '[T]he focal point for judicial review [of agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court.' " *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). This general rule makes sense given that in a typical APA challenge "[t]he entire case on review is a question of law, and only a question of law." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C.Cir.1993). When a reviewing court is faced with evaluating the legality of a particular agency action, and therefore has before it a pure question of law, there is rarely a reason or justification for developing a new factual record.

However, because Plaintiffs' APA claim against DOL is based on ACGIH's failure to comply with FACA, it is somewhat different from the usual APA claim. The answer to the legal issue presented by Plaintiffs' APA claim-whether DOL acts contrary to law when it relies on ACGIH's TLVs-turns on the relationship between DOL and ACGIH. If ACGIH is "utilized by" DOL as that phrase is used in FACA, and therefore functions as a federal advisory committee, then DOL is in violation of the law since it is undisputed that ACGIH does not comply with FACA's requirements. If, on the other hand, ACGIH is not "utilized by" DOL, it cannot be considered a federal advisory committee, it need not comply with FACA, and DOL's reliance on ACGIH's TLVs is not legally improper.

An evaluation of the sort required here cannot be made without the development of a factual record specifically focusing on the nature of this relationship; that is, a record from which the Court can ascertain whether ACGIH is "utilized by" DOL for FACA purposes. DOL's argument that, because this claim is brought under the APA, Plaintiffs are entitled to no discovery must be rejected because it does not take into account the particular features of Plaintiffs' claim which distinguish it from those

APA claims that are properly reviewable on the administrative record alone. The Court determines that the current relationship between DOL and AC-GIH cannot be discerned from looking solely at the administrative record. Consequently, the Court will permit Plaintiffs to engage in discovery with respect to its claim against DOL, but stresses that such discovery must be limited as discussed above.

### III. *Plaintiff's Motion to Exceed Limits on the Number of Written Interrogatories, Requests for Admissions, and Requests for Production*

**\*6** This matter was partially resolved during a phone conference held by the Court on May 16, 2005. During the conference call, ACGIH agreed to Plaintiffs' request for 40 written interrogatories, 50 requests for admissions, and 50 requests for production. DOL objected to a similar request with respect to Plaintiffs' APA claim, arguing that Plaintiffs' request is premature since no attempt has been made to conduct discovery within the limits prescribed by the Federal and Local Rules of Procedure (25/15/10-respectively).

DOL maintains that Plaintiffs should be required first to proceed under the prescribed limits and then, only if those limits prove infeasible, be permitted to seek additional discovery by leave of court upon a "particularized showing" of necessity. As discussed above, the Court anticipates that the scope of discovery with respect to Plaintiffs' APA claim will be rather narrower than the scope of discovery with respect to the UDTPA claim against ACGIH. Discovery on the APA claim will center on one issue: whether ACGIH is a federal advisory committee under FACA; more specifically, whether ACGIH is "utilized by" DOL.

For this reason, the Court agrees with DOL's proposal that, before seeking permission from the Court for an extension, Plaintiffs should make every diligent effort to conduct their discovery within the limits prescribed by this Court's Local Rules: 25 written interrogatories (L.R.33.1); 15 re-

quests for admissions (L.R.36); and 10 requests for production (L.R.34). Should Plaintiffs find that these limits unreasonably hamper their ability to discover information relevant to their claim against DOL, they are directed to file a motion with the Court specifying the grounds for a reasonable extension.

### IV. CONCLUSION

Having now resolved all the discovery-related issues currently pending, the Court summarizes its findings and directs the parties as follows:

1. ACGIH's Motion to Strike (tab 92) is hereby DENIED. Plaintiffs are ORDERED to file within 10 days an amended complaint containing a properly verified UDTPA claim complying with O.C.G.A. § 9-11-11.1 and O.C.G.A. § 9-10-113;

2. Plaintiffs shall be permitted to conduct discovery on their APA claim against DOL, but are directed to limit such discovery solely to the issue of whether ACGIH is "utilized by" DOL for FACA purposes;

3. The discovery process shall not be bifurcated;

4. Plaintiffs' Motion for Discovery (tab 90) is hereby GRANTED in part and DENIED in part:

a. With respect to ACGIH, Plaintiffs shall be entitled to propound up to 40 written interrogatories, 50 requests for admissions, and 50 requests for production;

b. With respect to DOL, Plaintiffs shall abide by the limits contained in this Court's Local Rules.

Furthermore, counsel are hereby ORDERED to confer with each other for the purpose of devising a jointly proposed scheduling order for submission to the Court. Such proposal shall be filed with the Court within 20 days.

**\*7** SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)
**(Cite as: 2005 WL 1220850 (M.D.Ga.))**

M.D.Ga.,2005.

International Brominated Solvents Ass'n v. American Conference of Governmental Industrial Hygienists, Inc.

Not Reported in F.Supp.2d, 2005 WL 1220850 (M.D.Ga.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2412126 (D.Md.)
**(Cite as: 2009 WL 2412126 (D.Md.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Maryland,
Southern Division.
NEURALSTEM, INC., Counter-Defendant,
v.
STEMCELLS, INC., Counter-Plaintiff.
**Civil Action No. AW-08-CV-1173.**

Aug. 4, 2009.

Michael Thomas Murphy, Bell Boyd and Lloyd LLP, Michael Jay Schrier, K & L Gates LLP, Washington, DC, Alan Lynn Barry, Christian Guillermo Stahl, Bell Boyd and Lloyd LLP, Sanjay Krishna Murthy, K&L Gates LLP, Chicago, IL, for Counter-Defendant.

### *MEMORANDUM OPINION*

ALEXANDER WILLIAMS, JR., District Judge.

This action involves a trade libel defamation suit brought by Counter-Plaintiff StemCells, Inc. ("StemCells" or "Plaintiff") as counterclaims against Counter-Defendant Neuralstem, Inc. ("Neuralstem" or "Defendant"). Currently pending before the Court is Neuralstem's Motion to Dismiss Counts three, four and five of StemCells' counterclaim. The Court has reviewed the entire record, as well as the Pleadings with respect to the instant motion. No hearing is deemed necessary. *See* Local Rule 105.6 (D.Md.2004). For the reasons stated below, the Court will grant in part and deny in part Defendant's Motion to Dismiss.

### FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. On July 24, 2006, Stem-Cells filed suit in this Court (the "StemCells Mary-

land Action") and asserted claims that Neuralstem infringed four of its patents. On June 19, 2007, the parties agreed to stay that action pending reexamination proceedings in the United States Patent & Trademark Office ("PTO") of the patents-in-suit. When the instant motion was filed, the StemCells Maryland Action was both stayed and administratively closed [FN1]. (*See* Civil Action No. 06-1877, Dkt. Nos. 69, 70.)

> FN1. Parties filed a joint motion to re-open the case on May 15, 2009. The Court granted the motion June 8, 2009.

On May 7, 2008, Neuralstem filed a Declaratory Judgment action in this court (the "Neuralstem Maryland Action") in response to StemCells' April 23, 2008 press release, announcing the issuance of United States Patent No. 7,361,505 (the "'505" patent). StemCells asserted that "any third party wishing to commercialize neural stem cells as potential therapeutics or use them as drug screening tools will have to seek a license from us irrespective of how they derive the cells." (*See* First Amended Compl. at ¶ 9.) Neuralstem asserted that the "'505" patent was invalid, not infringed, and unenforceable. Hours later, StemCells filed a complaint in the Northern District of California alleging infringement of another patent and California state law claims for trade libel and unfair competition. On May 13, 2008, Neuralstem filed an Amended Complaint seeking a declaration of non-infringement and also a declaration that whatever statements it had made concerning the PTO examinations, the prior dispute between the parties, and the filing of this action, did not constitute "trade libel" or "unfair competition." (*Id*. at ¶ ¶ 63-71.)

Neuralstem released three statements to the public. The first was an announcement made on May 22, 2007, at a Wall Street Analysts Forum by Neuralstem's President and CEO, Richard Garr, stating that:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2412126 (D.Md.)
**(Cite as: 2009 WL 2412126 (D.Md.))**

Well, also you refer us to the infringement law suite [sic] was filed last August by StemCells, Inc. and obviously we are not infringing their patents. But it actually hasn't gone anywhere. *At this point, the patent office has ruled that all of the patents [StemCells] accused us of infringing are invalid. In fact, [StemCells] have little bit, it's preliminary because they get to fight it out, but the preliminary ruling was that all of the claims in all the patents, they are not valid.* So, I think for a couple of years nothing will happen until and unless they make it out of the patent office even in those patents, intact. Yeah.

*Id.* (emphasis in original).

On March 28, 2008, Neuralstem issued a press release on its company website in the "Investor Relations" section, stating that:

In September the Company announced that it received notice that the United States Patent and Trademark Office (USPTO) had issued its first ruling in the reexamination of the four StemCells, Inc. patents requested by Neuralstem. In ruling the Patent Office rejected on multiple grounds all of the claims StemCells attempted to assert against Neuralstem in its law suit in all four of StemCells' patents that it examined and the lawsuit was subsequently dismissed. The Company believes that the Patent Office has now correctly found that these claims should never have been issued in the first place.

(StemCells' Counterclaim at ¶ 40.)

The third public release statement was made on May 7, 2008, by Neuralstem's President and CEO, Richard Garr, stating that:

While ... we have not yet been directly accused by StemCells, Inc. of infringing this patent, *the threatening statements in their press release of April 23rd leave the misleading impression that we would require a license from them as a result of the issuance of this patent.* Nothing could be

further from the truth," said Neuralstem President & CEO Richard Garr. "And, in addition to finding that the patent is unenforceable against us, or anyone else for that matter, as a result of their actions, we are asking that the Court also declare that we are not infringing the patent and that the patent is also invalid."

"We are confident *that their intentional withholding of highly material information and their intent to deceive the Patent Office,* will result in this patent being unenforceable," concluded Garr.

(*Id.* at ¶ 41. (emphasis added).)

On September 11, 2008, StemCells filed an answer to Neuralstem's Amended Complaint along with five counterclaims, three of which were directed at Neuralstem. Neuralstem seeks to have three of StemCells' counterclaims dismissed: Count III-Injurious Falsehood/Trade Libel in violation of Business and Professions Code; § 17200, Count IV-Maryland Common Law Unfair Competition; and Count V-Unfair Competition Violation of California Business and Professions Code § 17200. On October 1, 2008, Neuralstem filed the instant Motion to Dismiss.

### STANDARD OF REVIEW

*Motion to Dismiss, Fed.R.Civ.P. 12(b)(6)*

It is well established that a motion to dismiss under Rule 12(b) (6) of the Federal Rules of Civil Procedure should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining whether to dismiss a complaint pursuant to Rule 12(b) (6), this Court must view the well-pleaded material allegations in the light most favorable to the plaintiff and accept the factual allegations contained within the plaintiff's complaint as true. *See Flood v. New Hanover County,* 125 F.3d 249, 251

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4th Cir.1997) (citing *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 217-18 (4th Cir.1994)); *Chisolm v. TranSouth Finan. Corp.,* 95 F.3d 331, 334 (4th Cir.1996).

The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981)); *Young v. City of Mount Ranier,* 238 F.3d 576, 577 (4th Cir.2001) (the mere "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)"). Nor is the Court "bound to accept [Plaintiff's] conclusory allegations regarding the legal effect of the facts alleged." *United Mine Workers of Am. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085-86 (4th Cir.1994); *Neitzke v. Williams,* 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Thus, a complaint may be dismissed as a matter of law if it lacks a cognizable legal theory *or* if it alleges insufficient facts to support a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir.1984) (citing 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed.1982)).

### DISCUSSION

### I. Choice of Law

The first issue before the Court is to determine whether California or Maryland law applies to the instant motion. Neuralstem contends that California privilege law applies. In support of its argument, Neuralstem points to the fact that a federal court must apply choice of law rules of the forum state, here Maryland. *Superior Bank, F.S.B. v. Tandem Nat. Mortg. Inc.,* 197 F.Supp.2d 298, 309 (D.Md.2000). Where the substantive area of the chosen state's law is unclear, the court sitting in diversity is obliged to interpret the law as it believes that state's highest court of appeals would rule.

*Liberty Mut. Ins. Co. v. Triangle Industries, Inc.,* 957 F.2d 1153, 1156 (4th Cir.1992). Because the *lex loci delecti commissi,* or the place of harm principle, proves difficult in multistate defamation, the Maryland Court of Appeals adopts the Restatement (Second) of Conflict of Laws. *Abadian v. Lee,* 117 F.Supp.2d 481, 485 (D.Md.2000). The Restatement (Second) Conflict of Laws § 150 considers the state of plaintiff's domicile, the state of plaintiff's principal activity to which the alleged defamation relates, and the state where plaintiff suffered the greatest amount of harm, as significant factors in deciding applicable law. *Id. at 486.* When causes of action arise in tort, Maryland's choice of law rules require application of the law of the state where the tortious conduct or injury occurred. *Superior Bank,* 197 F.Supp.2d at 309. In this case, StemCells' domicile, principal activity, and greatest harm suffered occurred in California. Furthermore, nothing in the record indicates that StemCells has ever conducted business with Maryland or has had any contacts with Maryland, aside from filing litigation in this Court [FN2]. Accordingly, the Court finds that Maryland law is inappropriate and California law applies since California is the state where StemCells' reputation suffered the most harm.

