IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER RUSSELL, et al.

     v.

IMPLODE-EXPLODE HEAVY
INDUSTRIES INC., et al.

                      :    Civil Action No. DKC 08-2468

**MEMORANDUM OPINION**

Presently pending and ready for review in this defamation case is the motion for judgment on the pleadings and for summary judgment filed by corporate Defendants Implode-Explode Heavy Industries, Inc. ("IEHI") and Krowne Concepts, Inc. ("KCI"). (ECF No. 127). The issues have been fully briefed and a telephonic motions hearing was held on September 16, 2013. The court now rules. For the following reasons, the motion will be granted.[1]

---

[1] The parties agree that the complaint will be withdrawn as against Defendant KCI and Penobscot Indian Nation ("PIN") will be removed as a Plaintiff in this defamation action. Krista Railey, proceeding *pro se*, is another Defendant in this action. Corporate Defendants' counsel notes that she remains in default. That is incorrect. Ms. Railey has answered and no default as to her has been entered. (ECF No. 112, at 114). Furthermore, in an earlier opinion, this court held that Plaintiffs did not state a claim on the unfair business practice count and that count four in the complaint seeking injunctive relief did not set forth any cause of action. (ECF No. 112, at 13-14). Plaintiffs stated in an unrecorded teleconference that they are not pursuing those counts.

## I.  Background

### A.  Factual Background

The following facts are undisputed.  Penobscot Indian Nation ("PIN") is a federally recognized Native American Government located in Maine.  PIN created the Grant America Program ("GAP"), which is a national program that "provides low to moderate-income homebuyers with a down payment grant to be used towards the purchase of a home."  (ECF No. 1 ¶ 1). Plaintiff Global Direct Sales, LLC ("GDS"), a Maryland limited liability company with its principal place of business in Maryland, entered into an agreement with PIN whereby Global Direct would "develop, organize, and operate GAP."  (*Id.*). Plaintiff Christopher Russell ("Russell") was the founder and CEO of Ameridream, a not-for-profit seller-funded down payment assistance program ("SFDAP") from 1999 to 2001.  Russell also served as a CEO of GAP, which partnered with PIN, and Plaintiff Ryan Hill ("Hill") was co-owner and CFO of GDS.

GAP works as follows.  From a pool of funds, PIN provides grants to low to moderate-income homebuyers and first-time homebuyers to be used toward down payments.  Prior to closing, the grant is wired to the settlement agent.  At closing, the seller is charged an enrollment fee for enrolling the seller's home in the program.  The enrollment fee replenishes the grant fund pool and "any excess is the property of PIN."  (*Id.* ¶ 25).

The seller must certify that the sale price has not been increased to offset the seller's contribution to GAP.

Defendant IEHI now owns and operates a website called "ml-implode.com" ("the Website").[2]  The Website's mission is "transparency, education and accountability." (*Id.* ¶ 48; *see also* ECF No. 11-16, at 2).[3]  The Website provides that "[t]he site is a forum . . . [IEHI] add[s] a bit of editorial work to keep the site coherent, but it is a relatively small amount." (ECF No. 11-6, at 2).  As of 2007, the Website had a core daily audience of approximately 100,000 visitors.  (ECF No. 1 ¶ 57).

In approximately June 2008, IEHI offered Krista Railey ("Railey") an opportunity to create her own blog on the Website called the "FHA Mortgage Whistle Blower."  (ECF No. 132-3, at 21).  At no point did IEHI employ Railey.  (ECF No. 132-3, Railey Dep., at 33 ("it was just a hobby I was doing . . . community service, so to speak")).  Streamline Marketing, Inc., which is a company unrelated to IEHI, employed Railey at the time of the events in question here.  (ECF No. 18-2 ¶ 4).

Railey was interested in SFDAPs, which is how she learned about Russell, Ameridream, PIN, and GDS.  In June of 2008,

---

[2] KCI owned the website from March 15, 2007 until September 1, 2007, when ownership was transferred to IEHI.  (ECF No. 127-5, at 30-37).