> FN2. Both parties represented to the Court that StemCells does not conduct business in the state of Maryland. (Memorandum Opinion, Filed 08/27/2008).

On the other hand, StemCells argues that under the principle of depecage, both California and Maryland privilege law apply. StemCells argues for the principle of depecage so that this Court can address the Fourth counterclaim, which applies Maryland common law and the Firth counterclaim, which applies California state law. Under the principle of depecage, different issues in a single case, arising out of a common nucleus of operative facts, may be decided according to the substantive law of different states. *Putnam Resources v. Pateman,* 958 F.2d 448, 465 (1st Cir.1992). The Maryland Court of Appeals has not endorsed depecage explicitly, but

Slip Copy, 2009 WL 2412126 (D.Md.)

**(Cite as: 2009 WL 2412126 (D.Md.))**

has "implicitly endorsed the use of laws of different states to address different claims under Maryland conflicts of law analysis." *Trent Partners & Associates, Inc. v. Digital Equipment Corp.,* 120 F.Supp.2d 84, 95 (D.Mass.1999). *See also National Glass, Inc. v. J.C. Penney Properties, Inc.,* 336 Md. 606, 616, 650 A.2d 246, 251 (1994) (holding that choice-of-law provision in contract between sub-contractor and general contractor, which specified that parties' contract would be governed by law of state which permitted waiver of mechanics' lien rights, was unenforceable as contrary to public policy of Maryland); *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 511 (4th Cir.1986) (finding that Maryland tort law applied for violation of statute and the case was remanded to consider whether Connecticut law applied for breach of contract.)

The principle of depecage does not apply in this case because the Maryland Court of Appeals has not explicitly endorsed depecage. Neuralstem argues that this case is most analogous to *Trent Partners,* which in turns cites *National Glass* and *Johnson.* Facts from *National Glass* and *Johnson* both show that depecage applies only to a limited set of facts. In *National Glass,* the court held that Pennsylvania law cannot be applied to resolve the dispute despite choice of law provisions in a contract between a general contractor and subcontractor. 336 Md. at 616, 650 A.2d at 251. Instead, Maryland law was applied because it was evident that Maryland's interest in the case was materially greater than that of Pennsylvania. *Id.* Clearly, the *National Glass* court did not apply laws of two different states and depecage was not endorsed. Furthermore, this case can be further distinguished from *National Glass* in that there is no contract between two rival pharmaceutical companies, and certainly a choice-of-law provision does not exist. In a similar case, the *Johnson* court found statute violation existed and applied Maryland tort law. 785 F.2d at 511. The *Johnson* court remanded the case to determine whether there was a breach of contract. *Id.* If the contract was breached, then Connecticut contract law will apply. *Id.* The *Johnson* case merely al-

luded to the possibility of depecage upon finding a breach of contract. Unlike *Johnson,* this case does not involve a contractual issue. All three counter-claims in this case fall under tort law as opposed to contract law. As such, there is no need for this Court to consider different state laws given all claims fall under tort law. Thus the Court will only apply California law.

The parties do not argue that StemCells' domicile, principal activity, and greatest harm suffered occurred in California. Under Maryland's choice of law rules, the state where the tortious injury occurred controls, and thus the Court holds that California laws apply since StemCells' reputation suffered the most harm in that state.

**II. Count III-Injurious Falsehood/Trade Libel**

In Count III of this Counter-claim, StemCells contends that Neuralstem intentionally made false statements about the value or quality of StemCells' patents in order to devalue and injure the intellectual property of StemCells, to impugn the business honesty of StemCells, and to engage in unfair competition under California Business and Professional Code Section 17200. (StemCells' Counterclaim at ¶ 32.) Neuralstem argues their public release statements are not liable for injurious falsehood/trade libel because their communications are protected by the First Amendment, California litigation privilege, and the California anti-SLAPP (Strategic Lawsuit Against Public Participation) statute.

*A. First Amendment*

First and foremost, Neuralstem argues that its press releases are protected by the First Amendment. A statement that is "substantially true" will not be subject to liability even with "slight inaccuracy in the details." *Smith v. Maldonado,* 72 Cal.App.4th 637, 646-47, 85 Cal.Rptr.2d 397, 402 (Ct.App.1999). However, StemCells argues that the speech was commercial, as well as false and misleading, and therefore does not merit protection un-

Slip Copy, 2009 WL 2412126 (D.Md.)

**(Cite as: 2009 WL 2412126 (D.Md.))**

der the First Amendment.

As a general rule, false or unlawful commercial speech is not entitled to First Amendment protection. *United States v. Bell,* 414 F.3d 474, 481 (3rd Cir.2005). The first inquiry for the Court is whether Neuralstem's speech was commercial as StemCells claims. To determine if a speech is commercial, courts consider whether: 1) the speech is an advertisement; 2) the speech refers to a specific product or service; and 3) the speaker has an economic motivation for the speech. *Id.* at 479. An affirmative answer to each of the elements indicates "strong support" for commercial speech. *Id.*

The Court finds that Neuralstem's press releases are commercial speech. The public statements made by Neuralstem are certainly company advertisements, and the public statements refer to patents, i.e., the product or service of Neuralstem. And finally, Richard Garr, Neuralstem's President and CEO, had economic interests when speaking to existing and potential investors on Neuralstem's behalf. Therefore, the Court considers public release announcements at the Wall Street Analysts Forum and the public release statements made on the company website commercial speech.

Having established that Neuralstem's press releases are commercial speech, the Court now considers the lawfulness of the commercial speech. Commercial speech is entitled to protection under the First Amendment if it relates to lawful activities. *In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). However if the "particular content or method of the advertising suggests that it is inherently misleading or when the experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions." *Id.* In the present case, Neuralstem's press release is commercial, but the content was not entirely true and could be misleading. First, Garr used incorrect terminology regarding the status of the patent process. On the May 22, 2007, conference, Garr stated "the patent office has ruled that all of the patents they accused us of infringing are

invalid." In truth, the PTO had only granted Neuralstem's petitions for reexamination, meaning there was a question of patentability and not that the PTO had decided the patents were invalid. (StemCells' Counterclaim at ¶ 33, 35, 37.) Second, in Neuralstem's March 28, 2008, press release, Garr was quoted as saying the StemCells Maryland Action was "dismissed" and "believes that the Patent Office has now correctly found that these claims should never have been issued in the first place." (*Id.* at ¶ 40.) It is undisputed that the StemCells Maryland Action had not been "dismissed" but had instead been "stayed" pending reexamination of the four patents at issue. (*See* Civil Action No. 06-1877, Dkt. Nos. 69, 70.) Third, Garr was quoted on May 7, 2008, as saying that StemCells' "intentional withholding of highly material information and their intent to deceive the Patent Office will result in this patent being unenforceable." (*Id.* at ¶ 41.) This cannot be true as the PTO has not announced a finding of inequitable conduct. Were Garr not an attorney himself, the Court might not accord his statement the same significance; however, a well versed attorney will know the distinction between different patent terminologies and will also know the significant impact his statements can make. Given that all three commercial speeches were arguably false and misleading, the Court agrees with StemCells that none of Neuralstem's public statements are entitled to First Amendment protection because the public statements were unlawful.

*B. Litigation Privilege*

Neuralstem argues that its press releases qualify as privileged communications under California Civil Code § 47(b). Under Section 47(b), "communications made in or related to judicial proceedings are absolutely immune from tort liability." *Sharper Image Corp. v. Target Corp.,* 425 F.Supp.2d 1056, 1077 (N.D.Cal.2006). On the other hand, StemCells argues that the California litigation privilege does not apply in this case, because the privilege does not shield false statements broadcas-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ted to the general public and does not shield statements that do not further the objective of the litigation. *Silberg v. Anderson,* 50 Cal.3d 205, 213, 266 Cal.Rptr. 638, 786 P.2d 365, 369 (Cal.1990).

The principal purpose of litigation privilege is to provide freedom of access to the courts without fear of subsequent derivative tort actions. *Id.* The litigation privilege is generally described as applying "to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. *Id.*

First, Neuralstem's press releases were made at a forum and on the company's website. They were not made in relation to judicial or quasi-judicial proceedings. The second element of the test is satisfied because Neuralstem's President and CEO made the statements, and is arguably an authorized litigant. Third, the press releases were made to actual or potential customers of Neuralstem's services and products for the purpose of securing sales. The Court does not believe the press releases were made to achieve objectives of the litigation because the statements were made at a Wall Street Analysts Forum and on Neuralstem's website under "Investor Relations." Neuralstem concedes that the purpose of the communications was to inform potential and existing investors of pending litigation involving Neuralstem. And finally, although the press releases dispersed information related to the litigation, the information was incorrect and cannot be said to have some "connection or logical relation" to the litigation. Furthermore, the "connection or logical relation" must be a *"functional"* connection. *Rothman v. Jackson,* 49 Cal.App.4th 1134, 1146, 57 Cal.Rptr.2d 284 (Ct.App.1996). Per *Rothman,* the communication must serve as a necessary or useful step in the litigation process; it must serve its purpose. *Id.* The privilege "affords its extraordinary protection to the uninhibited airing, discussion and resolution of disputes *in, and only in, judicial or quasi-judicial arenas."* *Id.* Litigation privilege does

not apply when mere content of the communication is related to litigation subject matter. *Id.* The Court agrees with StemCells that Neuralstem's press releases are not privileged under California litigation privilege law because the four-part test is not met.

### C. California Anti-SLAPP Statute § 425.16

Neuralstem argues that California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute applies, and that the Court should strike StemCells' state claims for trade libel and unfair competition. StemCells asserts that the anti-SLAPP statute does not apply to commercial speech, and even if it did, Neuralstem has failed to meet its burden of proof.

California Code of Civil Procedure § 425.16, also known as the anti-SLAPP statute, provides "a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." *Rusheen v. Cohen,* 37 Cal.4th 1048, 1056, 39 Cal.Rptr.3d 516, 128 P.3d 713, 717 (Cal.2006). A two-part process is used to evaluate an anti-SLAPP motion. Courts must determine "whether the defendant has made a threshold showing that the challenged cause of action arises from protected activity." *Id.* Once that threshold has been met, the Courts must then determine whether the "plaintiff has demonstrated a probability of prevailing on the claim." *Id.* However due to the abusive use of anti-SLAPP, California Legislature enacted the Code of Civil Procedure § 425.17, which expressly excludes commercial speech from California's anti-SLAPP provisions. *Cal.Code of Civ. Proc. § 425.17*(c) (2004). Under Section 425.17(c), anti-SLAPP does not apply against a person engaged in the business of selling or leasing goods or services, providing the following two conditions are met:

(1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is **made for the purpose of** obtaining approval for, **promoting, or securing sales** or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

leases of, or commercial transactions in, the person's goods or services ... (2) **The intended audience is an actual or potential buyer or customer,** or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer ...

(*Id.* (emphasis added).)

In the present case, both conditions of the California statute are met. First, Neuralstem's public release statements were made for the purpose of securing sales for its services and products. Second, these statements were directed toward an audience of actual or potential buyers. Neuralstem is a publicly traded company and concedes these public statements were made to a specific target audience comprised of existing and potential investors. Therefore the Court finds that anti-SLAPP does not apply under Section 425.17(c) because Neuralstem's public release statements were made to existing and potential investors for the purpose of securing sales. Accordingly, the Court will deny the Motion to Dismiss as to Count III of StemCells' counterclaim for injurious falsehood and trade libel.

**III. Count IV-Maryland Common Law Unfair Competition**

In Count IV, StemCells claims that Neuralstem has "damaged or jeopardized StemCells' business by numerous actions amounting to fraud, deceit, trickery, or unfair methods." (StemCells' Counterclaim at ¶ 47.) Because the Court established above that California state law applies, Count IV of the counterclaim must be dismissed for its basis on Maryland common law.

**IV. Count V-Unfair Competition Violation of California Business & Professions Code § 17200**

StemCells contends in Count V of this Complaint, that Neuralstem has engaged and will continue to engage in unlawful and unfair practices, and promotions, in violation of Section 17200 of the California Business and Professions Code, including "disseminating false statements into California and elsewhere about actions of the Patent Office and actions of StemCells before the Patent Office." (*Id.* at ¶ 52, 39 Cal.Rptr.3d 516, 128 P.3d 713.) Neuralstem argues their public release statements do not constitute unfair competition in violation of California Business & Professions Code § 17200 because their communications are protected by the First Amendment, California litigation privilege, and the California anti-SLAPP.