[3] The specific purpose of the Website was "to track what was going on in the housing sector, mortgage lending sector.  And the larger economy."  (ECF No. 109-2, Krowne Dep., at 17).

Railey "began developing a series of stories and information resources on [down-payment assistance programs]." (ECF No. 18-2 ¶ 24). On September 9, 2008, Railey drafted an article entitled "The Penobscot Indian Tribe Down Payment Grants," which she intended to submit for internal review on the Website, but which was inadvertently published on her "Mortgage Whistleblower" blog. (ECF No. 132-4). Shortly after she inadvertently published the original version of the article, Railey received a comment from Russell threatening to sue her for "factual false statements" and "lies" in the article. (ECF No. 18-12, at 2). Among other things, Plaintiffs found the following statements contained in the September 9, 2008 article objectionable: (1) that GAP is a scam; (2) that Russell had a copycat website of Ameridream; (3) that Russell and Hill treated Ameridream like their own personal piggy bank; (4) that the DP Funder program, which Russell and Hill created was another type of seller-funded down payment scam; (5) that the seller contributions to GAP is clearly a concession; (6) that PIN isn't really providing assistance and is merely laundering the down payment for a fee; (7) that Russell and Hill are already working on an alternative scheme through the Down Payment Grant Alliance; (8) that the taxpayers and FHA should not be forced to sponsor continued lending abuse via seller funded down payment grant schemes; and (9) whether the seller funded down payment grants are

administered by non profit companies, for profit companies, or Sovereign Nations, they are still a scam. (ECF No. 1, at 7-8).

Shortly after she received Russell's comments, Railey forwarded them to Krowne and the Website administrators, at which point "the draft article [was] permanently removed from the website." (ECF No. 18-2, at 8). In response, Krowne and Randall Marquis, a contractor for IEHI who worked on advertising, business development, and was the senior editor of the mortgage content on the Website, (ECF No. 109-2, Krowne Dep., at 22), then edited Railey's article, and removed the word "scam" from the article. (ECF No. 18-13, at 2; see *also* ECF No. 132-8, at 27, email exchange between Krowne, Marquis, and Railey, "we have taken the original post down, [Railey] has extensively edited it to 'tone down' the commentary to neutral, and we will not republish until it has been reviewed and ok'd by one of you."). Railey published the revised article on September 15, 2008 on her blog, entitled "What the SFDPA Administrators Don't Want You to Know: Part 1, the Penobscot Indian Tribe Down Payment Grant Program." (*Id.*). Railey "fully researched everything that appeared in both the September 9 draft version and September 15 final version of the article, and both versions included links to supporting materials on which [her] article was based." (ECF No. 18-2 ¶ 31). Railey's research included interviewing Russell, "reading transcripts

from Congressional hearings about Plaintiffs . . . read[ing] articles published in reputable papers such as the New York Times and Forbes Magazine . . . research[ing] website registrations of various websites connected to Global Direct Sales, LLC, Russell, and Hill, and stored information and documents posted to those websites." (*Id.* ¶ 32). She also read reports about "DAPs, FHA insurance, the tax treatment of DAPs, and other related topics, issued by such agencies as HUD, the U.S. GAO and the IRS." (*Id.*). Plaintiffs similarly objected to the content of the revised September 15, 2008 article and consequently commenced this action.

**B.  Procedural Background**

On September 19, 2008, PIN, Global Direct, Russell, and Hill filed a complaint in this court based on diversity jurisdiction asserting the following four causes of action against seven total defendants: (1) defamation; (2) libel; (3) unfair business practice; and (4) injunctive relief. (ECF No. 1). Plaintiffs sought a preliminary injunction to halt publication of the Article (ECF No. 11), but the court denied their motion. (ECF No. 28). Defendants answered the complaint on November 18, 2008. (ECF No. 29).