Since Count V claims are analogous to those in Count III, analysis of both counts will be conducted in a similar manner. Neuralstem's press releases are not protected by the First Amendment, the California litigation privilege, or the California anti-SLAPP statute. First, Neuralstem's press releases were commercial, but the contents were not entirely true and can be misleading. The Court finds that none of Neuralstem's public statements are entitled to First Amendment protection given that all three commercial speeches are false and misleading. Second, Neuralstem's false public statements were broadcasted to the public and did not further the objectives of the pending litigation. Thus, the Court holds that Neuralstem's false public statements are not privileged under California Civil Code § 47(b). Finally, Neuralstem's public release statements were made to actual or potential buyers for the purpose of securing sales. As such, Section 425.17(c), anti-SLAPP does not apply and the Court will not dismiss StemCells' state claims for unfair competition. Therefore, the Court agrees with StemCells that Neuralstem's press releases are not protected by the First Amendment, the California litigation privilege, or the California anti-SLAPP statute. Given that Neuralstem's press releases are not protected, the Court will deny the Motion to Dismiss as to Count V of StemCell's counterclaim for unfair competition in violation of Section 17200 of the California Business and Professions Code.

**CONCLUSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2412126 (D.Md.)
**(Cite as: 2009 WL 2412126 (D.Md.))**

For all of the aforementioned reasons, the Court grants in part and denies in part Defendant's Motion to Dismiss. An Order consistent with this Opinion will follow.

D.Md.,2009.
Neuralstem, Inc. v. StemCells, Inc.
Slip Copy, 2009 WL 2412126 (D.Md.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)
**(Cite as: 2008 WL 619287 (D.Utah))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. Utah,
Central Division.
USANA HEALTH SCIENCES, INC., a Utah corporation, Plaintiff,
v.
Barry MINKOW, a citizen of California; Case Fraud Discovery Institute, Inc., a California corporation; John Does 1-100, Defendants.
**No. 2:07-cv-159 TC.**

March 4, 2008.

Bennett L. Cohen, Nicole A. Westbrook, Philip W. Bledsoe, Reid Page, Shughart Thomson & Kilroy, Denver, CO, David C. Reymann, Jeffrey J. Hunt, Michael D. Black, Michael T. Hoppe, D.J. Poyfair, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, for Plaintiffs.

David J. Porter, Corrado Salvatore, Stanley Yorsz, Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, Gregory J. Sanders, Kipp & Christian, Salt Lake City, UT, for Defendants.

**ORDER AND MEMORANDUM DECISION**

TENA CAMPBELL, Chief Judge.

**\*1** Plaintiff USANA Health Sciences, Inc., ("USANA") filed this action against Defendants Barry Minkow and Fraud Discovery Institute, Inc., (collectively, "Defendants") alleging that Defendants engaged in a scheme of illegal market manipulation. USANA asserts four causes of action under California state law and one claim under federal securities law.

In response, Defendants moved to strike all state law causes of action under California's anti-**SLAPP** (strategic lawsuit against public participation) statute, and moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted.

For the reasons stated more fully below, the court strikes the four state law causes of action. Because USANA has standing to seek an injunction under federal securities law, the court does not dismiss the claim under Rule 10(b)(5) of the 1934 Securities Exchange Act. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

Additionally, USANA has objected to an order by Magistrate Judge Alba granting expansive expedited discovery to Defendants. Through this order and memorandum decision, the court has shifted the focus of the litigation, and accordingly, vacates Judge Alba's expedited discovery order.

BACKGROUND FN1

> FN1. The court discusses only those facts necessary to resolve the issues presented, taken from the parties' pleadings.

Defendant Fraud Discovery Institute, ("FDI") co-founded by Mr. Minkow, authored a lengthy and uncomplimentary report about USANA's products and business practices ("the report"). On February 20, 2007, FDI sent the report to the Securities and Exchange Commission, the Federal Bureau of Investigation, and the Internal Revenue Service. On February 21, 2007, Mr. Minkow wrote a letter to those agencies explaining that he had short sold some shares in USANA. (*See* Letter from B. Minkow (Feb. 21, 2007), Original Compl. Ex. 2 at 2.)

FDI subsequently published the report on its website and issued a press release on March 15, 2007, highlighting several key findings from the report. Since that time, Defendants have apparently contin-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)
(Cite as: 2008 WL 619287 (D.Utah))

ued to make statements about USANA, through "follow-up reports" (Am.Compl.¶ 37), banner advertisements on the internet, and YouTube videos. FN2

> **FN2.** Although USANA provided no evidence of these subsequent public statements, other than allegations in the amended complaint, Defendants do not dispute that the statements were made.

ANALYSIS

**I. *Motion to Strike State Claims* FN3**

> **FN3.** Under California law, the motion to strike should be filed within sixty days of serving the complaint. Consequently, USANA urges the court to disregard the motion because it was filed on September 26, 2007, and the amended complaint was served on July 12, 2007.
>
> But Magistrate Judge Alba ordered that all exhibits must accompany service of the amended complaint-and that service did not occur until August 24, 2007-so the court finds that the motion is timely.
>
> But even if the motion had been filed more than sixty days after service, the court would exercise its discretion to consider the motion on its merits. *See* Cal.Civ.Proc.Code § 425.16 (2005) ("The special motion ***may*** be filed within 60 days of the service of the complaint or, ***in the court's discretion,*** at any later time upon terms it deems proper") (emphasis added).

Defendants have moved to strike the amended complaint under California's anti-**SLAPP** statute, "on the grounds that all of these claims for relief alleged arise from statements made by FDI and

Minkow in exercise of their constitutional free speech rights, and USANA cannot meet its burden of demonstrating a probability of prevailing on these claims." (Defs.' Mot. to Strike 1-2.) FN4

> **FN4.** Because the parties agree that the anti-**SLAPP** law applies only to state law claims, the present motion does not apply to the fourth claim for relief, which alleges violations of federal securities laws.

The anti-**SLAPP** statute "is designed to protect the defendant from having to litigate meritless claims aimed at chilling First Amendment expression...." *Batzel v. Smith,* 333 F.3d 1018, 1025 (9th Cir.2003) . "[A] defendant's rights under the anti-**SLAPP** statute are in the nature of immunity" because "California lawmakers wanted to protect speakers from the trial itself rather than merely from liability." *Id.* "Therefore, the California legislature looked for procedural and substantive remedies for the prompt exposure, dismissal, and discouragement of **SLAPP** suits." *United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.,* 190 F.3d 963, 971 (9th Cir.1999) (citing *Wilcox v.Super. Ct.,* 27 Cal.App.4th 809, 817, 33 Cal.Rptr.2d 446 (Cal.Ct.App.1994)). "The hallmark of a **SLAPP** suit is that it lacks merit, and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned, and of deterring future litigation." *Id.* at 970-71.

*The Erie Doctrine Does Not Bar Application of the Anti-SLAPP Statute*

**\*2** USANA first contends that under the doctrine of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the court should not apply the anti-**SLAPP** statute. USANA argues that the anti-**SLAPP** statute "is a state procedural rule, in conflict with the Federal Rules of Civil Procedure," so "it will not apply to a case, such as this, brought pursuant to diversity jurisdiction." (Pl.'s

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)
**(Cite as: 2008 WL 619287 (D.Utah))**

Mem. Opp'n Mot. to Strike 9.)

"As a federal court sitting in diversity, the doctrine of *Erie* dictates that state substantive law should apply, but that federal procedural rules will nevertheless control the analysis." *Aspen Orthopaedics & Sports Med., LLC v. Aspen Valley Hosp. Dist.,* 353 F.3d 832, 844 (10th Cir.2003) (citations omitted). "Procedural state laws are not used in federal court if to do so would result in a 'direct collision' with a Federal Rule of Civil Procedure." *Metabolife Int'l Inc. v. Wornick,* 264 F.3d 832, 845 (9th Cir.2001) (citing *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749-50, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980)). But if there is no collision, "the court must make the 'typical, relatively unguided Erie Choice.' " *Id.* (citing *Hanna v. Plummer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (citing Erie *R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

The first question, then, is whether there is a "direct collision" between the Federal Rules of Civil Procedure and the California anti-**SLAPP** statute. USANA contends that "the subsections facilitating early resolution of **SLAPP** suits, directly conflict with Federal Rule of Civil Procedure 56 when the anti-**SLAPP** motion is directed at the *evidentiary support* for the plaintiffs claim." (Pl.'s Suppl. Resp. Opp'n Defs.' Mot. Strike 14-15.) But, as explained by the Central District of California, the anti-**SLAPP** law does not conflict with the Federal Rules of Civil Procedure because "[b]oth statutes confer discretion on the trial court to permit discovery in the face of a dispositive motion, in the appropriate case and *upon a proper showing.*" *New.Net, Inc. v. Lavasoft,* 356 F.Supp.2d 1090, 1101 (C.D.Cal.2004) (emphasis added). Rule 56(f) offers the court discretion to "order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken...." Fed.R.Civ.P. 56(f). Similarly, the anti-**SLAPP** statute expressly directs that the "court, on noticed motion and for good cause shown, may order that specified discovery be conducted...."

Cal.Civ.Proc.Code § 425 .16(g) (2005).

Significantly, USANA has not filed any affidavits in support of its contention that it needs more discovery. Rule 56(f) requires more than a bare assertion that a party needs additional discovery. The Tenth Circuit has explained that a "party seeking to defer a ruling on summary judgment under Rule 56(f) must ' *file an affidavit* that explain[s] why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts.' " *Libertarian Party of N.M. v. Herrera,* 506 F.3d 1303, 1308 (10th Cir.2007) (quoting *Trask v. Franco,* 446 F.3d 1036, 1042 (10th Cir.2006)) (emphasis added). The court stated that a "party may not invoke Rule 56(f) by simply stating that discovery is incomplete but must 'state with specificity* how the additional material will rebut the summary judgment motion.' " *Id.* at 1308-09 (quoting *Ben Ezra, Weinstein & Co. v. Am. Online Inc.,* 206 F.3d 980, 987 (10th Cir.2000)) (emphasis added). Similarly, the court in *Rogers v. Home Shopping Network, Inc.,* 57 F.Supp.2d 973 (C.D.Cal.1999)-the primary case USANA uses to support its argument-denied the motion to strike only after the plaintiff had "identified specific discovery which she must obtain before being able to oppose the special motion." *Id.* at 985.

**\*3** USANA has already had extensive discovery in this matter. According to Defendants, "USANA possesses Defendants' entire file regarding the USANA investigation and report. USANA has all of Defendants' e-mails referring or relating to USANA. USANA also has Minkow's entire securities trading history and brokerage statements from the relevant period." (Defs.' Suppl. Reply Pl.'s Suppl. Resp. Opp'n Defs.' Special Mot. Strike 3.) And USANA has already taken Mr. Minkow's deposition.

Based on the above, the court concludes that in this case, there is not a direct collision between the federal rules and the California statute.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)

**(Cite as: 2008 WL 619287 (D.Utah))**

Because there is no direct collision, the court must next look to the "twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws" in deciding whether the anti-**SLAPP** statute can apply here. *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). In reaching its conclusion that application of the California anti-**SLAPP** statute did not violate the *Erie* doctrine, the court in *Lockheed Missiles & Space Co.,* stated:

Plainly, if the anti-**SLAPP** provisions are held not to apply in federal court, a litigant interested in bringing meritless **SLAPP** claims would have a significant incentive to shop for a federal forum. Conversely, a litigant otherwise entitled to the protections of the Anti-**SLAPP** statute would find considerable disadvantage in a federal proceeding. This outcome appears to run squarely against the "twin aims" of the *Erie* doctrine.

190 F.3d at 973.

Finally, USANA has not identified any federal interests that would suffer if the anti-**SLAPP** statute were applied here. In contrast, California has significant state interests furthered by the anti-**SLAPP** statutes. *Id.;* (*See Wilcox v.Super. Ct.,* 27 Cal.App.4th 809, 33 Cal.Rptr.2d 446 (1994) (containing a thorough discussion of the history and purpose of the Anti-**SLAPP** statute.))

Accordingly, the court concludes that Defendants can bring a motion to strike under the California anti-**SLAPP** statute in this lawsuit.

*The Motion to Strike*

Motions to strike under California's anti-**SLAPP** statute [FN5] are subjected to a two-part analysis: (1) the movant has the burden of making a prima facie showing that the conduct was done in furtherance of constitutionally protected conduct; and then (2) if the movant satisfies this first step, the burden shifts to a plaintiff to show a probability of prevailing on the claims. *Flatley v. Mauro,* 39 Cal.4th 299,

46 Cal.Rptr.3d 606, 139 P.3d 2, 11 (Cal.2006) (internal citations omitted).

> FN5. There is no dispute that California law controls the state law claims in this case. (*See* Defs.' Mem. Supp. Mot. to Strike, at 3 n. 2.)