Three of the original defendants, Aaron Krowne, Justin Owings, and Lorena Leggett, were then dismissed for lack of personal jurisdiction. (ECF Nos. 48, 49). A fourth defendant,

6

Streamline Marketing, Inc. ("Streamline"), was dismissed without prejudice. (ECF Nos. 85, 86). On July 12, 2010, the court denied the remaining Defendants' special motion to dismiss pursuant to Maryland's "anti-SLAPP" statute,[4] Md. Code Ann., Cts. & Jud. Proc. § 5-807, which, in certain circumstances, protects a party's First Amendment rights when reporting on matters within the authority of a government body. (ECF Nos. 92, 93).

On April 27, 2011 and May 9, 2011, counsel for IEHI and KCI filed motions to withdraw as attorneys (ECF Nos. 98, 101), which were granted on May 31, 2011 (ECF No. 104). In its letter-order granting the withdrawal, the court informed IEHI and KCI that, as corporate entities, they must be represented by new counsel; otherwise, they would be subject to default. (*Id.*). When IEHI and KCI failed to respond appropriately within the requisite time period, default was entered against them. (ECF No. 107).

On September 28, 2011, Plaintiffs filed a motion for default judgment against IEHI and KCI. (ECF No. 109). Aaron Krowne filed several documents in an attempt to respond on behalf of the corporate Defendants. (*See* ECF Nos. 105, 110). As corporate entities, however, IEHI and KCI can only be represented by counsel, *see* Local Rule 101.1.a, and Mr. Krowne's filings could not be considered. Nonetheless, Plaintiff's

---

[4] "SLAPP" is short for "Strategic Lawsuit Against Public Participation."

motion was denied on April 9, 2012. (ECF No. 112). On May 15, 2012, Plaintiffs moved for a default judgment as to liability against Defendants IEHI and KCI, for summary judgment, and a permanent injunction. (ECF No. 114). On July 6, 2012, IEHI and KCI, represented by new counsel, filed a motion to vacate the entry of default against them. (ECF No. 117). On January 3, 2013, the court granted Defendants' motion to vacate and denied without prejudice Plaintiffs' May 15, 2012 motion. (ECF No. 121).

Defendants IEHI and KCI filed the instant motion for judgment on the pleadings and for summary judgment on July 1, 2013. (ECF No. 127). Plaintiffs opposed on July 26, 2013 (ECF No. 132) and Defendants replied on August 18, 2013 (ECF No. 135).[5]

## II. Standard of Review

A court may enter summary judgment only if there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may

---

[5] In the reply, Defendants object to certain evidence on which Plaintiffs rely in their opposition. Given the disposition on Defendants' motion, Defendants' objections are now moot.

reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (*quoting* former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Defamation and Libel (Counts I and II)[6]

To state a claim for defamation in Maryland, a plaintiff must plead the following four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the

---

[6] As this court noted in a prior opinion, Plaintiff's defamation and libel counts will be analyzed as asserting a single cause of action. (ECF No. 112, at 7).

statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 402 Md. 191, 198 (2007).[7] All four elements must be met.

The dispositive issue is whether IEHI can be legally at fault for the allegedly defamatory statements made in the September 2008 article that Railey authored. IEHI argues that the Communications Decency Act ("CDA"), 47 U.S.C. § 230, immunizes IEHI from this defamation action. For the reasons set forth below, the court agrees.

**A.   Overview of the CDA**

Recognizing that the Internet provides a valuable and increasingly utilized source of information for citizens, Congress carved out a sphere of immunity from state law claims for providers of interactive computer services to preserve the "vibrant and competitive free market" of ideas on the Internet. 47 U.S.C. § 230(b)(2); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Congress enacted Section 230, in part, as a response to a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995), where an interactive computer service was held

---

[7]   "A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Offen*, 402 Md. at 198-99 (internal quotations omitted).

liable for defamatory comments made by one of its two million users. H.R. Conf. Rep. 458, 104th Cong.2d Sess. 194 (Jan. 31, 1996), 1996 U.S.C.C.A.N. 10, 208 ("One of the specific purposes of [Section 230] is to overrule [*Stratton*] and any other similar decisions which have treated [interactive computer service] providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material."); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (en banc); *Zeran*, 129 F.3d at 331.