To make a prima facie case a "defendant does not have to *establish* its actions are constitutionally protected under the First Amendment." *Id.* (quoting *Paul for Council v. Hanyecz,* 85 Cal.App.4th 1356, 1365, 102 Cal.Rptr.2d 864 (Cal.App.2001)). Instead, "the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." *Navellier v. Sletten,* 29 Cal.4th 82, 124 Cal.Rptr.2d 530, 52 P.3d 703, 709 (Cal.2002). The " 'focus is not on the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability-and whether that activity constitutes protected speech or petitioning.' " *Birkner v. Lam,* 156 Cal.App.4th 275, 67 Cal.Rptr.3d 190, 194 (Cal.Ct.App.2007) (quoting *Navellier,* 124 Cal.Rptr.2d 530, 52 P.3d at 711).

**\*4** USANA argues that the conduct of Defendants, as described in the amended complaint, is not the type of conduct protected by the anti-**SLAPP** statute. Specifically, USANA maintains that the case centers on illegal market manipulation, not the Defendants' statements made in the report and after.

But the allegations in the amended complaint do not support USANA's argument. In fact, most of the allegations arise from Defendants' "public relations campaign," in which Defendants made disparaging remarks about USANA's products and business strategy. (*See* Am. Compl. ¶¶ 1, 25-48.) Because the manipulation, as described in the amended complaint, is clearly based on the report and Defendants' statements about USANA, the basis of the lawsuit is the report and Defendants' statements about USANA. (*See id.* ¶¶ 5, 32, 38.)

What's more, USANA's own pleadings in response

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)

**(Cite as: 2008 WL 619287 (D.Utah))**

to Defendants' motions leave no doubt that the essence of USANA's claims centers on Defendants' statements. In its opposition to Defendants' motion to dismiss, USANA contended that it "is not alleging any stock transaction between the parties to this matter. Instead, USANA is alleging that the reports issued by the Defendants were false, deceptive, and misleading...." (Pl.'s Resp. Opp'n Defs.' Mot. Dismiss 6-7); *see also id.* at 3, 124 Cal.Rptr.2d 530, 52 P.3d 703 (the "first amended complaint, alleg[es] market manipulation focusing on a naked short selling scheme accomplished by the dissemination of false, deceptive, and misleading statements regarding USANA's products and business model"); *id.* at 6, 124 Cal.Rptr.2d 530, 52 P.3d 703 ("The False, Deceptive, And Misleading Statements Made By The Defendants Violate California's Unfair Competition Law"); *id.* at 9, 124 Cal.Rptr.2d 530, 52 P.3d 703 ("USANA's claim arises from the false, deceptive and misleading reports prepared and disseminated by the Defendants, as they contribute to the larger overarching scheme to manipulate the stock market."). Also, the original complaint filed by USANA asserted only causes of action arising out of Defendants' statements: defamation and business disparagement.

USANA also argues that Defendants' statements were false and do not merit constitutional protection because the anti-**SLAPP** statute "cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law...." *Flatley,* 46 Cal.Rptr.3d 606, 139 P.3d at 13. But USANA's arguments, by themselves, are not sufficient. In contrast to the situation here, the defendants in *Flatley* were not disputing that their conduct-money laundering-was illegal. When "a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but ***must be raised by the plaintiff in connection with the plaintiff's burden*** to show a probability of prevailing on the merits." *Id.* at 12 (emphasis added). [FN6]

FN6. This explanation of the law is consistent with *Bulletin Displays, LLC v. Re-*

*gency Outdoor Advertising, Inc.,* 448 F.Supp.2d 1172 (C.D.Cal.2006), the case USANA emphasized during oral argument. When the defendants in *Bulletin Displays* denied illegality, the court required the plaintiff to produce evidence of illegality under the second step of the anti-**SLAPP** analysis. *Id.* at 1184 ("Where the parties to an anti-**SLAPP** motion dispute the legality of the defendant's actions, and the plaintiff cannot establish as a matter of law that the actions were illegal, 'then the claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise and support in the context of the [step two] discharge of the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case.' " (quoting *Paul for Council,* 85 Cal.App.4th at 1367, 102 Cal.Rptr.2d 864)).

Here, Defendants do not concede the illegality of their conduct and any illegality is not shown by the evidence. Accordingly, the court concludes that the Defendants have met their initial burden under the anti-**SLAPP** statute. [FN7]

FN7. USANA also argues that the anti-**SLAPP** law is rendered inapplicable in this case based on § 425.17. To the extent USANA maintains this argument, the court agrees with the reasoning of the court in *New.Net, Inc. v. Lavasoft,* 356 F.Supp.2d 1090 (C.D.Cal.2004), which explained, "[i]n order to satisfy the required conditions of section 425.17(c), Plaintiff must also show, pursuant to section 425.17(c)(1), that Defendant is making statements about its own product or a competitor's business operations, goods or services." *Id.* at 1104. But "section 425.17 requires that the parties be competitors." *Id.*

In this case, there is no evidence that USANA competes with Defendant, and Defendants' statements were not about

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)

**(Cite as: 2008 WL 619287 (D.Utah))**

Defendants' products.

**Probability of Prevailing**

**\*5** After Defendants have made a threshold showing that Plaintiff's action is one arising from statutorily protected activity, USANA can defeat the anti-**SLAPP** motion by establishing a probability of prevailing on its claim. In this step, a motion to strike "operates like a demurrer or motion for summary judgment in 'reverse.' ... [T]he motion requires the *plaintiff* to demonstrate that he possesses a legally sufficient claim which is 'substantiated,' that is, supported by competent, admissible evidence." *Coll. Hosp. Inc. v.Super. Ct.,* 8 Cal.4th 704, 34 Cal.Rptr.2d 898, 882 P.2d 894, 903 (Cal.1994).

USANA must show "there is a reasonable probability [it] will prevail on the merits at trial" by "show[ing] both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment." *McGarry v. Univ. of San Diego,* 154 Cal.App.4th 97, 64 Cal.Rptr.3d 467, 475 (Cal.Ct.App.2007); *see also Overstock.com, Inc. v. Gradient Analytics, Inc.,* 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 38 (Cal.Ct.App.2007) ("[A] plaintiff opposing an anti-**SLAPP** motion cannot rely on allegations in the complaint, but must set forth evidence that would be admissible at trial"). Courts do "not weigh credibility, ... [or] evaluate the weight of the evidence," but must "accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." *Overstock.com,* 61 Cal.Rptr.3d at 38. The court "should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." *Wilson v. Parker, Covert & Chidester,* 28 Cal.4th 811, 123 Cal.Rptr.2d 19, 50 P.3d 733, 739 (Cal.2002) (citing *Paul for Council,* 85 Cal.App.4th at 1365, 102 Cal.Rptr.2d 864).

With these standards in mind, the court considers each of the four state law causes of action which are subject to Defendants' motion to strike.

*(a) Violation of California's Unfair Competition Law*

To prevail on its claim under the California Business and Professions Code § 17200, California's unfair competition and false advertising law, USANA "need only show that 'members of the public are likely to be deceived.' " *Cairns v. Franklin Mint Co.,* 24 F.Supp.2d 1013, 1037 (C.D.Cal.1998) (quoting *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995)). Courts have explained that "[a]n 'unfair' practice ... is one 'whose harm to the victim outweighs its benefits.' " *Day v. AT & T Corp.,* 63 Cal.App.4th 325, 74 Cal.Rptr.2d 55, 59 (Cal.Ct.App.1998) (quoting *Saunders v.Super. Ct.,* 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438, 441 (Cal.Ct.App.1994)).

USANA emphasizes that "Defendants knowingly released false and misleading reports ... in an effort to manipulate USANA's stock price." (Pl.'s Resp. Opp'n Defs.' Mot. Dismiss 7.) In support of its contentions, USANA points to the technical inaccuracy of a few statements. For example, USANA notes that the report states that an independent lab " 'found zero amounts of N-Acetyl L-Cysteine.' " (Pl.'s Suppl. Resp. Opp'n Mot. Strike 4) (quoting Compl. Ex. 1 at 84). Defendants attached the lab report as addendum 5 to the report. USANA argues that this statement gives rise to a claim of unfair competition because, in fact, "the lab report states that N-Acetyl L-Cysteine was 'Not Detected.' " (*Id.*) (quoting Original Compl. Ex. 1 Addendum 5 at 11). Without specific evidence to explain why this misstatement was material and could have deceived the public-particularly when Defendants attached the lab report to their report-the court has no basis to find that the statement establishes a violation of California's unfair competition law.

**\*6** Similarly, USANA emphasizes that the report compares the antioxidants of a serving of grape

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)

**(Cite as: 2008 WL 619287 (D.Utah))**

juice to a *serving* of USANA's TenX bar. USANA declares-without any evidentiary support-that this is misleading because "the only meaningful way to compare [differing foods] is gram-for-gram...." (Pl.'s Suppl. Resp. Opp'n Defs.' Mot. Strike 7.) But this assertion does not establish that the report is false. On the contrary, as USANA states in its brief, Defendants' report explains that it is not comparing the products gram-for-gram, stating that the " 'test results showed TENX is just over 2 times stronger than *8ounces of grape juice* ....' " (*Id.* at 6, 33 Cal.Rptr.2d 438) (quoting Compl. Ex. 1 at 12 n. 32) (emphasis added). USANA's remaining assertions of Defendants' inaccuracies suffer from similar problems; they are hyper-technical statements representing differing interpretations of data, with no evidence tending to show how the statement was material.

And the amended complaint undermines USANA's position that the alleged misstatements caused the price of USANA's stock to plummet. For example, USANA alleges "[s]ome analysts believed that USANA's growth could not be sustained, and as a result, USANA was viewed as a potentially lucrative target for short sellers." (Am.Compl.¶ 29.) USANA further alleges that "[s]ome of the sudden price drops in USANA's stock have occurred in conjunction with the publication of a USANA report or other elements of the public relations campaign, but *took place faster than any possible market reaction* ...." (Am.Compl.¶ 43) (emphasis added). What's more, USANA declared in its opposition to the motion to dismiss, "[t]here was simply no way the market could obtain and digest an internet posting, and convert that information into a sharp stock price decline so quickly." (Pl.'s Resp. Opp'n Defs.' Mot. Dismiss 2 .) These arguments undermine USANA's contentions that Defendants' statements are the reasons behind the decline in USANA's stock prices.

Because USANA provides no evidence to illustrate why the purported misstatements should create liability under the unfair competition law, USANA does not satisfy its burden of showing a probability of success for its claim of unfair competition and the court grants Defendants' motion to strike this cause of action.

*(b) Violation of California's Corporations Code*

Similarly, USANA has offered no evidence to support its claim under § 25400 of the California Corporation Code, the second claim for relief. This provision of the statute outlaws engaging in "a series of transactions in any security creating actual or apparent active trading ... for the purpose of inducing the purchase or sale of such security by others." Cal. Corp.Code § 25400(b) (2006). Put another way, this statute make it "unlawful ... to make false statements or engage in specified fraudulent transactions which affect the market for a security when done for the purpose of inducing purchase or sale of the security or raising or depressing the price of the security." *Diamond Multimedia Sys., Inc. v.Super. Ct.,* 19 Cal.4th 1036, 80 Cal.Rptr.2d 828, 968 P.2d 539, 541 (Cal.1999).

**\*7** Assuming-without deciding-that USANA has standing to bring this cause of action,[FN8] USANA has failed to produce evidence to support its claim. Although the amended complaint alleges that "Defendants ... create[d] phantom shares in the market [to] mislead USANA shareholders and depress the market price of USANA shares" (Am.Compl.¶ 73), and the amended complaint alleges that Defendants created these phantom shares by naked short selling USANA's stock (*see id.* ¶¶ 16-24), USANA provided no evidence to support these claims.

> FN8. Defendants argue that USANA does not have standing for this claim because "USANA fails to state in its Complaint that it was a buyer or seller of the securities that were allegedly manipulated by Defendants." (Defs.' Mem. Supp. Mot. to Dismiss 12.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)
**(Cite as: 2008 WL 619287 (D.Utah))**

Mr. Minkow, on the other hand, testified in an affidavit which expressly refuted these allegations, stating that he "never 'naked short sold' USANA's stock." (Defs.' Mem. Supp. Defs.' Special Mot. Strike Ex. A ¶ 10.) Although Mr. Minkow "took short positions in USANA stock" based on his conclusions about the company's prospects (*id.* ¶ 9, 80 Cal.Rptr.2d 828, 968 P.2d 539), he disclosed this fact to the SEC, FBI, and IRS. (*Id.* ¶ 13, 80 Cal.Rptr.2d 828, 968 P.2d 539.)

Consequently, the evidence now indicates only that Defendants engaged in the lawful trading of securities. Because USANA did not meet its burden, the court strikes the second claim for relief under California's anti-**SLAPP** statute.