To further the policies underlying the CDA, courts have generally accorded Section 230 immunity a broad scope. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). In one of the earliest cases involving the CDA, the United States Court of Appeals for the Fourth Circuit interpreted Section 230(e)(3) to bar all state law claims sounding in tort. *Zeran*, 129 F.3d at 330. The court observed that Congress did not want to "deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Id.* at 330-31. The court went on to state:

> Congress recognized the threat that tort-
> based lawsuits pose to freedom of speech in
> the new and burgeoning Internet medium. The

> imposition of tort liability on service
> providers for the communications of others
> represented, for Congress, simply another
> form of intrusive government regulation of
> speech. Section 230 was enacted, in part,
> to maintain the robust nature of Internet
> communication and, accordingly, to keep
> government interference in the [new] medium
> to a minimum.

*Id.* at 330. Notably, the reasoning in *Zeran* is now accepted by courts across the country, and "[t]he broad reach of the CDA to bar a panoply of torts is supported by other courts that have considered the CDA's reach." *See, e.g., Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *7 (C.D.Cal. May 4, 2011) (collecting cases). Moreover, Section 230 immunity, like other forms of immunity, is generally accorded effect at the earliest point in the litigation because it is otherwise "effectively lost if a case is erroneously permitted to go to trial." *Brown v. Gilmore*, 278 F.3d 363, 366 n.2 (4th Cir. 2002).[8]

---

[8] Although there is some disagreement in the circuits as to whether the statutory bar under Section 230 is an immunity or some less particular form of defense for an interactive computer service provider, the Fourth Circuit clearly views the Section 230 provision as an immunity: "By its plain language, [Section] 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran*, 129 F.3d at 330.

## B. Interactive Computer Service

The CDA bars the institution of a "cause of action" or imposition of "liability" under "any State or local law that is inconsistent" with the terms of Section 230. 47 U.S.C. § 230(e)(3). As relevant here, Section 230 prohibits a "provider or user of an interactive computer service" from being held responsible "as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). Assuming a person meets the statutory definition of an "interactive computer service provider," the scope of Section 230 immunity turns on whether that person's actions also make it an "information content provider."

Section 230(f)(2) defines an "interactive computer service" as any:

> information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

Courts generally conclude that a website falls within this definition. *See, e.g., Nemet Chevrolet, Ltd. Inc.*, 591 F.3d at 255 (consumeraffairs.com, a website allowing computer users to post reviews of businesses and products on it, constitutes an interactive computer service); *Fair Hous. Council of San*

13

*Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 ("Today, the most common interactive computer services are websites."); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ("[W]eb site operators . . . are providers of interactive computer services" because "[a] web site . . . enables computer access by multiple users to a computer server, namely, the server that hosts the web site." (internal quotation marks omitted)); *Batzel v. Smith*, 333 F.3d 1018, 1030 n.16 (9th Cir. 2003) (recognizing that several courts have concluded that a website meets the definition of an "interactive computer service"); *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *6 (N.D.Cal. Oct. 26, 2011) (Yelp, a website allowing computer users to post reviews of businesses and products on it, constitutes an interactive service provider). There is no dispute in this case that "ml-implode.com" is an "interactive computer service" and that individuals who operate the site are "providers" within the meaning of Section 230(c)(1).

## C. Information Content Provider

CDA's grant of immunity applies only if the interactive computer service provider is not also an "information content provider," which is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any

other interactive computer service." *Id.* § 230(f)(3); *see also Carafano v. Metrosplash.com., Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)("Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue."). "While an overt creation of content is easy to identify, determining what makes a party responsible for the 'development' of content under Section 230(f)(3) is unclear, and the CDA does not define the term. Accordingly, courts often look to the totality of the circumstances in making the determination." *Ascentive, LLC v. Opinion Corp.*, 842 F.Supp.2d 450, 474 (E.D.N.Y. 2011). Case law also suggests that "one is responsible for the 'development' of information when he engages in an act beyond the normal functions of a publisher (such as deciding to publish, withdraw or modify third-party content) that changes the meaning and purpose of the content." *See Roommates.com*, 521 F.3d at 1163.