### (c) Intentional Interference with Economic Relations

Under California law, a plaintiff must "show defendants engaged in conduct that was wrongful by some legal measure other than the fact of the interference itself." *Contemporary Servs. Corp. v. Staff Pro Inc.,* 152 Cal.App.4th 1043, 61 Cal.Rptr.3d 434, 449 (Cal.Ct.App.2007) (citing *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1153-54, 131 Cal.Rptr.2d 29, 63 P.3d 937 (Cal.2003)). Although USANA alleges that "Defendants have wrongfully and intentionally acted to interfere with and destroy or harm USANA's existing and prospective business relationships" (Am.Compl.¶ 80), USANA submitted no evidence of Defendants' wrongful conduct or any evidence that Defendants' wrongful conduct harmed USANA's business relationships.[FN9] Because USANA failed to meet its burden, the court strikes the third claim for relief.

> FN9. In addition, California courts appear to bar the tort for interference with hypothetical or undefined relationships. *See Silicon Knights, Inc. v. Crystal Dynamics, Inc.,* 983 F.Supp. 1303, 1311 (N.D.Cal.1997) ("[T]he requirement that

the plaintiff plead and prove that a business relationship contained the 'probability of future economic benefit' to the plaintiff precluded application of the tort to 'hypothetical relationships' not developed at the time of the allegedly tortious acts."). In the absence of any evidence of interference with specific relationships, the court cannot find that Defendants' statements can give rise to a tortious interference with economic advantage claim.

### (d) Tortious Exposure to Litigation

Finally, USANA has failed to provide evidence to support the fifth claim for relief, that "Defendants' intentional and tortious conduct has required USANA to act in the protection of his [sic] interests by defending legal actions filed by third parties...." (Am.Compl.¶ 92.)

California allows recovery of litigation costs by a "person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person...." *Prentice v. N. Am. Title Guar. Corp., Alameda Div.,* 59 Cal.2d 618, 30 Cal.Rptr. 821, 381 P.2d 645, 647 (Cal.1963). But USANA has offered no evidence tending to show that Defendants engaged in tortious conduct or that this conduct required USANA to incur litigation costs. Without any evidence to support the claim, USANA has failed to meet its burden, and the court strikes the fifth claim for relief.

Ultimately, under California's anti-**SLAPP** statute, the court strikes the first, second, third, and fifth claims for relief from the amended complaint.

### II. *Motion to Dismiss the Claim for an Alleged Violation of Federal Securities Law*

**\*8** Defendants have moved to dismiss USANA's fourth claim for relief, in which USANA claims that Defendants violated § 10b-5. USANA contends

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)
**(Cite as: 2008 WL 619287 (D.Utah))**

that as the target company, "it is in the best position to bring a Rule 10b-5 claim for injunctive relief to stop Defendants from further manipulating USANA stock. (Am.Compl.¶ 86.) Defendants argue that a "private action under 10b-5 must be brought by a purchaser or seller of securities, which USANA is not." (Def.s' Mot. Dismiss ¶ 8.) USANA counters that it has standing to seek injunctive relief under an exception to the purchaser or seller of securities rule. (Am.Compl.¶ 85.) Defendants respond that the exception to the purchaser or seller of securities rule relied upon by USANA "has not been viable for thirty years." (Mem. Supp. Defs.' Mot. Dismiss 16.)

The Tenth Circuit has determined that "10(b)'s language outlawing deception or manipulation 'in connection with the purchase or sale of any security' must be construed as meaning that in a suit for equitable relief any person showing a causal connection between the fraudulent sale of a security and injury to himself may invoke federal jurisdiction." Vincent v. Moench, 473 F.2d 430, 434-35 (10th Cir.1973) (quoting 17 C.F.R. § 240. 10b-5(c)) (internal quotation omitted). "The question is whether there is a causal connection between the deceptive sale and the injury to the plaintiffs." Vincent, 473 F.2d at 435.

Less than two years after Vincent, the Supreme Court addressed whether "the offerees of a stock offering ... may maintain a private cause of action for money damages where they allege that the offeror has violated the provisions of Rule 10b-5 of the Securities and Exchange Commission, but where they have neither purchased nor sold any of the offered shares." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 725, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (emphasis added). The Court held that a private party must be a purchaser or seller in order to avoid an "endless case-by-case erosion...." Id. at 754-55.

After Blue Chip Stamps, this court addressed whether the exception in Vincent remained. Equity Oil Co. v. Consol. Oil & Gas, Inc., 596 F.Supp. 507

(D.Utah 1983). "Prior to Blue Chip Stamps an injunctive relief exception to the purchaser-seller rule was widely recognized, including in the Tenth Circuit." Id. at 514. In Equity, the court stated that "[i]t is a legitimate question whether [the Vincent ] exception survives the Blue Chip Stamps decision, a question which the Tenth Circuit has expressly reserved for future determination." Id. (citing Westinghouse Credit Corp. v. Bader & Duffy, 627 F.2d 221, 223 (10th Cir.1980)). The court relied on Blue Chip Stamps to deny "standing to issuers under 10b-5 to seek an injunction based on alleged misstatements or omissions in a Schedule 13D" because such standing "would violate some of the same policy considerations present in Blue Chip Stamps. " Id. Those policy considerations were avoiding "strike suits based on oral testimony" and "the abuse of liberal federal discovery rules." Id. (citing Blue Chip Stamps, 421 U.S. at 741-43).

*9 Here, unlike the plaintiff in Blue Chip Stamps asking for damages, USANA is asking for injunctive relief. Because the facts in this case do not fit the facts in Equity and because Vincent has not been specifically overruled by Blue Chip Stamps or the Tenth Circuit, this court must next look to Vincent for guidance. To succeed under Vincent, the plaintiff must show a causal connection between the fraudulent sale of a security and injury to the plaintiff in order to maintain standing. Because the amended complaint alleges that "Defendants made the material misstatements or omissions in connection with the sale and/or purchase of USANA stock," (Am.Compl.¶ 89) and that "Plaintiff has suffered damages directly and proximately caused by Defendants [sic] scheme to unlawfully manipulate the USANA stock price," (id. ¶ 90) USANA has pleaded the necessary elements for standing for equitable relief.

Accordingly, dismissal of the 10b-5 claim for injunctive relief is not proper at this stage of the litigation, and the court DENIES Defendants' motion to dismiss this remaining claim.[FN10]

      FN10. On the basis of this ruling, the court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)

**(Cite as: 2008 WL 619287 (D.Utah))**

also DENIES the request to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Southern District of California.

### III. *Objection to Magistrate Order*

USANA has objected to Magistrate Judge Alba's order which granted Defendants' request for expedited discovery. By granting the motion to strike, however, the court has now significantly altered the scope of this litigation. Consequently, the court finds the expedited discovery order no longer applicable and GRANTS USANA's objection.

The court encourages the parties to reassess their discovery needs in light of this order, and file new discovery requests with Magistrate Judge Alba.

CONCLUSION

For the foregoing reasons, the court GRANTS the Motion to Strike the Amended Complaint (dkt.# 52) for the First, Second, Third, and Fifth Claims for Relief and the court DENIES the Motion to Dismiss (dkt.# 38) for the only claim remaining, the Fourth Claim for Relief.

The court GRANTS USANA's objection to the order granting expedited discovery (dkt.# 97).

SO ORDERED.

D.Utah,2008.
USANA Health Sciences, Inc. v. Minkow
Not Reported in F.Supp.2d, 2008 WL 619287 (D.Utah)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)
**(Cite as: 2006 WL 278618 (D.Hawai'i))**

**C**

Only the Westlaw citation is currently available.

United States District Court, D. Hawai'i.
Edralin VILLEZA, Plaintiff,
v.
UNITED STATES OF AMERICA; John Does
1-10; Jane Does 1-10; Doe Partnerships 1-10; Non-
Profit Organizations 1-10; and Doe Governmental
Agencies 1-10, Defendants.
**No. Civ. 05-00043JMS/BMK.**

Jan. 5, 2006.

*ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS AND DENYING DEFENDANT'S MO-
TION TO STRIKE*

SEABRIGHT, J.

**\*1** The United States has moved to dismiss Plaintiff
Edralin Villeza's claims for slander and intentional
infliction of emotional distress ("IIED") pursuant to
Rule 12(b)(1) of the Federal Rules of Civil Proced-
ure and Hawaii Revised Statutes ("HRS") § 634F-2.
The United States argues that this court lacks juris-
diction to decide Villeza's claims because Villeza
failed to bring his claims before the appropriate
federal agency as required by the Federal Tort
Claims Act ("FTCA") and because the United
States has not waived its sovereign immunity with
respect to claims for slander. The United States also
argues that the court should strike Villeza's claims
pursuant to HRS § 634F, Hawaii's anti-**SLAPP**
(strategic litigation against public participation) le-
gislation. Villeza contends that the FTCA does not
apply because his claims are against Lawrence
Castillo, a government employee, for a statement
Castillo allegedly made outside the scope of his
employment with the United States Navy. Villeza
also argues that he has not brought a **SLAPP** suit
and therefore the court should not strike his claims
pursuant to HRS § 634F.

For the reasons stated herein, the court finds that
Castillo was acting within the scope of his employ-
ment when he made the statement at issue in this
case and that the FTCA applies to Villeza's claims.
Because the FTCA bars Villeza's claims, the court
GRANTS the United States' motion to dismiss
Villeza's claims for slander and IIED. The court
also concludes that Villeza has not brought a
**SLAPP** suit and therefore it DENIES the United
States' motion to strike pursuant to HRS § 634F.

I. *BACKGROUND*

On July 27, 2004, Villeza filed a complaint against
Castillo in the Circuit Court of the First Circuit,
State of Hawaii. In the complaint, Villeza alleged
that Castillo made false statements to various indi-
viduals regarding a July 29, 2002 incident in which
Castillo was struck on the back of his head or neck
by a bag while on the job at Pearl Harbor Navy
Shipyard located in Honolulu, Hawaii. Villeza con-
tends that on July 29, 2002, he accidently hit
Castillo with a light bag containing dirty rags.
Villeza alleges that Castillo has since told numer-
ous people that Villeza intentionally threw a heavy
tool bag that struck Castillo's head. The complaint
alleges that Castillo made false statements regard-
ing the bag incident "to the United States Navy, its
employees, persons associated with Plaintiff's place
of employment and others[.]" In his opposition to
the United States' Motion to Dismiss, Villeza spe-
cifies that by "others," he means that Castillo also
told his personal doctor that someone intentionally
threw a tool bag at Castillo's head.FN1

> FN1. Villeza argues that this statement to
> Castillo's personal physician was the only
> statement made outside the scope of em-
> ployment. The United States maintains,
> and Villeza does not dispute, that Castillo
> did not use Villeza's name when Castillo
> described in the incident to his doctor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)

**(Cite as: 2006 WL 278618 (D.Hawai'i))**

Pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), the Attorney General or his designee certified that Castillo was acting within the scope of his employment when he made the statements forming the basis of Villeza's law suit. The United States contends that Castillo made most of the alleged statements at the workplace in compliance with mandatory procedures for reporting workplace injuries. Following the scope-of-employment certification, the United States was substituted as the defendant in this action and the case was removed to federal court. The United States then moved to dismiss Villeza's claims as barred by the FTCA.

**\*2** Villeza conceded in his Opposition to the United States' Motion to dismiss that the FTCA would bar his claims against the United States, but argued that his suit was against Castillo, not the United States, for a statement that Castillo made outside the scope of his employment. The United States did not file a reply and did not address this argument.

The court heard argument on the United States' motion on October 24, 2005. Because the parties agreed that the FTCA bars Villeza's claims against the United States, leaving the scope-of-employment determination as the primary issue in dispute, the court stated at the hearing that it would treat Villeza's Memorandum in Opposition to the United States' Motion to Dismiss as a motion challenging the scope-of-employment determination. The court instructed the parties to brief the scope-of-employment issue and has received briefing from both parties. In response to the court's request, the United States argues that Castillo's statement outside of work to his personal physician was within the scope of his employment because it was specifically authorized under Navy Regulations and by a Navy Medical Officer. Villeza argues that the statement to the private physician falls outside the scope of Castillo's employment at Pearl Harbor.

## II. *LEGAL STANDARD*

A motion to dismiss for lack of subject matter juris-

diction under Rule 12(b)(1) may either attack the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or attack the existence of subject matter jurisdiction in fact. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.,* 594 F.2d 730, 733 (9th Cir.1979). In evaluating a factual attack on jurisdiction, as in this case, the court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment, and the court need not presume the truthfulness of the plaintiff's allegations. *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000) (citations omitted). Villeza has the burden of proving that this court has subject matter jurisdiction. *See Thompson v. McCombe,* 99 F.3d 352, 353 (9th Cir.1996) ("A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction.").

## III. *ANALYSIS*

### A. Scope of Employment

The court must determine whether the United States erred in certifying that Castillo was acting within the scope of employment when he made the statements at issue in this case. Though Castillo made a number of statements concerning the incident while at work, Villeza's scope-of-employment argument focuses exclusively on the statement Castillo made to his private physician. At the October 24, 2005 hearing, Villeza's attorney confirmed that he was challenging the government's certification of Castillo's statement to his doctor, not the statements Castillo made at work. The court therefore will address only whether Castillo's statement to his personal doctor was within the scope of his employment.