Taken together, CDA's provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties. *Nemet Chevrolet, Ltd.*, 591 F.3d at 254. Plaintiffs contend that "[b]y its terms, the grant of immunity found in Sections 230(c)(1) and (2) applies only if the interactive computer service is not also an 'information content

provider,' (ECF No. 132, at 24) but indeed an entity *can* be both an 'interactive computer service' and an 'information content provider.'" *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (*en banc*). "The critical issue is whether . . . [the interactive computer service] acts as an information content provider with respect to the information" at issue. *Carafano*, 339 F.3d at 1125 (citation and quotation marks omitted).[9] Put differently, through Section 230, Congress established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them. *Nemet Chevrolet, Ltd.*, 591 F.3d at 254. If the computer service provider only passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. *Hare v. Nik Richie, et al.*, 2012 WL 3773116, at *15 (D.Md. Aug. 29, 2012) ("[i]n passing Section 230, Congress sought to spare interactive computer services . . . by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete" (*quoting Roommates.com, LLC*, 521 F.3d at 1165)). Unlike information

---

[9] In this regard, Plaintiffs' reliance on an earlier Order from Superior Court of the State of California is misplaced. (ECF No. 132-2, at 2). The Superior Court's rejection of defendants' CDA argument *in that case* is inconsequential to whether this immunity applies to the facts before this court.

providers such as newspapers, magazines or television and radio station – all of which may be held liable for publishing or distributing defamatory material written or prepared by others - Congress explicitly decided to treat interactive computer services differently. As the Fourth Circuit explained in its touchstone decision in *Zeran v. America Online, Inc.*, Section 230 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred." *Zeran*, 129 F.3d at 330. It is "immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 n.8 (9th Cir. 2009). For example, "an editor's minor changes to the spelling, grammar, and length of third-party content do not strip him of [S]ection 230 immunity." *Fair Housing Council*, 521 F.3d at 1170.

In this case, whether IEHI is entitled to immunity under Section 230(c)(1) turns on whether it acted as an information content provider with respect to the alleged defamatory communication at issue – the September 2008 article. Applying the above principles to the undisputed evidence, IEHI is not an

"information content provider" under Section 230 with respect to the alleged defamatory article and is thereby immune from suit.

First, Plaintiffs do not claim that IEHI created or authored either the September 9, 2008 version of the article, or the revised September 15, 2008 version. It is undisputed that Railey authored both the September 9, 2008 and September 15, 2008 articles (ECF No. 1 ¶ 5; *see also* ECF No. 132-10 ¶ 3). In fact, the complaint plainly states that "Defendant Railey individually and/or through . . . Streamline Marketing wrote and published the untrue and defamatory article." (ECF No. 1 ¶ 51). Streamline Marketing is unrelated to IEHI, a point which Plaintiffs do not dispute. Furthermore, Plaintiffs assert that "[t]he commentary and content of the untrue and defamatory article are attributable to Krowne and Owings as author(s) *of the website*." (*Id.* ¶ 47) (emphasis added). Krowne's and Owings's ownership of the website in and of itself, however, does not subject IEHI to liability for an allegedly defamatory article that a third-party, Railey, authored. Holding IEHI liable for mere control of the website on which allegedly defamatory content was published is precisely the type of conduct that falls squarely within the protections of the CDA. *See, e.g., Nemet Chevrolet, Ltd.*, 591 F.3d at 259 (upholding CDA immunity because "[t]here is nothing but [plaintiff's] speculation which pleads Consumer-affairs.com's role as an