**\*3** When a plaintiff brings a tort action against an employee of the federal government, the Attorney General or his or her designee may certify that the employee was acting within scope of employment

Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)

**(Cite as: 2006 WL 278618 (D.Hawai'i))**

when the alleged tort was committed. 28 U.S.C. § 2679(d)(2). Upon certification, the United States is substituted as the defendant and the suit converts to an action against the United States under the FTCA. *Id.* If the plaintiff originally filed suit in state court, the Attorney General removes the action to federal court. *Id.*

This court may review a scope-of-employment certification. *Guitierrez de Martinez v. Lamagno,* 515 U.S. 421 (1995). Certification is prima facie evidence that the employee, in this case Castillo, was acting within the scope of employment when the alleged incident occurred. *Billings v. United States,* 57 F.3d 797, 800 (9th Cir.1995). Villeza argues that Castillo was not acting within the scope of his employment when he made statement to his private physician. Villeza bears the burden of producing evidence that proves, by a preponderance of the evidence, that Castillo was not acting within the scope of his employment. *Id.*

The court looks to Hawaii's law on respondeat superior to determine whether Castillo was acting within the scope of employment when he made the statement in question. *Clamor v. United States,* 240 F.3d 1215, 1217 (9th Cir.2001). The Hawaii Supreme Court applies the Restatement (Second) of Agency § 228 to determine what conduct is in the scope of employment. *Henderson v. Prof'l Coating Corp.,* 72 Haw. 387, 392, 819 P.2d 84, 88 (1991). Under the Restatement:

Conduct of the servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; [and]

(c) it is actuated, at least in part, by a purpose to serve the master[.]

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that au-

thorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Whether an employee was acting within the scope of employment will often turn on the extent to which the employee was acting solely to serve him or herself. *See Bergeron v. Henderson,* 47 F.Supp.2d 61, 66 (D. Maine 1999) ("[A]ctions that are done with a private, rather than a work-related, purpose to commit wrongdoing are outside the scope of employment and render the motivation of the employee, in performing the act at issue a crucial, immunity-related fact."). In interpreting the purpose prong of the Restatement test, a court recently noted that "the District of Columbia's formulation of this test 'excludes from the scope of employment all actions committed solely for [the servant's] own purposes.' " *Hutchins v. Andrews,* No. 05-938, 2005 WL 1902842, at *3 (D.D.C.2005) quoting *Stokes v. Cross,* 327 F.3d 1210, 1216 (D.C.Cir.2003). This interpretation is consistent with the language of § 228 of the Restatement, which requires that an employee's conduct be motivated "at least in part, by a purpose to serve the master." Thus, a partially selfish motivation does not, by itself, render an employee's conduct outside the scope of employment.[FN2]

> FN2. Further, "an act may be within the scope of employment although consciously criminal or tortious." Restatement (Second) of Agency § 231.

**\*4** In support of his argument that Castillo was not acting within the scope of his employment, Villeza submitted a portion of a deposition in which Castillo states that he visited his private doctor the day after the bag incident and that he told his doctor someone threw a tool bag weighing 20-25 pounds at his head. Villeza argues that Castillo made this statement to his doctor in order to obtain false diagnoses of "neck sprain" and "cerebral contusion." Villeza contends that these diagnoses bolstered Castillo's defamatory assertion that Villeza intentionally threw a tool bag at Castillo's head. Villeza

Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)
**(Cite as: 2006 WL 278618 (D.Hawai'i))**

points out that Castillo's statement to his private doctor took place during Castillo's off-work hours and at a location outside of the workplace. Additionally, Villeza argues that the statement was unrelated to Castillo's employment and did not serve his employer.

The United States contends that Castillo's statement to his personal physician concerning a workplace injury was within the scope of employment. Castillo was injured during normal working hours while on duty aboard a vessel of the United States. Local Navy regulations require employees injured while on duty to follow certain procedures. The applicable regulations require an employee who suffers a traumatic injury to notify his or her immediate supervisor of the injury as quickly as possible. NAVSHIPYDPEARLINST 12810.1B at 9. The supervisor then fills out a Dispensary Permit and sends the employee to the Navy Medical Clinic. *Id.* The regulations specifically authorize the employee to see a personal physician. *Id.*

Castillo reported his injury to his supervisor. His supervisor then filled out a Dispensary Permit as required by the regulations and Castillo went to the Navy Medical Clinic for diagnosis and treatment. In the portion of the Dispensary Permit entitled "MEDICAL OFFICER'S REPORT," the medical officer indicated that Castillo should "see own physician as necessary" in the box labeled "REMARKS/DIAGNOSIS." The day after the injury occurred, Castillo went to see his personal doctor and described to his doctor how the injury occurred.

Villeza has failed to prove by a preponderance of the evidence that Castillo was acting outside the scope of his employment when he made the alleged statement to his physician. In particular, he has failed to prove that Castillo's actions were committed solely for his own purposes. Viewing the evidence in the light most favorable to Villeza, the evidence shows that Castillo acted, at least in part, with a purpose to serve the Navy.

It is undisputed that a bag hit the back of Castillo's head while he was on duty. Castillo followed the required Navy procedures and, in compliance with instructions from a Navy Medical Officer, met with and made a statement to his personal doctor regarding the incident.[FN3] Assuming that Villeza is correct that Castillo exaggerated his injury in an effort to defame Villeza,[FN4] Castillo's statement to his doctor was still within the scope of his employment. Because Castillo was hit in the head and then followed Navy procedure in response to this incident, Villeza has not proven, and the court cannot find, that Castillo was acting solely for his own purposes when he made the statement to his personal doctor. The statement was not "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master" such that it falls outside the scope of employment. Restatement (Second) of Agency § 228.

> FN3. While the court assumes the truth of Villeza's allegations for the purpose of this motion, it notes that Castillo did not even mention Villeza by name when he made the statement at issue to his physician. A Merit Systems Protection Board decision, referred to by both parties in their briefs, quotes from the private physician notes as follows: "Hit on back of R side of head by bag of bolts (working) nuts & tools-thrown by another person. ? ? bad HA [headache?] & ringing of R ear and pain in R eye. Nose bleed? getting up middle of night. Headache."

> FN4. In his complaint at paragraph 14, Villeza claims that "Castillo falsely told his private family physician Dr. Tsai that another person (referring to Plaintiff) threw a bag of tools at him, which hit Castillo in the head, and as a result of Castillo's fabricated history his physician drew erroneous conclusions as to Castillo's medical diagnosis of 'neck sprain' and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)
**(Cite as: 2006 WL 278618 (D.Hawai'i))**

'cerebral concussion." '

**\*5** Because Villeza has not met his burden to demonstrate that the government erred in certifying Castillo's statement to his physician and because Villeza does not challenge the scope-of-employment certification with respect to Castillo's other statements, the court concludes that the United States was properly substituted as the defendant in this action.

## B. FTCA

The FTCA bars Villeza's claims for slander and IIED against the United States. First, the court lacks subject matter jurisdiction over both of Villeza's claims because Villeza has not presented his claims to the appropriate federal agency. 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency[.]"); *Jerves v. United States*, 966 F.2d 517 (9th Cir.1992) ("A tort claimant may not commence proceedings in court against the United States without first filing her claim with an appropriate federal agency[.]"). Villeza acknowledges his failure to exhaust but argues that his claims are really against Castillo, not the United States, and therefore the FTCA does not apply. As discussed above, however, Castillo was acting within the scope of his employment with the United States Navy at the time he made the alleged statements and the United States was appropriately substituted as the defendant in this action. The court therefore lacks jurisdiction over Villeza's slander and IIED claims because Villeza has not exhausted these claims as required by the FTCA.

Second, the United States has not waived its immunity with respect to claims for slander. 28 U.S.C. § 2680(h). Villeza also acknowledges this point but argues that his claim is really against Castillo. Again, the United States was properly substituted as the defendant in this action. Even if Villeza had exhausted his slander claim as required by the FTCA, the court would dismiss this claim because

the United States has not waived its sovereign immunity

## C. Anti-**SLAPP**

HRS § 634F provides an expedited remedy to frivolous lawsuits designed to chill public participation in government. Section 634F-2 allows a defendant to move to dismiss a suit upon a prima facie showing that the action is a **SLAPP** lawsuit. The statutes defines " **SLAPP**," an acronym for "strategic lawsuit against public participation," as "a lawsuit that lacks substantial justification or is interposed for delay or harassment and that is solely based on the party's public participation before a governmental body." HRS § 634F-1. The prevailing party on an anti-**SLAPP** motion is entitled to dismissal of the other party's claims as well as costs and attorney's fees. HRS § 634F-2(8).

The United States argues that Villeza has brought a **SLAPP** suit. It argues that Villeza's claims "lack[ ] substantial justification" because it is clear that the FTCA bars claims for slander against the United States.[FN5] However, Villeza originally brought suit against Castillo, not the United States. Once the United States was substituted as the defendant in this action, Villeza challenged the Westfall Act certification, arguing that Castillo made the defamatory statement outside the scope of his employment with the Navy. The United States did not argue the scope-of-employment issue until the court requested briefing on the matter. If Castillo in fact made the statement outside the scope of employment, the FTCA would not bar Villeza's slander claim against Castillo. The court does not find that the FTCA bar on slander claims against the United States renders Villeza's lawsuit lacking in "substantial justification" simply because the court ultimately upheld the Westfall Act certification.

> FN5. Though the United States refers to Villeza's "claims" in its **SLAPP** argument, it discusses only his slander claim and not his IIED claim. The anti-**SLAPP** statute

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)
**(Cite as: 2006 WL 278618 (D.Hawai'i))**

requires the defendant to make a prima facie showing that the plaintiff's claim involves public participation and is a **SLAPP** lawsuit. Because the United States only discusses Villeza's slander claim as a **SLAPP** suit, the court will address only the slander claim under Hawaii's anti-**SLAPP** law.

**\*6** Additionally, the United States seems to argue that Villeza's suit was "interposed for delay or harassment." The United States points to the fact that Villeza bypassed the administrative procedures required by the FTCA as evidence that Villeza intended his lawsuit to chill Castillo's public participation. It is not clear why the decision to pursue a claim in state court (where Villeza originally filed suit) rather than in an agency proceeding suggests an intent to chill. Furthermore, as discussed above, Villeza brought his slander claim against Castillo, not the United States. The court does not find that Villeza's failure to comply with a procedure that he argued did not apply to his case indicates an intent to chill.

Because the United States has not shown that Villeza's slander claim lacks substantial justification FN6 or was interposed for delay or harassment, the court need not consider the issue of whether the claim was based solely on Castillo's public participation. The government simply has not made a prima facie case that Villeza brought a **SLAPP** suit.

> FN6. Though, as the court noted in the October 24, 2005 hearing, Villeza's slander claim appears thin, the United States did not argue that the claim was substantially unjustified because the facts alleged were insufficient to support a claim for slander. Its only argument was that Villeza should have known that the FTCA barred claims for slander against the United States.

IV. *CONCLUSION*

For the reasons stated herein, the court GRANTS the defendant's motion to dismiss both of Villeza's claims pursuant to Rule 12(b) and DENIES its motion to strike Villeza's slander claim under HRS § 634F. As this order disposes of all outstanding matters in this case, the clerk of the court is instructed to enter judgment in favor of the defendant and close the case file.

IT IS SO ORDERED.

D.Hawai'i,2006.
Villeza v. U.S.
Not Reported in F.Supp.2d, 2006 WL 278618 (D.Hawai'i)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GLOBAL DIRECT SALES, LLC, PENOBSCOT INDIAN NATION, CHRISTOPHER RUSSELL, and RYAN HILL, <br><br> Plaintiffs, <br><br> -v- <br><br> AARON KROWNE, individually, and d/b/a THE MORTAGE LENDER IMPLODE-O-METER and ML-IMPLODE.COM, KROWNE CONCEPTS, INC., IMPLODE-EXPLODE HEAVY INDUSTRIES, INC. JUSTIN OWINGS, STREAMLINE MARKETING, INC. and LORENA LEGGETT, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No.: 8:08-cv-02468 <br><br><br> Assigned: <br> Hon. Deborah K. Chasanow |

**DECLARATION OF JULIE S. TURNER IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF SPECIAL MOTION TO DISMISS, PURSUANT TO MARYLAND COURTS AND JUDICIAL PROCEEDINGS § 5-807**

I, Julie Turner, declare:

1.      I am an attorney at law licensed to practice *pro hac vice* for this action in the State of Maryland and before this Court.  I am an attorney of record for the Defendants named herein.  I make this declaration of my own personal knowledge and could and would testify to the facts contained in this Declaration.

2.      Attached hereto as Exhibit A is a true and correct copy of relevant portions of the transcript of the hearing on Plaintiffs' Motion for a Preliminary Injunction, held in this Court on November 11, 2008.