actual author in the Fabrication Paragraph"); *see also Zeran*, 129 F.3d at 331 ("[i]nteractive computer services have millions of users . . . [t]he specter of tort liability in an area of such prolific speech would have an obvious chilling effect"). In fact, IEHI maintains that it "did little more than provide a canvas upon which third parties placed material." (ECF No. 127, at 19). Specifically, IEHI asserts that Railey wrote about a topic of public interest and IEHI merely provided a forum for her to do so. (*Id.*).[10] It is undisputed that Railey was not IEHI's employee; instead, she maintained a blog on Defendant's website called the "FHA Mortgage Whistle Blower," on which she posted the September 2008 article. (ECF No. 18-2, at 2); *see Bobolas v. Does 1-100*, 2010 WL 3923880, at *2 (D.Ariz. Oct. 1, 2010) ("the [Communications Decency] Act does provide that GoDaddy cannot be held liable for defamatory statements made by bloggers").

On that score, even though Plaintiffs assert that the September 2008 article (either the initial or final version) was a "joint effort" between Railey and IEHI, Krowne testified that the "joint effort" was in creating Railey's blog portion of the Website, *not* the allegedly defamatory article. (ECF No. 109-2,

---

[10] Railey developed an interest in down-payment assistance programs ("DAP") from "HUD's attempts to shut down seller-funded DAPs and the DAP providers' attempts to protect them." (*Id.* at 7).

at 32). In fact, after Plaintiff Russell complained about the initial version of the article, which Railey explains she intended to have reviewed internally *before* publication, Krowne wrote to Railey that he didn't have the time to "look into this case" and advised her that if *she* thought it was worth pursuing, he "would recommend getting an investigative journalist to do an 'assist' on the story." (ECF No. 117-1, at 10). This is consistent with Krowne's other communications with Railey regarding the article. For instance, on September 10, 2008, in response to Railey's question of whether [Krowne] wanted to "remove the blog entry or just the word 'scam,'" Krowne asked if Railey thought there were any factual weaknesses in what *she* wrote and further stated that since he did *not* "do the investigation . . . [he didn't] have a good sense of whether [the article was] worth defending." (ECF No. 132-8, at 3).

Plaintiffs maintain, however, that IEHI worked with Railey as a content provider because it was "intimately involved in developing and creating the article." (ECF No. 132, at 23). Plaintiffs conclude that "[t]he facts prevent IEHI from simply putting its hands up and blaming an independent blogger." (*Id.* at 25). Plaintiffs assert that Railey received direct input from Krowne, that Marquis performed research and that drafts were exchanged, and IEHI had the last say on what was published. (ECF No. 132, at 4-5). Plaintiffs, however, attempt to hold

IEHI liable for decisions related to monitoring and publication of content on its network – "actions quintessentially related to a publisher's role." *Green v. America Online*, 318 F.3d 465, 471 (3rd Cir. 2003) (upholding immunity for the transmission of defamatory messages and a program designed to disrupt the recipient's computer because Section 230 proscribes liability where interactive computer service merely promulgates harmful content or fails to address certain harmful content on its network); *Ben Ezra, Weinstein, & Co. v. America Online, Inc.*, 206 F.3d 980, 985-86 (10th Cir. 2000) (upholding immunity for the online provision of stock information even though AOL communicated frequently with the stock quote providers and had occasionally deleted stock symbols and other information from its database in an effort to correct errors).

Nowhere does the record suggest that IEHI contributed to the alleged defamatory piece in a way that rose to the level of an "information content provider" under Section 230. After Russell objected to Railey's publication of the September 9, 2008 article, which she inadvertently posted, Railey followed up with "additional verifications and revisions" and then posted the final article on September 15, 2008. (ECF No. 18-2 ¶ 30). Indeed, under Section 230(c), "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity *regardless*

of the specific editing or selection process." *Carafano*, 339 F.3d at 1124 (emphasis added). Thus, Railey's statement that "Mr. Krowne and Randall Marquis of IEHI and Krowne were the editors of the article before it was published" does not defeat IEHI's immunity under Section 230(c) given the Fourth Circuit's broad pronouncement in *Zeran* - and later courts' acceptance of the standard set forth therein - that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or *alter content* – are barred." *Zeran*, 129 F.3d at 330 (emphasis added). Thus, even assuming Krowne edited or altered the content of the allegedly defamatory article, IEHI would still be immune under the law of the circuit in which this court sits.