      3.      Attached hereto as Exhibit B is a true and correct copy of relevant portions of the October 7, 2008, Declaration of Krista Railey in Support of Defendants' Opposition to Plaintiffs' Motions for a Temporary Restraining Order and Preliminary Injunction.

      4.      Attached hereto as Exhibit C is a true and correct copy of the Mortgage Lender Implode-O-Meter's complaint policy.

      5.      Attached hereto as Exhibit D is a true and correct copy of the comment that Plaintiff Christopher Russell purported to post on the Mortgage Lender Implode-O-Meter website in response to the article at issue in this litigation.

      I declare under penalty of perjury under the laws of the State of Maryland and the United States that the foregoing is true and correct, and that this declaration was executed on January 11, 2010 in Palo Alto, California.

                                            /s/  Julie S. Turner  /s/
                                          Julie S. Turner

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CHRISTOPHER M. RUSSELL, ET AL   .

      vs.             .  08-CV-2468-DKC

ERIN KROWNE, ET AL       .  GREENBELT, MARYLAND

                       .  NOVEMBER 11, 2008


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE DEBORAH K. CHASANOW
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFFS:      GARY E. MASON, ESQ.
                        MICHAEL L. BRAUNSTEIN, ESQ.


FOR THE DEFENDANTS:      JULIE TURNER, ESQ.


Court Reporter:          Sharon O'Neill, RMR
                        Official Court Reporter
                        United States District Court
                        6500 Cherrywood Lane
                        Greenbelt, Maryland 20770
                        301-344-3227

1      Nobody talks about the problem the plaintiffs already

2  have in that this is out there.  It can't be -- I guess we in

3  another context call it claw back agreements -- you can't bring

4  it back.  It's out there.  Nothing anybody can do will bring it

5  back.

6      But it's still posted on the website, I gather.  I

7  don't know.  Nobody has told me what the policy is as to how

8  long any such article remains ordinarily, but I gather it's

9  still up there and what the plaintiff wants me to do is to

10 require them to change some of the words, delete some of the

11 phrases, although they had very broadly asked me to order them

12 not to publish anything that is false, which I pointed out at

13 the beginning is very, very broad and obviously not going to be

14 granted.

15      A court must be very circumspect in considering any

16 preliminary injunctive relief.  It at the beginning is

17 extraordinary relief that a court is empowered to impose in

18 sufficiently egregious circumstances.  Ordinarily it is to

19 maintain the status quo when a law suit goes forward.

20      Sometimes it can be used to alter the status quo,

21 that is a mandatory injunction requiring a defendant to do

22 something, and that's what is being requested here.  This isn't

23 to maintain the status quo.  It's not to prevent something from

24 happening while we determine the merits of this dispute.  So

25 that makes it an even less ordinary situation that the

1  plaintiffs are infusing themselves in.

2        At bottom, I conclude that the plaintiffs have not

3  established the grounds for the issuance of a preliminary

4  injunction, even of the lesser nature of requiring the

5  elimination of the word "laundering," "extortion," "sales

6  concession," or, frankly, any of the other "not HUD approved",

7  or any of the other dozen or so purported falsehoods in the

8  article.

9        The article itself is, I don't know, I didn't count

10  the number of words, but it's one, two, three, four, five, six

11  pages in one of the exhibits, another one with smaller type

12  that may not be quiet as long, but it's lengthy.  It covers a

13  lot of material and plaintiffs have chosen to focus on some

14  phrases, sometimes taken out of context, but more

15  significantly, from my perspective, at a place where what's

16  being discussed provides a link to other information as well.

17        I mean, this is a comprehensive article and it is

18  simply not, I don't think, susceptible at this stage to the

19  conclusion that plaintiff wants me to draw, that they can have

20  proven that any of these terms or words are false.

21        The term "laundering" may have a certain definition

22  in the Criminal Code.  It may not necessarily have that same

23  definition when used in this article.

24        In any event, I think the allegations of plaintiff

25  are simply not precise, focused enough to make a determination

1   that they can prove that any one or more of them necessarily

2   are false on the current record, never mind whether they can

3   make the, or have made sufficient showings of the other

4   elements of a defamation claim to show likelihood of success on

5   the merits.

6          Secondly, in terms of irreparable harm to the

7   plaintiff, all I am told is that some people have taken note

8   and that there have been some calls.  There is no attempt to

9   quantify any harm and, as I indicated a moment ago, there is no

10  indication that the requested relief, that is telling them not

11  in the future to do anything, would prevent the harm, given the

12  nature of the internet.

13         This article is out there, has been and cannot be

14  eliminated from the internet.  So I don't see the establishment

15  of irreparable harm.

16         Damages will be available should plaintiffs prevail

17  later, and I don't see how granting the injunction at this

18  point in any event would avoid the harm.

19         Damage to the defendant, if it's improperly granted,

20  here we are dealing with a website that provides an opportunity

21  for authors to post material -- I'm going to learn, I suppose,

22  a lot more about how it all works -- but to the extent to which

23  the plaintiff is asking me to prevent them from disseminating

24  material, it certainly, if it's an improper injunction, would

25  affect a First Amendment right of the defendants.

1          Public interest, this is an area where to say the

2     public has become more involved is an understatement.  The

3     mortgage industry is in the news all the time.  The economic

4     reality of this wordwide, I don't know whether -- well, the

5     whirlwind of international activity in terms of the financial

6     markets, many say prompted by a mortgage, subprime mortgage

7     crisis, there is probably little that's as much in the public

8     interest today as this.

9          And, to the extent to which this article furthers

10    discussion, debate, consideration of that situation, it is not

11    in the public interest for me to broadly order that this

12    article not be posted.  The few sections that the plaintiffs

13    complain of do not detract from the overall public interest of

14    the nature of the article, and I think the public interest

15    would not be served in this case, given the subtlety of some of

16    the allegations of the plaintiff and the very, very broad

17    request for relief.

18         As indicated by Ms. Turner, any injunction in this

19    regard would chill the First Amendment rights of people like

20    the defendants, never mind just the defendants, and would

21    stifle rather than foster appropriate debate at this precise

22    time when it is so important.

23         So I conclude that the plaintiffs have not

24    established justification for the issuance of a preliminary

25    injunction and, therefore, I deny the motion which is contained

1   in paper 11 here.

2              We will leave for another day all of those wonderful

3   legal issues as to the nature of the speech, whether any

4   injunction under any circumstance can issue, because I find it

5   unnecessary to resolve those debates in the current context.

6              We have a schedule in terms of when the defendants

7   will be filing a response to the complaint.

8              MS. TURNER:  I believe it's November 18th.

9              MR. BRAUNSTEIN:  That's correct, Your Honor, it's

10  November 18th.

11             THE COURT:  I just wanted to put my hands on that.

12  And we will wait to see -- November 18th, we will wait to see

13  the nature of that before going forward.

14             MS. TURNER:  Yes, Your Honor.

15             MR. BRAUNSTEIN:  Your Honor, very briefly, on your

16  docket entry number 19, it states that "replies are due by

17  November 4, 2008."

18             THE COURT:  That happens automatically when the

19  computer receives something for filing.  If you stipulate -- I

20  mean, there will be another docket generated when whatever they

21  file is filed.

22             MR. BRAUNSTEIN:  I just wanted to make sure I wasn't

23  missing anything, Your Honor.

24             THE COURT:  No.  No.  The computer, the CMECF system

25  automatically generates dates, so you can ignore them.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GLOBAL DIRECT SALES, LLC, PENOBSCOT )
INDIAN NATION, CHRISTOPHER RUSSELL )
and RYAN HILL, )
                                         )    Case No.: 8:08-cv-02468
                 Plaintiffs, )
                                         )
            -v- )
                                         )
AARON KROWNE, individually and d/b/a THE )
MORTGAGE LENDER IMPLOD-O-METER and )
ML-IMPLODE.COM, KROWNE CONCEPTS, )
INC., IMPLODE-EXPLODE HEAVY )
INDUSTRIES, INC., JUSTIN OWINGS, KRISTA )    Assigned:
RAILEY, STREAMLINE MARKETING, INC. and )    Hon. Deborah K. Chasanow
LORENA LEGGETT, )
                                         )
               Defendants. )

## DECLARATION OF KRISTA RAILEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Krista Railey, declare as follows:

    1.     I am over 18 years of age and competent to testify to the matters below.

    2.     I make the following statements based on my personal knowledge.  If called to testify under oath in a court of law as to the matters set out herein, I could and would do so truthfully.

My background

    3.     I am a licensed California real estate broker (California Real Estate broker license number 00978970) and mortgage professional, with 20 years in the mortgage and real

- http://www.penobscotnation.org/Tribal%20Business%20Links/PINFHA.html Tribal Business Announcement Creation of Penobscot Indian Nation Fair Housing Administration (PIN-FHA)

- http://209.85.173.104/search?q=cache:JHrAKRpMuTYJ:rismedia.com/wp/2007-04-14/new-grant-america-program-offers-safe-option-for-low-to-moderate-income-home-buyers/+grant+america+program&hl=en&ct=clnk&cd=5&gl=us&client=safari

My Article on the Penobscot Indian Nation/Global Direct DAP Program

24.     In June of this year, I began developing a series of stories and information resources on DAPs.  My interest arose from HUD's attempts to shut down seller-funded DAPs and the DAP providers' attempts to protect them.   I have posted these stories on the Mortgage Lender Implode-O-Meter, as well as on an unrelated website called Ticker Forum.

25.     I started speaking out about seller-funded DAPs in my June 17, 2008 column, when I wrote a story supporting HUD Commissioner Montgomery's decision to publish a revised rule and to reopen the comment period.  I also wrote an entry on July 13, 2008 entitled: "The FHA Delinquency Crisis: 1 in 6 Borrowers in Default," which correlated the increase in seller-funded DAPs to the FHA's rising delinquency rate.  On September 17, 2008, I also reported on the House mark-up hearing for H.R. 6694.

26.     Normally, when I post my column, I first post the entries for internal review by the Mortgage Implode-O-Meter website.  After an entry has been reviewed, and I have had the opportunity to edit the posting, I receive a notice to publish the entry on the site and then publish the entry for public viewing.  When a member of the public views an entry, that person can post a comment or response to the entry.  I receive these comments, and review and approve them before they are posted on the website.

7

27.     On September 9, 2008, I posted for internal review an article I had been drafting about the Penobscot Indian Nation DAP. A copy of this draft article was attached as Exhibit E to the Russell Certification filed in support of Plaintiffs' Motions ("Russell Certification").

28.     On September 10, 2008, I had not yet provided a request to publish the article as I was continuing to edit the piece. I was surprised, therefore, to receive comments on the article, because I believed that the article was not yet available to the public for viewing. The comment was from Christopher Russell, who threatened to sue me. Attached hereto as Exhibit I is a true and correct copy of that comment.

29.     I immediately forwarded Russell's comment to administrators for the Mortgage Implode-O-Meter website. Within 45 minutes of receiving Mr. Russell's comment, the draft article had been permanently removed from the website.

30.     Following additional verifications and revisions, I posted the final version of the article on September 15, 2008. The final version included a link to Mr. Russell's comments on the initial draft article. Attached hereto as Exhibit J is a true and correct copy of the article posted on September 15, 2008.

31.     I fully researched everything that appeared in both the September 9 draft version and September 15 final version of the article, and both versions included links to supporting materials on which my article was based.

32.     My research included, among other things, reading transcripts from Congressional hearings about Plaintiffs. I also read articles published in reputable papers such as the New York Times and Forbes Magazine. I also researched website registrations of various websites connected to Global Direct Sales, LLC, Russell, and Hill, and stored information and documents posted to those websites. I read numerous reports about DAPs, FHA insurance, the tax treatment

of DAPs, and other related topics, issued by such agencies as HUD, the U.S. GAO and the IRS.
My research also included interviewing Plaintiff Christopher Russell. I also located and
analyzed corporate formation documents, AmeriDream non-profit tax returns, public and court
records, and an arbitration settlement related to the Plaintiffs.

33.    I provided links to over 20 of the documents on which I relied in the article itself,
so that readers could confirm for themselves what was said in my article.

34.    I have reviewed the statements about which the plaintiffs complain in their
defamation complaint. Without getting into the original underlying support for the following
statements, I note that the following statements were present only in the September 9 draft
article, and not in the final September 15 article:

a.    "The Penobscot Indian Tribe's Grant America Program is a scam."

b.    "Russell and Hill treated AmeriDream like their own personal piggy bank."

c.    "The Dp funder is another type of seller-funded down-payments scam."

35.    I stand behind all of the statements I have made in my article about the Plaintiffs,
and I believe each and every one of them to be based in truth and supported by my research.