The evidence indicates that Krowne was not completely uninvolved with the allegedly defamatory article, but his involvement was limited to editorial work, which is insufficient to transform IEHI into an "information content provider" with respect to the allegedly defamatory September 2008 article. (*See* ECF No. 127-4 ¶ 32, Krowne Decl.) ("[a]t no time did I, or to my knowledge any IEHI staff, ever directly change, or cause to be changed, any portion of Railey's article about Plaintiffs (either the preliminary or final versions), with the exception of 'the header' which [Krowne] placed into the article text in

July 2011, directing visitors to the 'retraction/rebuttal' provided by Russell and Railey."). Krowne's review included "some corrections," but in large part he thought it was "a solid piece . . . [and did not] . . . suggest[sic] any substantial changes to it." (ECF No. 109-2, at 55); *see Nemet Chevrolet, Ltd.*, 591 F.3d at 258 (finding that plaintiff failed to plead facts to show any alleged drafting or revision by the website was "something more than a website operator performs as part of its editorial function"). In Railey's own words, she "fully researched everything that appeared in both the September 9 draft version and September 15 final version of the article, and both versions included links to supporting materials on which [her] article was based." (ECF No. 18-2 ¶ 31). Railey's retrospective doubts about the article's integrity *after the fact* are immaterial to IEHI's responsibility. (ECF No. 132-10 ¶ 6, Railey Decl., "I believe there are significant problems with the final published article. I believe that the article contains and implies false statements of fact and is misleading in a material manner").

Nor do Plaintiffs suggest that IEHI's control over the alleged defamatory article exceeded editorial functions – it is IEHI's involvement as an editor to which Plaintiffs attempt to attach liability – albeit to no avail. Defendant's mere agreement with the content of the article does not give rise to

liability for defamation. *See S.C. v. Dirty World, LLC*, 2012 WL 3335284, at *4 (W.D.Mo. Mar. 12, 2012) (holding that "merely encouraging defamatory posts is not sufficient to defeat CDA immunity."); *see also Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929, 933 (D.Ariz. 2008) (holding that operator of consumer review website entitled "Ripoff Report" was entitled to Section 230(c)(1) immunity and stated that, although it was obvious that a website entitled Ripoff Report encourages the publication of defamatory content, there was "no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site"); *Zeran*, 129 F.3d at 330 (narrow construction of the CDA would frustrate the statute's intent by discouraging service providers from voluntarily regulating third-party contributions to their websites).

Plaintiffs point to *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008), as the leading Ninth Circuit case on the scope of the CDA, but that case involved factual circumstances distinguishable from those here. Whereas the website in *Roommates.com* arguably required users to input illegal content as a necessary condition of use, there is no evidence on the record that IEHI structured its website to require bloggers or

24

individuals leaving commentaries to input illegal content as a condition of using the Website. *Roommates.com*, 521 F.3d at 1164. Even though Plaintiffs argue that IEHI monitored what Railey wrote about as a blogger, "a service provider's exercise of its editorial prerogatives as to information from another content provider does not transform the service provider into the content provider under [Section] 230." *Jane Does v. Friendfinder Network, Inc.*, 540 F.Supp.2d 288, 297 (D.N.H. 2008); *see also Batzel*, 333 F.3d at 1030-1032 (holding that an online newsletter was an "interactive computer service" but that its administrator was not an "information content provider" of a third-party's allegedly defamatory e-mail message even though the administrator selected, lightly edited, and published its contents).

Based on the foregoing, Plaintiffs' defamation (and libel) claims against IEHI are barred by the CDA.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant IEHI will be granted. A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