36.    Following is a table of statements that Plaintiffs have identified as "defamatory,"
coupled with documents supporting those statements:

| STATEMENT | SUPPORT |
|---|---|
| Russell had a copycat website of AmeriDream. | See Ex. K (showing an arbitration decision noting that the Russell site is confusingly similar). |
| Russell and Hill created a new venture known as the Dp Funder Program and the Owner's Alliance. | See Exhibits L, M, N and O, true and correct copies of which are attached hereto (showing that the DpFunder Website is copyrighted to Global Sales LLC; that Global Direct Sales, LLC was registered by Ryan Hill; that a buyer signs up as an independent contractor with Global Direct Sales; that funds for the Owner's Alliance Funding are remitted |

| STATEMENT | SUPPORT |
|---|---|
|  | to Rycho; and that Rycho is also registered and affiliated with Russell and Hill). |
| On April 3, 2008, HUD and the Penobscot Indian Tribe executed a Stipulation to Resolve Remaining Claims and Dismiss Action which the Grant America Program website *erroneously* asserts as a "HUD approval". | See the Stipulation (Exhibit F); and *compare* Grant America Program website ("G.A.P. is HUD Approved!!!") with the HUD website ("FHA does not 'approve' down payment assistance programs in the form of gifts administered by charitable organizations."). True and correct copies of the website pages are attached as Exhibits P and Q. |
| Not only is the Stipulation and Dismissal *not* an approval letter, it doesn't provide specific approval of seller-funded grants as the Sovereign Grant provider claims. | See Exhibit F (PIN-HUD Stipulation) (showing only that HUD will insure the Penobscot Indian Nation's seller-funded grants under the rules then in existence because of the sovereign status of PIN, and not because HUD approves of seller-funded grants). |
| The Stipulation and Dismissal is merely a temporary settlement which gave HUD the opportunity to publish a revised proposed rule and re-open the comment period. | See Exhibit F (PIN-HUD Stipulation) (was based on court's finding that HUD had not allowed a sufficient public comment period before promulgating the rule concerning seller down payment programs) |
| The seller contributions to the Grant America Program is clearly a concession that is confirmed by IRS ruling 2006-27. | See Exhibit E at 41-45. (showing that concessions are payments made by sellers instead of buyers that need to be accounted for so as to not inflate sales value) |
| The PIN-FHA gift letter also confirms that it is a concession. | See Exhibit R (showing that Plaintiffs tell sellers that their contributions are not charitable contributions) |
| Russell and Hill are already working on an alternative scheme through the Down Payment Grant Alliance. They intend to replace one scam with another even more complicated scam. Kind of like a convoluted down payment shell game. | See Exhibit H (Forbes article discussing Russell's and Hill's new scheme) |

37.   At no time during the research and drafting of my article on the Penobscot Indian

Nation, Global Direct Sales, Christopher Russell or Ryan Hill was I aware that any of the

Plaintiffs or their related organizations had refused to advertise on the Mortgage Lender

Implode-O-Meter website, as Russell alleges. If any such discussions about advertising did in fact occur, they had no impact on my decision to write and publish my article.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _10/7/08_

_____
Krista Railey

11

# EXHIBIT C

**The Weiss Lists**

**These Banks Are About to Close ...**
**Is *Yours* One of Them?**

Click Here
to Find Out
*Before*
It's Too Late

www.MoneyandMarkets.com                                                                    Ads by Google

# THE MORTGAGE LENDER
# Implode-O-Meter ™

*Tracking the housing finance breakdown: a saga of corruption, hypocrisy, and government complicity.*

**Home** - **Lists** - **News** - **Forum** - **NON-Imploded** - **I have a Tip** - **Search** - **About** - **Advertise**

## About the Mortgage Lender Implode-O-Meter

### What We Do

The mission of ml-implode.com is *transparency, education, and accountability*. We focus on the housing finance sector, which we believe has become the focal point of extreme distortions in the US economy. These distortions have now obviously (within a year of our founding) transitioned to outright collapse. To use a metaphor that deposed Citigroup CEO Chuck Prince might appreciate, "the music has stopped".

We seek the root causes of this distortion and resulting turmoil (who and what policies were responsible); we seek to document the ripple effects and study broader economic and societal implications; and we seek to determine how to heal the housing sector, the economy, and the country. We also seek to provide a historical record, preserving indefinitely our lists, discussions, and linked articles, so that it might be impossible and inexcusable to forget the debacle that is now unfolding.

**This site is a forum**. We may have our own ideas regarding the above (though our own team does not even agree on everything), but we are here to learn as much as to teach, and wish to foster discussion regarding the issues. All of the primary information on the site is *received*, either from the mainstream media, independent media and bloggers, or (most importantly) people working in the housing finance sector. We add a bit of editorial work to keep the site coherent, but it is a relatively small amount. In other words, we don't make this stuff up. The site belongs to the community of all those who have a burning interest in this area of concern... a group which is beginning to look more and more like "the general public."

### Who We Are

We are a small team of dedicated individuals who care about the housing industry and the economy:

Aaron Krowne : Founder, Publisher, general management, editor-in-chief (owner)
Justin Owings : General management, financials, forum moderation, graphic design, marketing (owner)
Randall Marquis : Senior Editor, Research lead, writing, industry liaison, business development
Bonnie Rabichow : Treasurer, books & office management
Robin Medecke : Research, writing, forum admin/moderation

ML-Implode is owned and operated by a small "virtual corporation" called Implode-Explode Heavy Industries, Inc. ("IEHI"). IEHI is a company we have set up to run the site and similar sites (see "History" below).

### Our Standards

In general we editorially include any factual report or editorial which we feel is credible and/or insightful, with little regard to name recognition or organizational reputation. **We care primarily about content, not reputations or resources**. Any repeat coverage from a particular writer or outlet is more a testament to our appreciation of the content and other incidental factors of our screening than any sort of deference to reputation. As an independent source, we have this luxury.

For company coverage (in "implosion" or "ailing/watch" lists), we like at least 2 out of three of the following to be met:

at least $20M/month in origination volume (any stage of origination)
at least 3 states of operation
at least 50 employees

These are not hard-and-fast standards; we've been known to lower the bar a bit to include "smaller" failing divisions at major companies. Ultimately what matters is whether the implosion is particularly "noteworthy" for some reason. If it appears the public is "interested" in coverage of a particular company, we will likely cover it.

The "ailing/watch" list tends to stay smaller for a number of reasons. One is that the prevailing opinion on a company (or division) tends to be that it is going to survive... until the day it closes down. This is just natural wishful thinking that is exhibited at all levels. Another reason is that *most* companies in the industry are in general distress right now, so we must wait until we receive *specific* information that sets a company apart (on a potential path towards implosion) before listing it. Finally, still-operating companies and units will closely guard any such information, making it difficult to get much more than rumors and hearsay. Plus, even more compelling information might be difficult to post without being sued by a still-operating company (even if not much of it is left).

All leads on companies must be supported by multiple independent sources. We prefer in the following order:

1. communication from the company itself
2. mainstream or industry press coverage (or blog coverage with clear supporting evidence)
3. multiple independent tips from individuals

This is not to say that we don't want reports from individuals; however these are more likely to go into our files and inform our research, as opposed to resulting in an immediate publication per se.

## Complaints

If you have a complaint about any information carried on the site, we reccommend as a first course of action posting to the item or our forum with your concerns, in a level-headed manner. This is the appropriate course of action for any material we have included from elsewhere, whether there is a factual error or argument that you find contentious. If it is wrong, say why it is wrong. As a forum, we do not have the authority to say that someone else's contribution is wrong.

If you have an objection to a lending operation we are (or are not) including in one of our lists, please **email us** with evidence supporting your case (see "Standards"). We are always looking to improve our coverage and our categorization of covered companies. Keep in mind it is impossible to have 100% perfect coverage at any point in time, and your feedback helps us achieve greater accuracy over time.

If you are principal management at one of these companies, please email us at the above address with an official statement of your company's condition that addresses the alleged innaccuracies. We almost always defer to an official statement in the absence of reliable public documentation. **We cannot do anything without further (publishable) information**; and a legal threat or naked assertion does not constitute sufficient information we can use.

## History

This site was founded on January 1, 2007, by Aaron Krowne, a blogger with a computer science and math background and an avid interest in economics and finance. By early to mid 2006, Krowne had come to the conclusion that housing was the "linchpin" of the US economy, but disconcertingly, it appeared to be in a historically unprecendented bubble. When a number of subprime lending companies (including Ownit!) began imploding in fall of 2006, Krowne deemed it the start of a larger wave and deflation of the housing bubble, with likely wider economic impact (including recession).

When the media failed to catch on to the story within a few months, Krowne resolved to do it himself the "blogger" way, and started ml-implode.com as a single web page with six companies listed.

Soon there were dozens of companies, and the site received increasing links from bloggers and newsletter writers. In March, 2006, the site was covered on-air on Bloomberg and CNBC, and traffic exploded to almost 100,000 visitors a day.

Soon after this, the site became a de facto mortgage industry site, as a core following of industry professionals developed to check out the latest of the turmoil on the daily basis. This audience began regularly sending tips and leads, which allowed ml-implode to begin rivalling mainstream and even mortgage industry media in the timeliness and breadth of its coverage.

As 2007 proceeded, the crisis deepened, spreading throughout the US and global banking system. Homeowner distress also continued, with delinquencies and foreclosure skyrocketing. The housing market was clearly in a freefall. By late year, recession was an openly-discussed possibility.

The skeptical, if bearish case ml-implode had been making with its coverage, as well as the implicit

# EXHIBIT D

**From:** WordPress <wordpress@whistleblower.ml-implode.com>
**Subject:** [The Mortgage Whistleblower] Please moderate: "The Penobscot Indian Tribe Down Payment Grants"
**Date:** September 10, 2008 12:21:19 AM PDT
**To:** kraileyus2@aol.com

A new comment on the post #91 "The Penobscot Indian Tribe Down Payment Grants" is waiting for your approval
http://whistleblower.ml-implode.com/?p=91

Author : Christopher Russell (IP: 69.138.30.42 , c-69-138-30-42.hsd1.md.comcast.net)
E-mail : iam_oy@hotmail.com
URL   : http://www.fhadpa.com
Whois  : http://ws.arin.net/cgi-bin/whois.pl?queryinput=69.138.30.42
Comment:
If you are going to throw stones, you shouldn't live in a glass house.

First, you need to immediately remove the word "scam" in connection to the Penobscot Indian Nation.  Your bitter diatribe does not need to include them, they have done nothing wrong nor do they deserve this attack.

Now, let's start with the "secret" testimony of "Mr. House".  His perjured testimony was completely discredited four years ago!!  We were suing Mr Brandon for embezzling over $660,000 when this joke of a hearing took place.  He had attempted to blackmail us for another $250,000, threatening to turn us into the IRS.  Since we did nothing wrong, nor did we do any of the things he accused us of doing, we refused to pay the hush money he was demanding.  As a result, James was able to trick the incompetent, grandstanding Senator Shelby into including him as a witness in that sham hearing.  You should have watched the video, where he testified behind a screen with a voice modulator and two US Marshalls by his side.  The hearing was nothing but political grandstanding and if there was any truth to his accusations, I would have had a visit from the FBI by now.  So, you need to remove your libelous article here.  For your information, I will seek damages, as I have now collected nearly a quarter million from Mr. Brandon so far.  (We allow him to make monthly payments.  I won't be so generous with your "scam" blog.)

I don't have the time or patience to go line by line through every factual error and lie in your article.  Let's just say, you need to remove it or bear the consequences of your actions because you have made repeated "statements of fact" which are untrue and if you had done a shred of investigation, you would know that.  Also, you failed to tell everyone that I readily participated in your joke of an interview.  If you actually cared about reporting the truth, you would have simply asked me about the things you wrote about but since you never asked me a single question about AmeriDream and even acted surprised when I told you I was the Founder of AmeriDream, it's obvious that this is a hit piece written by an amateur hack.

Real and credible news organizations like, the Washington Post, Wall Street Journal, Forbes and others have all investigated this to the nth degree and they never reported the bullshit you are reporting because they found most of it to be gossip and innuendo which was completely untrue.

Incompetent and irresponsible armchair sleuths like you are why the internet is full of lies, half truths and down right bullshit.  Fortunately, our judicial system offers a way for me to seek recompense for the harmed caused by a fraud, such as you.  Spend the money for a good lawyer because I use the best and I am coming after you hard.  I would have answered you truthfully on anything you could have asked me about but instead, you thought you were being so slick with me.  Now, you have reported a bunch of lies and factually false statements which have harmed me professionally and personally.

Approve it: http://whistleblower.ml-implode.com/wp-admin/comment.php?action=mac&c=156
Delete it: http://whistleblower.ml-implode.com/wp-admin/comment.php?action=cdc&c=156
Spam it: http://whistleblower.ml-implode.com/wp-admin/comment.php?action=cdc&dt=spam&c=156
Currently 1 comment are waiting for approval. Please visit the moderation panel:
http://whistleblower.ml-implode.com/wp-admin/edit-comments.php?comment_status=moderated